UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Armando Alonso, et al. | § § | |
| Plaintiffs, | § § | |
| *versus* | § § | Civil Action No. B-04-005 |
| Agrigenetics, Inc., et al. | § § | |
| Defendants. | § § | |

**REPLY TO DEFENDANT PABLO MARTINEZ'S
RESPONSE TO PLAINTIFFS' MOTION TO COMPEL**

Plaintiffs' hereby submit this reply in response to Defendant Pablo Martinez' response to Plaintiffs' Motion to Compel.

## I. GENERAL REPLY TO MR. MARTINEZ' RESPONSE

**A. Mr. Martinez can afford to hire an attorney but he chooses not to.**

Defendant Pablo Martinez argues in his response to the motion to compel that since he is a pro se defendant, the Court should find that it would be an undue burden for him to completely and straightforwardly answer discovery and that he should therefore be excused from complying with the rules of discovery. In making this argument, Mr. Martinez implies that he is appearing pro se because he cannot afford to hire an attorney; however, Mr. Martinez has not submitted any evidence showing that he is appearing pro se because he is indigent, and the record evidence shows otherwise.

In regards to Mr. Martinez' financial ability to hire an attorney, in 2002, the year the claims in this case arose, Mr. Martinez recruited and supervised a crew of almost 70 workers to work for Agrigentics, and in the month of July 2002 Mr. Martinez was paid

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 1 of 7

over $120,000 for the detasseling work that was performed by this crew in that month. (See Exhibit A DEF 0035; and Exhibit B, MYC39). In addition to having substantial income, Mr. Martinez also owns various properties and other businesses. For example, Mr. Martinez owns at least one house in Mercedes Texas that he uses as a base to recruit workers, another house in Belle Glade, Florida where Mr. Martinez is believed to reside, and a store in Belle Glade, Florida. Since Mr. Martinez' status as a pro se defendant appears to be by choice, and not by financial necessity, Mr. Martinez should be required to comply with the Federal Rules of Procedure governing discovery.

> **B.   Mr. Martinez should be required to comply with the Federal Rules of Procedure because he understands the Federal Rules of Civil Procedure as well as most attorneys or he is receiving assistance from an attorney.**

Mr. Martinez also argues that he should be excused from complying with the rules of discovery because he is appearing pro se. However, the discovery responses and pleadings submitted by Mr. Martinez indicate that he either understands the rules of procedure as well as most attorneys or that he is receiving behind the scenes assistance from an attorney. For example, Mr. Martinez has filed an answer to the complaint, and while the answer is deficient because it is a general denial, it is properly formatted and it otherwise meets with the technical requirements of the local rules of procedure. Also, in responding to discovery Mr. Martinez exhibited the legal training to assert various technical objections, the documents he produced are Bates stamped, and he has also shown the ability to draft and timely submit a response to Plaintiffs motion to compel. The level of legal knowledge exhibited by Mr. Martinez is puzzling in light of the fact that in appearing in a similar proceeding pending in another district court, Mr. Martinez could not participate without the participation of an interpreter. See, minute entries

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 2 of 7

attached as Exhibit C. Thus, Mr. Martinez either possesses the skill to follow the rules of procedure and evidence or he is receiving behind the scenes assistance from an attorney.[1] Therefore, Mr. Martinez should be required to comply with the rules of procedure and the rules of evidence.

## II.   REPLY TO SPECIFIC PORTIONS OF MR. MARTINEZ' RESPONSE

### A. Defendant did not produce any documents with his responses to Plaintiffs' Requests for Production.

Contrary to Defendant's assertion, not a single document was attached to Defendant's responses to Plaintiffs' requests for production. Plaintiffs sent Defendant a letter, a copy of which was attached to their motion to compel as Exhibit C, that asked Defendant to send all responsive documents. Defendant sent nothing. Plaintiffs did not receive documents Bates numbered DEF 0001-0092 until September 23, 2004 when they were served with Defendant's Response to Plaintiffs' Motion to Compel.

### B. Defendant's objections to the requests for production are improper as documents from years prior to 2002 are relevant.

Defendant asserts that he properly objected to requests for documents from years other than 2002 because that is the year at issue in this lawsuit. Plaintiffs have set forth in detail in their motion to compel and previously in their letter to Defendant (Exhibit C to that motion) their position that documents from years other than 2002 are relevant. Defendant does not respond Plaintiffs position, but only flatly states that information

---

[1]   Counsel for Agrigenetics has stated that he has assisted Mr. Martinez by filing for him "*pro se*" answers in this and similar cases pending in McAllen. Counsel for Agrigenetics has stated that he is simply providing a typing service for Mr. Martinez, however. If Mr. Martinez is receiving behind the scenes assistance from Agrigentics, Plaintiffs are entitled to know this because Agrigentics is trying to shield itself from liability by claiming that Mr. Martinez is solely responsible for any claims alleged by the Plaintiffs. See generally Agrigentics Answer to Plaintiffs' Original Complaint.

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 3 of 7

from prior or subsequent years are not relevant. As they are relevant for the reasons previously explained by Plaintiffs, the Court should order Defendant to respond to Requests for Production Nos. 10, 11, 12, 13, 20, 42, and 50.

Defendant also lists Rule 26(b)(2)(iii) factors the Court should consider in determining whether a request is proper. Defendant then simply states that all five favor the Defendant. Defendant provides no explanation of how the factors apply to him or to the case. Defendant also fails to recognize that the five factors it identified are not the only factors the Court should consider. For example, Defendant ignores the factors listed in Rule 26(b)(2)(i) and (ii). Considering all the factors outlined in Rule 26, the Plaintiffs' discovery requests are proper and the Defendant is required to respond.

Rule 26(b)(2)(i) favors Plaintiffs because the discovery sought is not unreasonably cumulative or duplicative and it is not obtainable from some less burdensome source. Plaintiffs are not asking Defendant to reproduce documents already produced by Agrigenetics, but he can identify the documents that are responsive to the requests.

Rule 26(b)(2)(ii) favors Plaintiffs because they have not had ample opportunity by discovery to obtain the information sought. The discovery that is the subject of the motion to compel is the first round of discovery propounded by Plaintiffs. Defendant offers himself for deposition as an alternative. Plaintiffs intend to take his deposition, but should not have to limit themselves to that one form of discovery. Indeed, Defendant's failure to fully answer their discovery makes it difficult for Plaintiffs to prepare for depositions and limits the documents that they can use at depositions.

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 4 of 7

Finally, all the factors listed in Rule 26(b)(2)(iii) favor Plaintiffs. First, the discovery sought is essential to Plaintiffs' case. Plaintiffs need the information sought is necessary for Plaintiffs to determine liability among the Defendants. As the information is essential to Plaintiffs' case, the importance of the proposed discovery factor weighs in favor of Plaintiffs. Second, the burden and expense for Defendant to provide, for instance, pay records that he is required to keep by the Fair Labor Standards Act, 29 U.S.C. § 211, and by agreement with Defendant Agrigenetics (agreement attached as Exhibit D, at page MYC 10) does not outweigh the benefit to Plaintiffs. Third, the relative resources of the parties also favor Plaintiffs as they are indigent migrant farmworkers and Defendant is one of their employers who owns at least one business and at least two homes. Finally, the importance of the issues at stake in the litigation also weighs in favor of Plaintiffs. Congress has recognized that migrant farmworkers are particularly vulnerable group of people and enacted the Agricultural Worker Protection Act, the act central to this suit, to protect them.

C. **Defendant has not fully responded to Plaintiffs' interrogatories.**

Defendant claims that several of Plaintiffs' interrogatories contain multiple discrete subparts so that Plaintiffs have propounded more than 25 interrogatories. Defendant adds that nevertheless, he has answered them to the best of his ability. Plaintiffs have not exceeded this limit and Defendant has not given any specific explanation of how Plaintiffs have exceeded the 25-interrogatory limit. In any event, Defendant did not raise this objection when responding to Plaintiffs' discovery requests. Therefore, he cannot now raise this objection.

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 5 of 7

Defendant also does not respond to the detailed description of how his responses are inadequate and how his objections are unfounded. Plaintiffs set forth their argument in great detail in a letter to Defendant attempting to resolve this discovery dispute.

Defendant's assertion that he has nevertheless answered to the best of his ability is not compelling as many of his responses are plainly not answered to the best of his ability. Interrogatory No. 2, for instance asks Defendant for his job title and job duties. His answer gives his title, but provides no job duties.

Defendant, for the reasons set forth by Plaintiffs in the motion to compel, should be ordered to fully and completely answer the interrogatories at issue without objection.

### III.   CONCLUSION

For the reasons set forth above and in their motion to compel, Plaintiffs ask that the relief sought in that motion be granted.

Respectfully submitted,

*[signature]*

Nathaniel Norton
Texas Bar No. 24037196
S.D. No. 33422
TEXAS RIOGRANDE LEGAL AID, INC.
300 South Texas
Weslaco, TX 78596
Tel. 956-968-9574
Fax. 956-968-8823
Attorney-in-Charge for Plaintiffs

Rodolfo D. Sanchez
Texas Bar No. 17572100
S.D. No. 12600
TEXAS RIOGRANDE LEGAL AID, INC.
300 South Texas
Weslaco, TX 78596
Tel. 956-968-9574
Fax. 956-968-8823

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 6 of 7

Co-Counsel for Plaintiffs

CERTIFICATE OF CONFERRAL

I hereby certify that I, Nathaniel Norton, have in good faith conferred with Defendants Martinez and Martell and with Counsel for Defendant Agrigenetics, Frank Hill in an effort to resolve the disputes at issue in Plaintiffs' Motion to Compel, but the parties were unable to reach an agreement.

_____
Nathaniel Norton

CERTIFICATE OF SERVICE

I hereby certify that on September 29th, 2004, a true and correct copy of the foregoing document with attached exhibits was served on Defendants as listed below by first class U.S. mail.

Frank L. Hill
Thompson & Knight
98 San Jacinto Blvd., Ste. 1900
Austin, TX 78701

Eugene Martell                    U.S. Mail and cm/rrr: 7002 2330 0005 5901 8299
620 N. Nevada St.
Weslaco, TX 78596

Pablo Martinez                    U.S. Mail and cm/rrr: 7002 2030 0005 5901 8282
c/o Country Store
1800 E. Canal St.
Belle Glade, FL 33430

_____
Nathaniel Norton

Reply to Defendant Pablo Martinez's
Response to Plaintiffs' Motion to Compel
Page 7 of 7

| # | | | | | | # | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|   |   | 31 |     |     |   | 49 |   | 31 | 53 | 50 |   |
|   |   | 31 | 105 | 105 |   | 50 |   | 31 | 53 | 40 | – pendiente |
|   |   | 31 | 105 | 45  |   | 51 |   | 31 | 105 | 80 |   |
|   |   | 31 | 105 | 105 |   | 52 |   | 31 | 70 | 60 |   |
| ? |   | 31 | 105 | 105 |   | 53 |   | 31 | 105 | 105 |   |
| ? |   | 31 | 105 | 105 |   | 54 | 26 | 47-18 | 70 | 95 |   |
| ? |   | 31 | 105 | 45  |   | 55 | 26 | 47-18 45-41 | 70 | 80 |   |
|   |   | 31 | 105 | 105 |   | 56 | 26 | 47-18 60-24 | 50 | 54 |   |
| 12 |  | 31 | 105 | 105 |   | 57 | 26 | 47-18 60-24 | 50 | 54 |   |
| 13 |  | 31 | 105 | 45  |   | 58 | 26 | 47-18 60-24 | 50 | 54 |   |
| 14 |  | 31 | 105 | 45  |   | 59 | 26 | 47-18 60-24 | 50 | 54 |   |
| 15 |  | 31 | 105 | 70  |   | 60 | 26 | 47-18 | 50 | 23 | ← 118 45 |
| 16 |  | 31 | 105 | 105 |   | 61 |    | 48 | 105 | 50 |   |
| 17 |  | 31 | 105 | 70  |   | 62 |    | 31 | 105 | 50 | $7.00 |
| 18 |  | 31 | 50  | 105 |   | 63 | 48 | 60-24 | 112 | 126 | $12.00 |
| 19 |  | 31 | 105 | 105 |   | 64 |    | 48 | 112 | 126 | $12.00 |
| 20 |  | 31 | 70  | 70  |   | 65 |    |    | 52 | 15 |   |
| 21 |  | 31 | 105 | 80  | ← | 66 |    | 11 |    |    |   |
| 22 |  | 31 | 70  | 80  |   | 67 |    | 11 |    |    |   |
| 23 |  | 31 | 105 | 60  |   | 68 |    | 31 | 105 | 126 | five checks |
| 24 |  | 31 | 105 | 105 |   |    |    |    |    |    |   |
| 25 |  | 31 | 84  | 50  |   |
| 26 |  | 31 | 84  | 50  |   |
| 27 |  | 31 | 84  | 50  |   |
| 28 |  | 31 |     | 60  | ← |
| 29 |  | 31 |     | 60  | ← |
| 30 |  | 31 |     | 60  | ← |
| 31 |  | 11 |     |     |   |
| 32 |  | 31 | 72  | 105 |   |
| 33 |  |    | 60  |     |   |
| 34 |  | 11 |     |     |   |
| 35 |  | 31 | 90  | 50  |   |
| 36 |  | 31 | 70  | 40  |   |
| 37 |  |    | 52  |     | ←$6.50 |
| 38 |  | 11 |     |     |   |
| 39 |  | 31 | 70  | 40  |   |
| 40 |  | 31 | 70  | 40  |   |
| 41 |  | 31 | 70  | 40  |   |
| 42 |  | 31 | 70  | 40  |   |
| 43 |  | 31 | 105 | 70  |   |

PLAINTIFF'S EXHIBIT

DEF 0035

Mycogen Seeds Oquawka          309-867-3092          08/25/04  02:22P  P.002

Final

| Field # | Name | Gross Acres | Gross Fertile Acres | Fertile Female Acres | Sterile Female Acres | Total Female Acres | Male Acres | Contractor | First Pass | Second Pass | Rate / Acre | Paid / Acre | Total Due | Paid | Left for Settlement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TC2101 | M&K | 180.9 | 83.10 | 66.48 | 71.12 | 137.60 | 43.30 | Pablo | 7/18/2002 | | 160.00 | 100.00 | 10,636.80 | 6,648.00 | 3,988.80 |
| TC2102 | Morris | 98.6 | 44.00 | 35.20 | 38.72 | 73.92 | 24.68 | Pablo | 7/15/2002 | | 150.00 | 175.00 | 5,280.00 | 6,160.00 | -880.00 |
| TC2103 | Morris | 54.2 | 48.40 | 38.72 | 0.00 | 38.72 | 15.48 | Pablo | 7/18/2002 | | 155.00 | 175.00 | 6,001.60 | 6,776.00 | -774.40 |
| TC2104 | TBL | 117.2 | 111.40 | 89.12 | 0.00 | 89.12 | 28.08 | Pablo | 7/24/2002 | | 135.00 | 100.00 | 12,031.20 | 8,912.00 | 3,119.20 |
| TC2105 | Mark Torr | 181.8 | 150.90 | 120.72 | 0.00 | 120.72 | 41.08 | Pablo | 7/24/2002 | | 135.00 | 100.00 | 16,297.20 | 12,072.00 | 4,225.20 |
| TC2106 | Stan Torra | 254.7 | 247.00 | 197.60 | 0.00 | 197.60 | 57.10 | Pablo | 7/20/2002 | | 145.00 | 100.00 | 28,652.00 | 19,760.00 | 8,892.00 |
| TC2107 | Mark Torr | 69.4 | 33.40 | 26.72 | 25.20 | 51.92 | 17.48 | Pablo | 7/25/2002 | | 150.00 | 100.00 | 4,008.00 | 2,872.00 | 1,336.00 |
| TC2108 | M&K | 307 | 141.10 | 112.88 | 115.44 | 228.32 | 78.68 | Pablo | 7/18/2002 | | 150.00 | 100.00 | 16,932.00 | 11,288.00 | 5,644.00 |
| TC2114 | Callahan | 148 | 140.90 | 112.72 | 0.00 | 112.72 | 35.28 | Pablo | 7/22/2002 | | 160.00 | 100.00 | 18,035.20 | 11,272.00 | 6,763.20 |
| TC2120 | Callahan | 24.4 | 23.50 | 18.80 | 0.00 | 18.80 | 5.60 | Pablo | 7/25/2002 | | 145.00 | 100.00 | 2,728.00 | 1,880.00 | 848.00 |
| | | | | | | | | Pablo | 818.96 | | | | | | |
| | | | | | | | | | | | Totals | 120,800.00 | 87,440.00 | 33,160.00 |
| | | | | | Paid Per Acre | 147.26 | | Rogueing | 1,190.10 | | | | | | |
| | | | | | | | | Detasselling | 120,600.00 | | | | | | |
| | | | | | | | | Bus | 1,465.00 | | | | | | |
| | | | | | | | | Van | 1,000.00 | | | | | | |
| | | | | | | | | Worker Comp | 8,142.00 | | | | | | |
| | | | | | | | | Paid | 87,440.20 | | | | | | |
| | | | | | | | | Settlement | 23,742.90 | | | | | | |


PLAINTIFF'S EXHIBIT B

HONORABLE RICARDO H. HINOJOSA, JUDGE PRESIDING

United States District Court
Southern District of Texas
FILED

SEP - 9 2004

Michael N. Milby, Clerk

COURTROOM CLERK: Sylvia S. Martinez
ELEC REC OPER: Tony Tijerina
LAW CLERK:
INTERPRETER: Cindy De Pena (used as to Deft. P. Martinez)
CONVENE  pm        ADJOURN    pm        DATE: September 9, 2004

---

CIVIL ACTION NO. M-04-230

JUAN ORTIZ, et al.                       COUNSEL:   NATHANIEL NORTON

v.

AGRIGENETICS, INC.                       COUNSEL:   FRANK HILL
dba Mycogen Seeds
PABLO MARTINEZ                           PRO SE
EUGENE MARTELL                           PRO SE

---

## MINUTES OF HEARING

Case is called on the docket. The Court GRANTS the oral request of Mr. Hill to appear in this case. Mr. Hill states he will be filing his timely answer by September 15, 2004. There are possible settlement negotiations ongoing as to Plaintiffs and Deft. Agrigenetics, Inc. Mr. Pablo Martinez and Mr. Eugene Martell state they are proceeding pro se. The Court notes there is no joint discovery/case management plan that has been filed. The Court sets a Initial Pretrial and Scheduling Conference for October 7, 2004 at 2:30 p.m.

PLAINTIFF'S EXHIBIT C

**HONORABLE RANDY CRANE, U. S. DISTRICT JUDGE PRESIDING**
Courtroom Clerk: Ludi Cervantes
Electronic Court Recording Operator: Richard Cortez
Interpreter: Beatriz Guzman, *Elena Medrano (used)*
Law Clerk: Samantha Snyder, Dennis Windscheffel
DUSM/Court Security Officer: Zapata
Time Set: 9:30 A.M.
Convene / Adjourn: *9:49 - 9:53* / 10:24 / 10:48-10:57 A.M.

United States District Court
Southern District of Texas
FILED

SEP 0 9 2004

Michael N. Milby, Clerk

DATE: **SEPTEMBER 9, 2004**

CIVIL CASE NO. __M-04-229__

| | | |
|---|---|---|
| **BALTAZAR MORALES, ET AL** | ) | Nathaniel Norton |
| | ) | |
| vs | ) | |
| | ) | |
| **AGRIGENETICS, INC.** | ) | Frank Hill |
| dbaMycogen Seeds, | ) | |
| | ) | |
| **PABLO MARTINEZ** *(Interpreter used)* | ) | Pro Se |

### INITIAL PRETRIAL AND SCHEDULING CONFERENCE

*The Court announces to all counsel in the courtroom, that the Court has implemented electronic filing. The Court encourages counsel to familiarize themselves with the process and the recent local rule adopting electronic filing. The Court further announces that the Court will not hand out orders today, but counsel will be electronically noticed or mailed any orders the Court enters.*

Case is called on the docket. All counsel announce their presence. Also present is Pro Se Defendant Pablo Martinez. The Court recesses briefly, to allow time to locate a court interpreter.

The Court recalls the case and the hearing resumes with all present. The Court provides interpreting services for Mr. Martinez. The Court addresses counsel as no one has answered and no joint case management plan has been filed. Counsel announce they have an agreement to extend the answer date.

Page 1 of 2

Civil Action No. M-04-229  Continuation - Initial Pretrial and Scheduling Conference
Morales vs Argigenetics  SEPTEMBER 9, 2004

The Court directs counsel and the defendant to file a joint case management plan in the next few days. The Court addresses counsel about the other two similar cases and encourages counsel to conduct discovery for all three cases at the same time. Counsel announce that once they conduct some discovery, they anticipate discussing settlement on all the cases. Mr. Hill indicates he will assist Mr. Martinez and files an answer, as a courtesy, for the pro se defendant. The Court encourages Mr. Martinez to retain counsel. The Court will issue a scheduling order setting a trial date for August 2005. A copy of the order will be provided to all counsel and to the Pro Se Defendant, Mr. Martinez, at 1800 E. Canal Street, Belle Glade, Florida 33430, address confirmed by the Court. Counsel announce they will file the joint case management plan.

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is entered into and made effective as of the 28 day of June, 2002, by and between Agrigenetics, Inc., d/b/a Mycogen Seeds ("Company") whose address is 101 Elm St P.O. Box 180 Gladstone, IL 61427 AND _Pablo Martinez_ Contractor") whose address is _1800 E. Canal St. Belle Glade, FL 33430_ and whose Social Security or Employee Identification Number is listed with such Contractor's signature at the end of this Agreement.

The Contractor and Company hereby agree as follows:

1. **Contractor's Services and Responsibilities:**

    A. **Services.** Contractor, individually or through individuals selected by Contractor (its "Personnel") will provide each and every service to Company contracted for hereunder in accordance with the items checked (collectively the "Services"), by August, 15, 2002.

    ☒ **Roguing** - All rogues or off-type plants will be removed from within and between seed corn rows. Rogues or off-type plants which are different in height, color, shade of leaves, leaf blade width, silk color, shape of tassel, etc. will also be removed. These rogues will be completely cut off at the soil surface. The roguing work will not be complete until Company's inspector has given his or her approval that such work is satisfactory and complete.

    ☒ **Full Pull Detasseling** (No Machines)- All tassels from plants within the designated female rows, including tassels on tiller/sucker plants, will be pulled as they emerge and before shedding pollen. Contractor and its Personnel may be required to detassel on rainy days, Sundays, and holidays. Two or more trips through the field are necessary to pull all the tassels. The detasseling work will not be complete until Company's inspector has given his or her approval that such work is satisfactory and complete. Contractor and its Personnel will complete the detasseling work so as not to unduly injure or mutilate the plants by breaking stalks or pulling an excessive number of leaves.

    ☒ **Cleanup Detasseling** (After Machines)- All tassels or part tassels that remain from plants after detasseling machines have covered the designated female rows, including tassels on tiller/sucker plants, will be pulled as they emerge and before shedding pollen. Contractor and its Personnel may be required to provide such services on rainy days, Sundays, and holidays. Two or more trips through the field are necessary to pull all the tassels. The cleanup detasseling work will not be complete until Company's inspector has given his or her approval that such work is satisfactory and complete. Contractor and its Personnel will complete the cleanup detasseling work as not to unduly injure or mutilate the plants by breaking stalks or pulling an excessive number of leaves.



PLAINTIFF'S EXHIBIT D

MYC 9

*Independent Contractor Agreement*

Contractor warrants that the Services will be performed (1) in a competent and professional manner and (2) by individuals who are fully qualified to perform them.

B. **Location of Services.** Contractor agrees to perform the Services checked in Section 1A on approximately 800 acres, located in Henderson & Mercer Counties, State of Illinois.

C. **Compliance with Laws.**

1. If recruiting or hiring any migrant or seasonal workers, Contractor and each of its Personnel will obtain and maintain, if required by law, a valid Farm Labor Contractor Certificate of Registration ("Certificate"), as those terms are defined in 29 U.S.C. $1811 (the "Migrant and Seasonal Agricultural Worker Protection Act"), covering recruiting, hiring, housing, transportation, and other activities for which such a Certificate is required. Contractor warrants and represents that he has complied with all requirements under the laws of the United States and any state where such Certificates are required and that all persons engaged on his behalf in the soliciting, recruiting, hiring, employing, furnishing, or transporting of any worker pursuant to this Agreement have complied with all applicable licensing and registration requirements. If Contractor is subject to farm labor contracting licensing and certification requirements, attached hereto as Exhibit A are photocopies of Certificates issued by the United States Department of Labor for the Contractor and any other persons engaged in activities on Company's behalf pursuant to this Agreement for which Certificates are required. Contractor is using and will at all times use only employees in Contractor's workforce who are authorized to work in the United States.

2. Contractor will comply with all applicable Federal, State and local laws in performing its obligations under this Agreement, including, but not limited to, the Federal Wage and Hour Standards for Farmworkers, the Migrant and Seasonal Agricultural Worker Protection Act, the Fair Labor Standards Act, the Occupation Safety and Health Administration Field Sanitation Standards, any applicable state minimum wage and maximum hours standards. When recruiting workers to work for Contractor on the Company's property, Contractor will, as required by law, provide and read aloud to each such worker a worker disclosure document of the terms and conditions of their employment, in a form substantially in the form attached to this Agreement as Exhibit B and will obtain a signed and dated acknowledgment from each and every such worker stating that the worker received and reviewed the disclosure document. Contractor will provide to Company a copy of the signed and dated disclosure document for each worker. Contractor agrees to make no representation regarding the terms and conditions of the worker's services under this Agreement other than as described in the worker disclosure statement.

3. Contractor will, at all times, be in full and complete compliance with the employment verification procedures mandated by the Immigration Reform and Control Act of 1986, as amended, as to each of Contractor's Personnel who, at any time, provide services to Company hereunder, including, without limitation, completion and execution of I-9 Forms. Contractor represents that Contractor has complied with all of Contractor's obligations under this Section with respect to any Personnel who have already been retained by Contractor. Contractor agrees to

MYC 10

*Independent Contractor Agreement*

indemnify the Company for any damages, penalties or other liability, including attorney's fees, arising out of Contractor breaching this Section 1.C.

    D. **Transportation.**

        1. <u>Generally</u>. Contractor will be solely responsible for transporting itself and any of its Personnel, including all costs associated with that transportation. In providing transportation to any Personnel who are migrant or seasonal workers, as those terms are defined in the Migrant and Seasonal Agricultural Worker Protection Act, Contractor will, to the extent required by law, comply with the requirements of the Migrant and Seasonal Agricultural Worker Protection Act and its regulations, including, but not limited to, the requirements for certification, driver and vehicle safety, and insurance.

        2. <u>Use of Company-Leased Vehicles</u>. Contractor may request, in Contractor's sole discretion, to provide transportation to its Personnel performing the Services through certain buses leased by the Company that may be made available to Contractor for this purpose (the "Leased Buses"). To make use of any Leased Buses, Contractor must sign and return to the Company a copy of the "Mycogen Leased Vehicle Requirements" letter, attached hereto as <u>Exhibit D</u> and receive Company authorization prior to using the Leased Buses. Company reserves the right to refuse or revoke authorization to Contractor to use the Leased Buses at any time. Contractor's use of the Leased Buses shall be subject to all of the terms and conditions specified in <u>Exhibit D</u>, including without limitation that Contractor shall be responsible for all costs and expenses associated with Contractor's use of the Leased Buses.

        3. <u>Indemnification for Transportation Services</u>. Contractor will be liable and hold harmless Company from any and all claims, damages or liabilities, including attorney's fees, arising from the transportation of Contractor and/or Contractor's Personnel to and from Company's fields including, but not limited to, transportation on the Leased Buses.

    E. **Safety Training.** Contractor will provide management of the Personnel performing the Services, including training in all levels of field leadership, the Company's policies with regard to safety (including Workers' Protection Safety), and first aid, in accordance with Company policies and Environmental Protection Agency regulations.

    F. **Record-keeping.** Contractor will provide proper record-keeping for all of its Personnel including names, addresses, social security numbers, W-4 forms, days and hours worked, OSHA records, worker' compensation records, proper tax withholding, payment of FICA and unemployment taxes, and end of the year W-2 forms. Contractor will, upon request, provide copies of those records to the Company at least once per month. Contractor will maintain those records for at least three (3) years following the end of each season of work under this Agreement.

    G. **Rules and Regulations.** Contractor will be familiar with and responsible for enforcing Company's Temporary Agricultural Employee Safety Regulations, Field Safety Rules, and Hazard Communication Program.

*Independent Contractor Agreement*

  H. **Quality of Personnel.** All individuals selected by Contractor as Personnel to perform the Services shall bring sufficient useful skills and experiences to the Services as to be able to perform them in a competent and satisfactory manner. Without in any way assuming responsibility for any Personnel, Company reserves the right to approve or disapprove (including the right to withdraw such approval at any time) the assignment of any individual to perform the Services. Contractor shall cause all such Personnel performing Services under this Agreement to execute a Contractor Personnel Agreement, a copy of which is attached hereto as <u>Exhibit C</u>, prior to performing any such Services.

  I. **Independent Contractor.** Contractor and each of its Personnel will be an independent contractor and not an employee, agent or representative of Company. Therefore, Contractor assumes all legal responsibility as the provider of the Personnel contributing to the performance of the Services, including (a) responsibility for payment of wages and other compensation, if any, due such Personnel and (b) compliance with all applicable Federal, state, and local tax requirements, including withholding of taxes, related to performance of Services by Contractor and its Personnel. Furthermore, Contractor and each of its Personnel shall not be considered to be Company's employees, under common law or otherwise, and shall not be entitled to participate in any plans, arrangements, or distributions by Company pertaining to or in connection with any benefit available to employees of Company. Accordingly, Company shall not withhold any taxes, including federal, state, and local income taxes, and FICA and FUTA tax on amounts paid to Contractor or its Personnel in exchange for their performance of Services, nor shall Company provide worker's compensation insurance on behalf of Contractor or its Personnel. No prior course of dealing between Company and Contractor shall be of any effect to modify in any respect the status of Contractor under this Agreement as an independent contractor. Any provision in this Agreement which may appear to give Company the right or ability to direct Contractor or its Personnel as to the means or details of doing the work or performing the Services or to exercise a measure of control over the work or Services shall mean only that Contractor and its Personnel shall follow the desires of Company in the results of the work or Services. Contractor has sole and exclusive responsibility for and control over the daily means by which Contractor and its Personnel fulfill the obligations under this Agreement.

2. <u>**Indemnification and Insurance**</u>

  A. **Indemnification by Contractor.** Contractor agrees to indemnify and defend Company, its parents, Affiliated Companies (defined as any company that directly, or through one of its intermediaries, controls or is controlled by, or is under common control with, Company), and their respective officers, directors, employees and agents, from and against any and all claims, demands, suits, causes of action in law or in equity, expenses (including court costs and reasonable attorneys fees), and liability of any nature on account of (1) any actual or alleged damage or destruction of property or the environment, injury or death of its Personnel, agents, contractors, invitees, or visitors related in any way to Contractor's or its Personnel's performance of Services under this Agreement, unless such damage or destruction, injury, or death is caused solely by the Company's negligence or

MYC 12

*Independent Contractor Agreement*

intentional misconduct, and (2) Contractor's breach of any obligation to Company under this Agreement.

    B.    **Indemnification by Company.** Company agrees to indemnify and defend Contractor and its officers, directors, Personnel, and agents, from and against any and all claims, demands, suits, causes of action in law or in equity, expenses (including court costs and reasonable attorneys fees), and liability of any nature on account of any actual or alleged damage or destruction of property or the environment, injury or death of persons, or action of any federal, state or local governmental agency arising out of (1) any negligent act or omission or intentional misconduct on the part of Company, its officers, employees, agents, contractors, invitees or visitors in conjunction with the performance of the Services under this Agreement by Contractor and its Personnel; or (2) breach of any obligation of Company under this Agreement.

    C.  **Insurance Provided by Contractor.**

        1. <u>Worker's Compensation</u>.

        (a) Contractor represents that Contractor carries any and all Workers' Compensation insurance that is legally required to perform Contractor's obligations under this Agreement.

        (b) If Contractor carries Workers' Compensation insurance, Contractor will (i) provide Workers' Compensation insurance for Contractor and all Contractor's Personnel and supervisory Personnel in accordance with the laws of the State where the Services are to be performed and which shall have the minimum limits as required by applicable state law; and (ii) provide Company with a Certificate of Insurance as proof of such insurance.

        (c) If Contractor is not required by applicable State law to provide Workers' Compensation insurance, Contractor assumes all responsibility for costs or losses associated with medical treatment and loss of wages in connection with Contractor, its Personnel, agents, contractors, invitees, or visitors related in any way to the performance of the Services by Contractor and its Personnel under this Agreement.

        2. <u>General Liability Insurance</u>.

        (a) Contractor shall furnish and maintain throughout the course of the Agreement Commercial General Liability insurance, including contractual liability and personal injury liability coverage, with combined single limits of not less than $1,000,000 for each occurrence.

        (b) If Contractor breaches Contractor's obligation to carry Commercial General Liability insurance of the type and in the amounts described in paragraph (a) above, Contractor assumes all responsibility for costs associated with loss or damage related in any way to its or its Personnel's performance of Services under this Agreement which would otherwise be covered by such insurance.

MYC 13

*Independent Contractor Agreement*

        3. Automobile Liability Insurance. If driving while performing Services under this Agreement the Contractor will maintain automobile liability insurance on each and every unit of automobile equipment, whether owned, non-owned, hired, operated, or used by Contractor and/or its Personnel in the performance of Services under this Agreement covering injury, including death, and property damage, in an amount not less than $300,000 as a combined single limit per occurrence. This Section 2.C.3 shall not apply to Contractor's election to use the Leased Buses under Section 1.D. of this Agreement.

        4. Additional Insurance Requirements. Contractor shall abide by the following additional insurance requirements: insurance policies (except for any Worker's Compensation Insurance under Subsection 2.C.1 above) shall name the Company as an additional insured. All such insurance policies shall be endorsed to provide that the insurer may not have any right of subrogation against the Company. All such insurance shall be primary and non-contributing with respect to any insurance carried by the Company. All such insurance to be provided by Contractor shall be endorsed to provide that at least 30 days' prior written notice shall be given to the Company in the event of cancellation or material change in the policies. Contractor shall waive any right of recovery against the Company for loss or damage covered by such insurance. Contractor shall provide the Company with a certificate of insurance, properly executed by the insurance carrier, showing all such insurance to be in force and effect

3.    **Payment for Services**. Company will pay Contractor upon work completed to the satisfaction of Company and in compliance with the terms of this Agreement as follows:

    A. **Detasseling** - Contractor will remove at least 99.5% of the female tassels at a base rate of $175.00/female acre, with deductions from the base rate at $5/acre for each 10% of the acreage that is machine cut/pulled. Example: if 60% of the acre is machine cut/pulled, $30/acre will be deducted from the base rate.

    B. **Roguing:**

        (i)    Base rate of $ 7.00 /gross acre for the first pass.

        (ii)    Base rate of $ 6.00/gross acre for second pass.

        (iii)    Late Male roguing: $ 3.00

        Base rate of $/gross acre.

*Independent Contractor Agreement*

All authorizations by Company of Services to be performed shall be narrowly construed. Payment by Company for Services or expenses not previously approved or agreed to by Company in writing (by inclusion in Section 1.A. or otherwise) shall be at Company's sole discretion.

   C. **Loan Advances.** Should Company advance to Contractor any loan of funds for start-up expenses in conjunction with Contractor's provision of the Services, such loan shall be documented by the execution by Contractor of a promissory note in substantially the form attached hereto as Exhibit E.

   D. **Offset for Amounts Owed to Company.** Contractor understands and agrees that any amounts owed by Contractor to the Company under this Agreement or in connection with the provision of the Services, including without limitation under Sections 1.D.2 or for repayment of a loan advance under Section 3(C), shall be set off against and deducted from any payments due to Contractor under this Section 3. In addition, in the event the amounts due to Company from Contractor exceed the payments due to Contractor under this Section 3, Contractor shall make full payment of any such amounts due to Company by certified check or money order within fifteen (15) days of Contractor's receipt of documentation by Company of the amounts owed by Contractor to Company.

4.   **Termination.**

   A. If Company determines in good faith that the work required of Contractor hereunder cannot be completed by Contractor on or before the date set forth in Section 1A, Company has the option of terminating this Agreement as to that particular field and assigning that field to another contractor. In such an event, this Agreement will remain in full force and effect as to the remaining Services.

   B. Company can terminate this Agreement in its entirety at any time and will be obligated to pay Contractor only the reasonable value of Contractor's services prior to termination.

   C. Termination of this Agreement will not relieve a party from any obligation hereunder accrued prior to termination.

   D. Contractor may terminate this Agreement upon providing 30 days advance written notice to Company.

5.   **Governing Law.** All subject matter and venue will be governed by and subject to the laws of the State of Indiana, without reference to any choice-of-law rules.

6.   **Miscellaneous.** This Agreement encompasses all the understandings of the parties as to the subject matter herein and supersedes all prior agreements, whether oral or in writing. Only a writing, signed by both parties, may operate to amend this Agreement. This Agreement and the obligations and rights hereunder are not assignable by the Contractor. Except as specifically authorized in this Agreement, no portion of these Services may be subcontracted out by Contractor for performance by

MYC 15

*Independent Contractor Agreement*

any third party. A failure to enforce the terms of this Agreement shall not operate as a waiver of any subsequent breach.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

"COMPANY"                                      "CONTRACTOR"

AGRIGENETICS, INC.,
d/b/a Mycogen Seeds

By: _____         By: _____
                                                                   [Signature]

Name:      James A Sheriff            Name: Pablo Martinez
                                                                   [Print Name]

Its: Field Activities Work Process Coordinator     SS or EIN#: _____