1
2          UNITED STATES DISTRICT COURT
3          SOUTHERN DISTRICT OF TEXAS
4             BROWNSVILLE DIVISION
5
           Civil Action No. B-04-005
6
7   Armando Alonso, et al.,
8          Plaintiffs,
9   -vs-
10  Agrigenetics, Inc., et al.
11         Defendants.

12
13  VIDEOTAPED DEPOSITION OF PABLO MARTINEZ
14
15        Tuesday, December 21, 2004
             9:06 - 6:11 p.m.
16
17      515 N. Flagler Drive, Suite 200-P
         West Palm Beach, Florida 33401
18
19
20
21  Reported By:
    TERESA WHALEN, RPR
22  Notary Public, State of Florida
    Esquire Deposition Services
23  West Palm Beach Office Job # 692170
    Phone:  800.330.6952
24       561.659.4155
25

---

1
2                 - - -
              E X H I B I T S
3                 - - -
4   NUMBER      DESCRIPTION        PAGE

5   Ex. No. 1  Pay information 2001         37
6   Ex. No. 2  ADP payroll information      44
7   Ex. No. 3  Answers to interrogatories   54
8   Ex. No. 4  Independent contractor agreement  67
9   Ex. No. 5  Department/Labor form (Spanish)  75
10  Ex. No. 6  Department/Labor form (bilingual) 107
11  Ex. No. 7  Final tabulations            108
12  Ex. No. 8  Contract labor agreement     114
13  Ex. No. 9  Safety guidelines            116
14  Ex. No. 10 Letter dated 5/7/03          116
15  Ex. No. 11 Mycogen field information    118
16  Ex. No. 12 Workers' comp. insurance     119
17  Ex. No. 13 Picture of fields            136
18  Ex. No. 14 Pictures of posters          145
19  Ex. No. 15 Contract labor agreement     143
20  Ex. No. 16 Insurance application        143
21  Ex. No. 17 Working days/hours           141
22  Ex. No. 18 FLC cards                    144
23
24
25

---

1  APPEARANCES:
2  On behalf of the Plaintiff:
3     RODOLFO D. SANCHEZ, ESQUIRE
       NATHANIEL C. NORTON, ESQUIRE
4     TEXAS RIOGRANDE LEGAL AID, INC.
       FARM WORKER DIVISION
5     300 S. Texas Boulevard
       Weslaco, Texas 78596
6
7  On behalf of the Defendant:
8     FRANK L. HILL, ESQUIRE
       THOMPSON & KNIGHT
9     98 San Jacinto Boulevard, Suite 1900
       Austin, Texas 78701
10
   ALSO PRESENT:  Eugene D. Martell
11               Nubia Richman (Spanish translator)
12       I N D E X
13 WITNESS:              PAGE
14 PABLO MARTINEZ
15 Direct By Mr. Sanchez          4
16 Cross By Mr. Hill            136
17 Redirect By Mr. Sanchez      157
18 Recross by Mr. Hill          161
19 Further Redirect By Mr. Sanchez   164/169
20 Further Recross By Mr. Hill      168/170
21
22
23
24
25

---

                                    Page 4

1           P R O C E E D I N G S
2                  - - -
3        Videotaped deposition taken before TERESA
4  WHALEN, Registered Professional Reporter and Notary
5  Public in and for the State of Florida at Large, in
6  the above cause.
7                  - - -
8        (Thereupon, Nubia Richman was sworn as the Spanish
9  translator.)
10       Thereupon,
11         (PABLO MARTINEZ)
12 having been first duly sworn or affirmed, was
13 examined and testified via the interpreter as
14 follows:
15         DIRECT EXAMINATION
16       THE WITNESS:  I swear.
17 BY MR. SANCHEZ:
18    Q.  Good morning, Mr. Martinez.
19    A.  Good morning.
20    Q.  I'm going to go over a few things to try to
21 make this go faster than yesterday.
22    A.  Very well.
23    Q.  But it may be a little slower because we're
24 using an interpreter.
25       The first thing is, since we're using an

EXHIBIT A

**Page 5**

1  interpreter, I understand you speak some English,
2  right?
3     A.  The English I speak is from work, because I'm
4  dedicated to the fields.
5     Q.  Well, that's going to be very important,
6  then, Mr. Martinez -- well, the reason I'm asking this
7  is because since we have an interpreter, I'd like you
8  to wait for the interpreter to translate my question,
9  that way we know you understood the question I asked.
10  Is that okay?
11     A.  Yes. Very well.
12     Q.  Also, if you can wait for me to finish my
13  question before giving an answer, would you agree to do
14  that?
15     A.  Yes.
16     Q.  Also, if you can answer verbally instead of
17  nodding your head or shaking your head, because we have
18  a court reporter taking down your testimony.
19     A.  Very well.
20     Q.  Can you think of any reason, Mr. Martinez,
21  why you can't give full, complete, and accurate
22  testimony this morning?
23     A.  The words at this end, why?
24     Q.  Well, for example, are you taking any
25  medication this morning that might make you drowsy?

**Page 6**

1     A.  No.
2     Q.  Can you think of any other reason like that
3  that would affect your ability to testify accurately
4  and truthfully this morning?
5     A.  No. I'm just going to say the things. I
6  don't feel there is any crime, so I don't have a reason
7  why.
8     Q.  Okay. Mr. Martinez, have you ever given your
9  deposition before?
10     A.  If I gave it to him?
11     Q.  No. Just have you ever been in a proceeding
12  like this where you've raised your hand to tell the
13  truth and you've had to answer questions like this?
14     A.  Yes.
15     Q.  Have you ever been a defendant in another
16  lawsuit?
17     A.  No.
18     Q.  What sort of proceeding did you give your
19  deposition testimony in before?
20     A.  For a traffic violation.
21     Q.  Have you ever testified in court?
22     A.  They had chosen me as a juror.
23     Q.  But you've never testified in court?
24     A.  Just for the traffic and related to that, but
25  not for other problem.

**Page 7**

1     Q.  Could you please state your full name.
2     A.  Pablo Martinez de la Cruz.
3     Q.  What is your current address, Mr. Martinez?
4     A.  1800 Canal Street, Belle Glade.
5     Q.  Do you have a home phone number,
6  Mr. Martinez?
7     A.  Yes. It's 992-7801.
8     Q.  What's your date of birth, Mr. Martinez?
9     A.  8/26/55.
10     Q.  You understand that this morning that you're
11  sworn to tell the truth, correct?
12     A.  Correct.
13     Q.  Do you read -- excuse me. Do you read or
14  write in English, Mr. Martinez?
15     A.  The most minimum, one or two simple things
16  that I have learned.
17     Q.  Do you ever read an English paper?
18     A.  No. I try, because I want to retain
19  something, like things like tomorrow, tomorrow, today,
20  things that you need along the way.
21     Q.  Do you also own a house in Mercedes, Texas?
22     A.  Yes.
23     Q.  What's the address for that property?
24     A.  Route One, Box 47-B, Mercedes, Texas.
25     Q.  Do you live in that property on a part-time

**Page 8**

1  basis?
2     A.  When I finish job with the company here,
3  which is May, I go there for two or three months.
4     Q.  So probably for the months of May, June, and
5  part of July?
6     A.  May I finish my job here, I stay here one or
7  two weeks, like fixing up the machinery that the
8  company ask me to do, and then I go.
9     Q.  Do you consider yourself to be a resident of
10  Texas or Florida, or some other states?
11     A.  Well, because I spend most of my time and
12  work here because the company is here, but I consider
13  my home Texas.
14     Q.  Are you building another house in Texas?
15     A.  Yes. Built, I finished it.
16     Q.  So you have two houses in Texas?
17     A.  I have a little house, small house where I
18  used to live, and the new -- the bigger house, the one
19  I built.
20     Q.  And then you have a house here in Florida?
21     A.  (Witness shook head from side to side.) I
22  live in the company property.
23     Q.  Do you run a business called The Company
24  Store here in Florida?
25     A.  Yes.

Page 9

1    Q.  Is that store -- do you own that building, or
2  is it on company property?
3    A.  No.  I rent it.  The company doesn't have
4  anything to do with it.
5    Q.  So you don't rent it from the company?
6    A.  No.
7    Q.  Do you live in that same building where the
8  store is at?
9    A.  I have the trailer with the company, the
10  company has a trailer where I live.  But I have worked
11  so much that I sometimes have an apartment above the
12  store to sleep.
13    Q.  And the store and the apartment, that's 1800
14  Canal Street, correct?
15    A.  Correct.
16    Q.  And the trailer, is that at that same
17  address, or is it some other address?
18    A.  No.  That's like three or four miles away.
19    Q.  Do you know the address for the trailer?
20    A.  Duda Road, D-U-D-A Road.
21    Q.  And that's for your employment with Duda
22  Onions, or Duda Farms?
23    A.  Duda is the name of the company, right.  I
24  have it here.  I got thirty years working with the
25  company.  Would you like to check my records?

Page 10

1    Q.  Mr. Martinez, you handed me a card that has
2  your picture on it, and it says A. Duda and Sons, Inc.,
3  and it has your name, Pablo Martinez, and it has a
4  Social Security number of 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, and it says --
5  is that your Social Security number?
6    A.  The one that's there?
7    Q.  Yes.  The one I just read.
8    A.  Yes.
9    Q.  And it says department, celery field.
10    A.  Uh-huh.
11    Q.  What is this card used for?
12    A.  When you get to the people for the payroll,
13  everybody has to show their card, that is the property
14  of the company.
15    Q.  What do you do for Duda and Sons?
16    A.  Right now I'm like a supervisor that checks
17  all the jobs -- and the fields.  (In English).
18    Q.  This is seasonal-type employment, right?
19    A.  Of the season, yes.
20       THE INTERPRETER:  The interpreter makes a
21  clarification.  When I say seasonal, he uses a
22  different word, "temporada" instead of "estacion,"
23  so it's seasonal.
24  BY MR. SANCHEZ:
25    Q.  You've had this seasonal employment for

Page 11

1  thirty years?
2    A.  Thirty years, yes.
3    Q.  What's your seasonal work schedule?
4    A.  5:30 in the morning, and there is no time in
5  the afternoon.  It could be eight o'clock at night,
6  nine, five o'clock in the afternoon.
7    Q.  What I meant by the season is what months out
8  of the year do you work with A. Duda and Sons?
9    A.  This job, this year they gave me from
10  September to May; my responsibility is the lettuce
11  department.
12    Q.  From the beginning of September until the end
13  of May, or --
14    A.  May 10th.
15    Q.  Has it always been like that for the last
16  thirty years, or have you had a different monthly sort
17  of work schedule?
18    A.  Thirty years ago I started with the little
19  plants, cleaning it up, then I made an effort and kept
20  going to where I am now.
21    Q.  But this period of employment you expect it
22  to go from September 2004 to May 2005, correct?
23    A.  Correct.
24    Q.  And what is your period of employment with
25  Duda?

Page 12

1    A.  More or less the same.
2    Q.  So 2003 you more or less worked from
3  September 2003 to May 2004, correct?
4    A.  Correct, more or less.  Two or three weeks
5  before or after, I don't remember.
6    Q.  So it could have been mid August to almost
7  June, or could it have been October to the end of
8  April?
9    A.  That's a very good question.  It all depends.
10  The weather is the one that sets it all, and God is the
11  one that -- you know, the growing of the --
12    Q.  You already worked 2003 and 2004, so I'm just
13  trying to get what you remember the period of
14  employment to be.
15    A.  Yes.  It's the same dates, from August of
16  2003 to 2004, it's the same.
17    Q.  And in 2002 it would also be the same, August
18  or September until May of 2003?
19    A.  Yes.
20    Q.  Has it been like that for the last ten years?
21    A.  Correct.
22    Q.  Earlier you said that you worked from 5:30 in
23  the morning when you work with Duda, and it could be
24  anywhere from eight or nine at night.
25    A.  Yes.

3 (Pages 9 to 12)

**Page 13**

1    Q.  Is it that sort of -- that amount of hours
2  throughout that whole period of employment, or is there
3  a slack -- is there a time where there is less work?
4    A.  Yes.  It varies.  I worked the lettuce.
5  California had all their lettuce frozen, so Florida has
6  lettuce, so you've got to cut it.
7    Q.  Are there periods of time on a regular basis
8  where you have from August or September to May where
9  you have weeks off?
10   A.  Christmas, and Saturday and Sundays sometimes
11  there's no market, so you don't cut.
12   Q.  Do you have a regular daily weekly work
13  schedule?
14   A.  They have weeks -- that word I don't
15  understand.
16      THE INTERPRETER:  May I clarify which word he
17  doesn't understand?
18      MR. SANCHEZ:  I'll just rephrase the
19  question.
20  BY MR. SANCHEZ:
21   Q.  Do you work seven days a week?
22   A.  No.  Like I told you, it all depends on the
23  market.  They say Pablo, I got market, and I have
24  fifty, you have to cut them.
25   Q.  For that work that you do for Duda, do you

**Page 14**

1  supervise a crew of workers?
2    A.  Yes.
3    Q.  Are these workers that you locate, or are
4  these workers that are hired directly by Duda?
5    A.  Employed by Duda.
6    Q.  During the months when you're not working for
7  Duda:  June, July, and August, okay, do you work during
8  those months also?
9    A.  No.  Just the time that I work with the
10  company, three weeks.
11   Q.  In the summer of -- in July of 2004, you
12  worked with Mycogen, right?
13   A.  Not July and August.  I started in June.
14  Like say the second week of June, the second week of
15  August.  It all depends on the weather.
16   Q.  But I'm talking about this last summer.  And
17  I just want to know what period of time you worked for
18  Mycogen this last summer, 2004.
19   A.  It's like I told you, from the second week in
20  June -- I'm not sure, I would have to check the
21  papers -- through the first week of August.
22   Q.  What papers would you check to get that
23  information?
24   A.  The payrolls that I got, that I did.
25   Q.  Payroll records that you kept for yourself?

**Page 15**

1    A.  Yes.
2    Q.  Are those records that you have at your
3  house?
4    A.  Yes.
5    Q.  So what work did you do for Mycogen from
6  approximately the second week of June 2004 to
7  approximately the second week of August, 2004?
8    A.  The thing that we're talking about, taking
9  the -- detasseling the corn.
10   Q.  Now, the actual detasseling work in the
11  fields, when did that occur in 2004?
12   A.  Like I told you, I'm not going to tell you
13  lies, the exact dates, I don't remember.  It could have
14  been the second week in June when I started the job, or
15  it could have been a few days early, it depends on the
16  papers.
17   Q.  Your recollection is you don't recall when
18  you were actually out in the fields detasseling in
19  2004?
20   A.  I don't remember.  I'm not going to tell
21  lies.
22   Q.  In 2003 did you do work for Mycogen during
23  the summer?
24   A.  The same dates.
25   Q.  And the same work?

**Page 16**

1    A.  Yes.
2    Q.  In 2002, did you do that same work for
3  Mycogen during the summer?
4    A.  Yes.
5    Q.  In 2003 did you do any work for Mycogen in
6  the corn sorting?
7    A.  Yes.
8    Q.  When did that corn sorting work take place in
9  2003?
10   A.  Well, I don't remember the date.
11   Q.  Is it before or after the detasseling?
12   A.  No.  That's when the corn ages that you have
13  to take it out.
14   Q.  So it's part of the harvest?
15   A.  Yes.
16   Q.  And the harvest is typically in September and
17  October, correct?
18   A.  Correct.
19   Q.  And in 2003, in September and October, you
20  were in Florida working for Duda and Sons, right?
21   A.  This last year, yes.
22   Q.  So how did you work for Mycogen in the
23  sorting in 2003, if you were in Florida?
24   A.  Because you take the people to the company,
25  because the company is the one that pays, then I take

4 (Pages 13 to 16)

**Page 17**

1  the people and then what do you call it, the ones that
2  pick the harvest and they were sorting and they're
3  working, and the company is paying them. They measure
4  the time, count the time, I don't take care of taking
5  their time, measuring their time.
6      Q.  In 2003 while those workers are working for
7  Mycogen, Mycogen is paying you for the work they do,
8  right?
9          MR. HILL:  Objection as to form.
10         THE WITNESS:  Yes.  The contract says that --
11     I don't remember the contract, but when I take the
12     people over in the contract, it says what is given
13     to me.
14  BY MR. SANCHEZ:
15     Q.  And when you work for Mycogen in the
16  detasseling --
17     A.  Yes.
18     Q.  -- can you describe how that's different from
19  when you work with Mycogen in the sorting?
20     A.  The difference from sorting to detasseling?
21     Q.  No.  Just your role in that process.
22     A.  Mine?
23     Q.  Yes.
24     A.  Yes.  Because in detasseling they pay me by
25  the acre.

**Page 18**

1      Q.  And in the sorting?
2          THE INTERPRETER:  May the interpreter ask for
3      a repetition?  There is something I missed.
4          MR. SANCHEZ:  I can translate.
5          THE INTERPRETER:  Okay.  Thank you.
6          MR. SANCHEZ:  He says that in the sorting
7      they pay him by the hour for each of the workers
8      that works.
9          THE INTERPRETER:  There was a word I missed.
10         THE WITNESS:  I don't remember exactly what
11     they pay me, but they pay me so much per person,
12     because there is no acreage or anything, because
13     it's just purely hourly rate.
14  BY MR. SANCHEZ:
15     Q.  Are there any other differences that you are
16  aware of in your role as working in detasseling and
17  working in the sorting?
18     A.  Yes.  It's different.
19     Q.  Tell me the differences.
20     A.  The difference is the one that you were
21  talking about, they pay me by hour, and this other one
22  they pay me by acre.
23     Q.  Anything else you can think of?
24     A.  No.
25     Q.  Mr. Martinez, what's the highest level of

**Page 19**

1  education that you've had?
2      A.  Sixth.
3      Q.  Here in the US?
4      A.  In Mexico.
5      Q.  Can you tell me who Jim Sheriff is?
6      A.  It's the boss of the company where we go
7  there.
8      Q.  Mycogen?
9      A.  Yes.
10     Q.  Do you know a gentleman by the name of
11  Mike Zecher, Z-E-C-H-E-R?
12     A.  Mike?
13     Q.  Zecher.
14     A.  Well, I'm not going tell you lies either, I
15  know a Mike, but I don't know the last name.
16     Q.  Do you know a Mike who works with Mycogen?
17     A.  Yes.
18     Q.  The Mike that you're referring to, what does
19  he do?
20     A.  Well, he is like a boss of the company, he
21  just goes around and he says hello.
22     Q.  When you're detasseling, is he a Mycogen
23  employee who goes and checks the fields?
24     A.  Jim?
25     Q.  Jim Sheriff.

**Page 20**

1      A.  Yes.  This is the one that I know that goes
2  around with me all the time.
3      Q.  Do you know what sort of duties the Mike that
4  you're referring to does?
5      A.  The truth, I don't know.  I know he has a
6  position in the company, but the actual business, I
7  don't know.
8      Q.  The Mike that you're referring to, do you
9  have much interaction with him when you're detasseling
10  for Mycogen?
11     A.  With that person Mike?
12     Q.  Yes.
13     A.  No.
14     Q.  Do you know a gentleman by the name of
15  Kenny Stevens?
16     A.  I know the man, but I don't know the last
17  name.  I know the Kenny, the Kevin, but I don't know
18  the last name.
19     Q.  The gentleman you know as Kenny, is he
20  employed with Mycogen, as far as you know?
21     A.  Yes.
22     Q.  Do you know what Kenny does for Mycogen?
23     A.  Supervise the fields.  And he says there is a
24  field forty miles away, give me the address, okay.  I
25  follow him, talk to this one and that one.

Page 21

1    Q.  During the detasseling season do you have
2  much interaction with Kenny?
3    A.  The truth is, I go with the corn and I look
4  how they are doing. I say hi, and the truth, I have
5  very little contact with him.
6    Q.  Do you know if either Jim Sheriff or the Mike
7  you mentioned or the Kenny that you mentioned speak
8  Spanish?
9    A.  Mike talks like a little bit.  Like I
10  speak -- like what I know about English, he knows about
11  Spanish.
12    Q.  How about Kenny?
13    A.  No.  He says adios to me, good-bye.
14    Q.  How about Jim Sheriff?
15    A.  Same.  Tacos and adios, and good-bye.  It's
16  big.
17    Q.  He never tells you hello?
18    A.  Yes.  Hello.
19    Q.  Do you know a woman by the name of
20  Maria Flores?
21    A.  Yes.
22    Q.  Does Ms. Flores work with you during the
23  summers?
24    A.  Yes.
25    Q.  What does Ms. Flores do?

Page 22

1    A.  Okay.  When we get to Texas, she prepare the
2  forms, she gets the books ready, she gave the -- writes
3  down the names, the different rows.  Each bed has a
4  number, 47, 48.  In the afternoons, she stays and
5  puts -- and puts the numbers on the fields for the next
6  day.
7    Q.  So Ms. Flores works with you in Texas and she
8  has some duties in Texas, right?
9    A.  When the company send me the contract to go
10  up there, then she start working with me.
11    THE INTERPRETER:  Excuse me.  I need a
12  repetition.  The interpreter needs a repetition.
13    THE WITNESS:  Now, when Maria starts, she
14  stays three weeks with me, because nobody wants to
15  work for three weeks, so she starts in her
16  position, her job, paperwork, write down frames,
17  all that.  Because my work is inside the field
18  making sure that people are doing what, you know,
19  checking that they're doing what they have to do.
20  BY MR. SANCHEZ:
21    Q.  I'm just trying to understand, just to be
22  clear.  So Ms. Flores does work for you in Texas, and
23  then she travels with you to Iowa or Illinois and works
24  with you up there, right?
25    A.  Yes, she goes there.

Page 23

1    Q.  And you said Ms. Flores, when she's in Texas,
2  that she helps you fill out different types of
3  paperwork, to prepare different forms, right?
4    A.  Well, she has to do some work for me, so I
5  have to ask her -- I have a yard there that needs
6  something, I have to give her some work, she has to do
7  some work for me, so I ask her what, you know.
8    Q.  So she does yard work and paperwork and
9  miscellaneous sort of work for you in Texas; is that
10  what you're saying?
11    A.  Change the -- say kind of job.  It could be
12  like change the oil in the car.  I have to give her
13  something to do, because she can't just be sitting
14  around without nothing.
15    Q.  And you mentioned that you don't think she
16  would work for you for just three weeks out of the
17  year, correct?
18    A.  It's difficult to get a person to work with a
19  person that's going to do that, that's going to do the
20  job well.  You're going to have to pay the person well
21  to do the job, because there is going to be -- if I
22  have to try somebody else, it's going to be a lot of
23  confusion, because you have to teach the job well, you
24  have to train them well.
25    Q.  So when you're referring to the three weeks

Page 24

1  of work, you're referring to the time you're actually
2  in Illinois or Iowa detasseling, right?
3    A.  Yes.  It's three weeks what you work almost,
4  it could be four sometimes.  Everything depends on the
5  weather, everything I do is according to the weather.
6    Q.  So in addition to those three weeks of
7  physical labor in the fields, you also consider
8  yourself doing work for Mycogen in mid June through
9  early August?
10    A.  I'm not sure without the papers, but it's
11  from three to four weeks.
12    Q.  Of detasseling?
13    A.  Yes.
14    Q.  And the other time what are your duties?
15    A.  I return to Texas.
16    Q.  And do what?
17    A.  I sleep, rest.  I recharge my body again, I
18  rest.
19    Q.  And during that time you're resting,
20  Ms. Flores is filling out paperwork and changing your
21  oil and cutting your grass?
22    A.  No.  When we finish the contract the second
23  week in August, she's free, she's already free.
24    Q.  But I'm saying before you go to Iowa.
25    A.  Yes, before.

6 (Pages 21 to 24)

Page 25

1    Q.  What are you doing before you go to Iowa?
2    A.  I'm in Texas.  I take care of my yard, I mow
3  the lawn, I visit my friends.
4    Q.  Are you trying to find workers to go with you
5  to Iowa to help you detasseling?
6    A.  I almost never have to, because I have people
7  have been years working with me.
8    Q.  During that time before going to do the
9  detasseling, are you trying to make arrangements for
10  people to have housing?
11    A.  Yes.
12    Q.  Could you describe what you do with respect
13  to arrangements for housing while you're still in
14  Texas?
15    A.  The job that I have, this guy Martell, I send
16  him to get hotels, I stay in Texas.
17    Q.  So you stay in Texas and you send
18  Eugene Martell, the other defendant in this lawsuit --
19    A.  Yes.
20    Q.  -- to go find housing?
21    A.  Yes.  Because it's very hard.  Nobody wants
22  to rent motels to one person, they don't want to rent.
23  So you have to be looking and looking, and it has to be
24  appropriate motel.
25    Q.  They don't want to rent to you?  I don't

Page 26

1  understand what you mean by that.
2    A.  Since I have several people, I go and say I
3  need thirty, forty people, I say I need ten rooms for
4  the contractors, and they say no, I don't have any.
5    MR. SANCHEZ:  He said I'm a contractor.
6  BY MR. SANCHEZ:
7    Q.  They don't want to rent to you because you
8  are trying to reserve a block of workers to do the
9  detasseling, right?
10    A.  Yes.
11    Q.  So when Mr. Martell is out trying to locate
12  housing, is Ms. Flores doing anything related to trying
13  to get ready to go to do the detasseling work?
14    A.  Okay.  She starts working on the books,
15  because when you're going to do the labor, it's let's
16  say block 108, then she starts preparing herself,
17  because I taught her.  People come in and each person
18  has a number, plus every bed needs a label with the
19  job.  And the same story, Maria, she goes when the
20  people go.  Martell is the one who goes to get the
21  motels.
22    Q.  So Martell goes before Maria?
23    A.  Yes.  Martell is the first one, because he's
24  the one looking for motels; sometimes he goes a week
25  before.

Page 27

1    Q.  In 2002 what did you pay Ms. Flores?
2    A.  The truth, I don't remember.  Because when a
3  person starts, you pay her less until you train her,
4  and then go up in her work, and then you raise the fee.
5    Q.  Was 2002 the first year for Ms. Flores to
6  work for you?
7    A.  I don't remember truthfully.
8    Q.  So Ms. Flores is not someone who is going out
9  to the field to detassel while you're up there, right?
10    A.  No.  She goes through her job, which is
11  paperwork.
12    Q.  What do you base her pay on, do you pay her
13  by the hour, by the documents she produces?
14    A.  She gets paid a salary, I'd say.  If you go
15  help me, 4,000, 5,000.  I can't tell you.
16    Q.  And when do you start paying her?  By that I
17  mean at some point in June, or do you wait until she
18  gets up to Illinois?
19    A.  Well, when I first give her the contract, I
20  say well, I'm going to give you -- I tell her I'm going
21  give you the job, because we signed a contract.
22    Q.  And at that time do you negotiate her salary
23  for the season?
24    A.  For her, yes.
25    Q.  And do you also negotiate how much you're

Page 28

1  going to give her in the beginning and how much you're
2  going to give her in the end?
3    A.  Yes, of course.  Because if I tell her yes, I
4  can't give her the whole money ahead, so I gave her so
5  much, and then at the end I give her a bonus.
6    Q.  What is the bonus that you gave to
7  Ms. Flores, in 2002, based on?
8    A.  The truth is that I don't remember how much.
9  Like I told you, it depends after you train the person,
10  then you keep increasing the price.
11    Q.  But my question to you is, the bonus that you
12  paid to Ms. Flores in 2002, was that based on the
13  number of workers you had, or was it based on the
14  amount of acres you did, or was it based on the number
15  of hours that she worked, or was it just a number that
16  you and her negotiated without a basis in anything?
17    A.  The question is good.  I base myself
18  according to the acres, like the company tells me there
19  is so many acres.
20    Q.  In 2002, how much did you pay Ms. Flores per
21  acre?
22    A.  No.  She doesn't get paid by acre.  When
23  there is more acres -- when there are more acres, there
24  is more work.
25    Q.  In 2002, how many times did you pay

7 (Pages 25 to 28)

**Page 29**

1  Ms. Flores?

2      A.  I don't remember.  It was two checks or

3  three, I don't remember.

4      Q.  Are you related to Ms. Flores?

5      A.  Through an uncle, she is the niece of an

6  uncle.  But she's a good worker, she's responsible, she

7  does all the work that's needed, she deserves the pay.

8      Q.  How long have you known Ms. Flores?

9      A.  I don't know.  I don't know.  Five, six,

10  years, I don't know.  The truth is that I know so many

11  people in the work that I do, that I don't retain it.

12      Q.  What's Ms. Flores' address?

13      A.  It's 20th Street, Apartment 902, Belle Glade,

14  also.  (In English).

15      Q.  What's Ms. Flores' phone number?

16      A.  993-4808.  Or I'm not sure.  Hold on a

17  minute.  I have to look it up in my cell phone.  It's

18  right there.

19      Q.  Do you have your cell phone here?

20      A.  I have it in the car.

21      Q.  Would you agree during the break to give me

22  that number, when we have a break?

23      A.  Yes.

24      Q.  The work you mentioned that Ms. Flores did

25  before the detasseling season, I understood you to say

**Page 30**

1  that she does that work in Texas, correct?

2      A.  With me, or with whom?

3      Q.  In June when Ms. Flores starts to work for

4  you, you described some of the activities that she did,

5  right?

6      A.  Yes.

7      Q.  Does she do that here in Florida or in Texas,

8  those activities you described?

9      A.  When I get the contract, she's already got a

10  contract when I get the contract with Mycogen, because

11  she depends on me.

12      Q.  Then what she starts working for you, does

13  she work for you here in Florida, or does she go to

14  Texas with you and do the work over there?

15      A.  Yes.  She goes to Texas to her family, she

16  has family there, too.  She has her mother and sisters

17  there, she lives here.

18      Q.  So when she's in Texas, the work that you

19  described her doing for you she does for you in Texas,

20  right?

21      A.  Correct.  What happens is if I give you a

22  contract, you already have a contract, but the work

23  doesn't start until we go there.

24      Q.  But before you go there, you have to do some

25  preparatory stuff, right?

**Page 31**

1      A.  Sure.  Something has to be done.  It has to

2  be done.  Okay.  She has to be at my...

3      Q.  Beck and call?

4      A.  Yes.  At my command, because when I call her,

5  I say Maria, I need this.

6      Q.  You said Maria has a mother and other

7  relatives in Texas, right?

8      A.  Yes.

9      Q.  Where do they live in Texas?

10      A.  They live in Mercedes.

11      Q.  Do you know the address?

12      A.  No.  They live near where I live, but I don't

13  know the address.

14      Q.  Do you know a gentleman by the name of

15  Celestino Lopez?

16      A.  Yes.

17      Q.  Did Mr. Lopez work for you in 2002?

18      A.  I think so.  I got an idea he did, but I'm

19  not for sure.  Because he did detasseling, but he has

20  learned so much, then I gave him field work.  I changed

21  his job, I don't know if that year or this one.

22      Q.  By field work you mean you gave him some

23  supervisory responsibilities?

24      A.  I'm changing the fields.  He talks to me

25  through a radio, and he says Pablo, the person here is

**Page 32**

1  leaving too much tassels, too many tassels.  The whole

2  time I have two field workers, they're all checking the

3  same such, plus me, plus myself.  And Maria is the one

4  that she does everything at the head of the beds, take

5  note of everything.

6      Q.  I believe the position that you described

7  Mr. Lopez in, you used the phrase "field walker"?

8      A.  A person that keeps walking the fields.

9      Q.  Is he walking the fields to see how people,

10  if they're going fast enough or if they're doing the

11  job right, that sort of thing?

12      A.  Yes.  Because there are different people, we

13  are all different.

14      Q.  And then you have Ms. Flores who also is out

15  in the fields, she's marking the rows?

16      A.  The name of the people, the name of the

17  people, give me another row.

18      Q.  Would it be fair to say that Ms. Flores is

19  responsible for keeping track of how many acres are

20  being produced by each worker?

21      A.  Every row.  Let's say this block has 80 —

22  let's say this block has 80 acres, it's divided in 100

23  rows.  You're going to pay — okay, it's paid 70 by the

24  acre to the people.  Okay?  It's 80 rows, so seven

25  times eight is 56, so it's 5600 that has to be paid.

8 (Pages 29 to 32)

Page 33

1  And if it's a hundred rows, then you divide that money
2  in a hundred rows, and that's how you know what you pay
3  the people.
4      Q.  So in 2002 was it Ms. Flores' job to keep
5  track of the rows done by each person?
6      THE INTERPRETER:  Could you repeat for me,
7      the interpreter?
8  BY MR. SANCHEZ:
9      Q.  Was it her responsibility to keep track of
10  the rows detasseled by each person for the year 2002?
11      A.  I don't remember that's the year that I
12  started training the person for that.
13      Q.  So your answer is you don't know if
14  Ms. Flores performed that job in 2002; is that your
15  answer?
16      A.  The answer is that she could have been there,
17  but I have to be there to train her, so she couldn't be
18  earning the same that she's earning this year.
19      Q.  So in 2002 were you partly responsible for
20  keeping track of the rows that each person detasseled?
21      A.  Yes.
22      Q.  Did either you or Ms. Flores keep records of
23  the amount of work done by each person?
24      A.  Correct.  Because those records have been
25  kept.

Page 34

1      Q.  And I'm talking specifically about 2002
2  detasseling.  Yes?
3      A.  Yes.
4      Q.  Do you have those records?
5      A.  I have all of them at home, I have all the
6  records.
7      Q.  What do you refer to those records as?
8      A.  I call them simply -- I don't have any
9  problem with the people that have been working with me,
10  I keep them because of some day something like you say
11  Pablo, I have a contract for you, and then I'm not
12  going to remember, so I go to the records and I say,
13  okay, I'm going to charge you so much an acre.
14      Q.  What do you call those records?
15      A.  What do you call them?
16      Q.  Let me ask it to you this way.  If I wanted
17  to ask you to give me those records, what would I ask
18  you to give me so that you would understand that I'm
19  talking about the 2002 records that you just described?
20      A.  My records, the records of 2002.
21      Q.  Okay.  Are those records at your home here in
22  Florida or your home in Texas?
23      A.  I don't know if they're in Florida or in
24  Texas, because you know that I go around and I have to
25  get them all together.  I think I have them in Texas.

Page 35

1      Q.  Do you have records like --
2      A.  I have been robbed at my home in Texas, I
3  have been robbed here.
4      Q.  As best you know, has anybody stolen your
5  records, your records from 2002?
6      A.  I haven't really checked, truthfully.
7      Q.  So you know you created records like this and
8  you stored them somewhere?
9      A.  Yes.  I know there are records, because there
10  is records for everything, you cannot work without
11  records.
12      Q.  What other records did you keep for the 2002
13  detaseling?
14      A.  The records of the people, I have it, and
15  then the company that makes the checks for me also has
16  it.  Because I have a company that does the checks for
17  me.  So if someone says Pablo, give me information
18  about 2002, I say go to the company, the check company.
19      MR. HILL:  Can we take a break?
20      (Thereupon, a short recess was taken.)
21  BY MR. SANCHEZ:
22      Q.  Can you tell me who a gentleman by the name
23  of Roberto Renderos is?
24      A.  Who he is, what he is, or what is -- what do
25  you mean?

Page 36

1      Q.  Do you know someone named Roberto Renderos?
2      A.  Yes.
3      Q.  How do you know Mr. Renderos?
4      A.  Because he worked with us here in Florida,
5  and then he married my sister, a person -- then he
6  married my sister, and he's worked with me here in
7  Florida.
8      Q.  Does Mr. Renderos also work with you during
9  the summers when you're in Illinois?
10      A.  2002?
11      Q.  Sure, 2002.
12      A.  Yes.  He was the one who drove the bus.
13      Q.  You talked about the records that you kept in
14  2002 for the --
15      A.  That's what I told Mr. Sanchez, that those
16  records we already gave to him, he already has all the
17  records, the papers.
18      Q.  When you're referring to that, you provided
19  in response to some document requests we had?
20      A.  When he said do you have the records, I
21  thought you were asking me if I had them, but I already
22  gave them to you.  He already has all the papers from
23  2002.
24      Q.  Do you have the originals of the records that
25  you provided to us?

9 (Pages 33 to 36)

Page 37

1     A.  No.  That's what we had, those papers.
2     Q.  You didn't give us copies of stuff that you
3  had?
4     A.  Those were all the papers.  Copies?  I'm not
5  sure if we kept them.  What I have of 2002, he has.
6     (Exhibit No. 1 was marked for identification.)
7  BY MR. SANCHEZ:
8     Q.  Mr. Martinez, I'm going to hand you a
9  document marked Exhibit Number 1.  Could you look at
10  Exhibit Number 1, and after you look at
11  Exhibit Number 1, can you tell me what it is?
12     A.  That is -- the number one.  Okay.  That if I
13  know, I understand what this is?
14     Q.  Right.  Do you know what the document is?
15     A.  Yes.  This is a record of a person what he
16  did at the end of the season.
17     Q.  You pointed to the first page of
18  Exhibit Number 1, right?
19     A.  Well, this is from 2001, no?
20     Q.  That's what I'm asking you, I'm asking you if
21  you can tell me what this document is.
22     A.  Uh-huh.  Yes, the record of a person.  The
23  bonus what he earned, what you pay by the time that you
24  pay him, and what's left for the...
25     Q.  Now what I'd like to you to do is go ahead

Page 38

1  and look at Exhibit Number 1, on the very bottom
2  right-hand corner, it has the number DEF 0017.
3     A.  Here?
4     Q.  Right.  And each page has the letters DEF,
5  and the numbers go from 0017 through 0035.  Okay?
6     A.  Uh-huh.
7     Q.  So this is a document that is 19 pages long,
8  so I would like you to look at the 19 pages of
9  Exhibit Number 1 and just tell me what this document
10  is, if you know.
11     A.  Perfect.
12     Q.  Go ahead.
13     A.  I don't have my glasses, I miss my glasses.
14  This is the record of Jose Hernandez, Eusebio Martinez.
15  Pablo Martinez, a friend.
16     Q.  What I'd like you to do, Mr. Martinez, is
17  just look through this record and tell me what this
18  record is.  Maybe to make it clearer, are these your
19  field records for 2001?
20     A.  Here ends 2001.
21     Q.  You're pointing to which page in
22  Exhibit Number 1, Mr. Martinez?
23     A.  0019, it looks like.
24     Q.  What is DEF 0020, which would be the next
25  page?

Page 39

1     A.  This they have zeros here.  Okay.  These are
2  the bonus.  That means they didn't make more than they
3  earned, they didn't get more than what they earned.
4     Q.  Now, can you tell me whether Exhibit 1 are
5  records from 2001, 2002, or some other year?
6     A.  This is 2001.
7     Q.  You said 2001 is which page, which pages?
8     A.  Here you have 0017, 0018.
9     Q.  So why don't we do it this way just so we're
10  not confused.  0017 is from 2001, right?
11     A.  Correct.
12     Q.  0018 is from 2001 also?
13     A.  Yes.  It's here, 2001.
14     Q.  0019 is from which year?
15     A.  This is the problem, that's where I'm
16  confused.  Okay.  I understand.  Here is 2001.  Here it
17  ends.
18     Q.  Okay.  So 0019 is 2001?
19     A.  It has 2001 here.
20     Q.  And 0020 is from which year?
21     A.  It doesn't have the date here.
22     Q.  So your answer is you don't know which year
23  0020 is from?
24     A.  About this, he can explain better, because he
25  keeps the records (indicating).

Page 40

1     Q.  The process here is we're just trying to find
2  out what you know and what you don't know.
3     A.  I know about these people, it's from the
4  2001.
5     Q.  I just want to know if you can tell me if
6  Exhibit Number 1 are records from 2001 or from 2002.
7     A.  Okay.  Let me see.  I have to concentrate
8  well, because -- I have to know which is the one from
9  2002, right?
10     Q.  No.  I mean, you need to tell me which year
11  these are from.  They could be from this year for all I
12  know, so I'd just like to know, if you can tell me,
13  what year these records are from.
14     A.  These records I think are from before.
15     Q.  From before 2001?
16     A.  2001 could be.  If you are arguing about the
17  2002, why are you showing me 2001?
18     Q.  So your answer to my question is these
19  records are for 2001 and not for 2002, correct?
20     A.  This is what I'm looking at here, it looks
21  like, yes.
22     Q.  In 2001, who was responsible for keeping your
23  field records?
24     A.  It was Francisco Galvan, G-A-L-V-A-N, Jr.
25     Q.  Where is Mr. Galvan, where does he live?

10 (Pages 37 to 40)

Page 41

1    A. He's in Mexico.
2    Q. Was 2001 the last year that Mr. Galvan kept
3  your field records?
4    A. Yes.
5    Q. And you recognize the handwriting in
6  Exhibit Number 1 to be Mr. Galvan's?
7    A. Well, I was remembering because it's 2001.
8  Like I tell you, the papers, you know, they're to make
9  sure that they paid what has to be paid to the people.
10    Q. And it's your understanding that you kept
11  records just like or similar to these for 2002?
12    A. Those be the ones that he has, that my
13  partner here, that my friend here. If I can ask him,
14  you can ask him, he knows.
15    Q. But my question to you is, you have documents
16  that contain the same information as Exhibit Number 1,
17  which is for 2001, you have records for 2002?
18    A. No. I only have those that he has there.
19    Q. And in 2002, that was the first year that
20  Ms. Flores started helping you with the records,
21  correct?
22    A. Correct. Her and Martell.
23    Q. And I believe you said that you were training
24  Ms. Flores in 2002, so you also helped keep these sorts
25  of records; is that true, in 2002?

Page 42

1    A. Yes. I would say put the name of the person,
2  this person's going to be number six, put the tag
3  number here. The first day you give each one a number,
4  people go to work, you teach them, you do the first
5  job, which is the first time. The third day you have
6  to come back to the same block, and Maria has to go
7  again this is your block, this is yours, this is yours.
8  Like if somebody comes and says where is my block,
9  where is my block, and let's suppose it's 461, it's
10  over there.
11    Q. So in 2002, was it Ms. Flores', one of her
12  duties, was it to keep records like this, or was it to
13  help people get to the right rows, or both?
14    A. Martell takes care of the payroll. She comes
15  to him and says here are the rows of each person.
16    Q. And in 2002, was that the first year that
17  Mr. Martell did that sort of work for you?
18    A. Yes.
19    Q. In 2001 what work did Ms. Flores do for you?
20    A. In 2001?
21    Q. Yes.
22    A. Sometimes to make sure that there is -- you
23  have enough water, that there is no water missing.
24    Q. How was Ms. Flores paid in 2001?
25    A. I'm not sure, but I think that she started

Page 43

1  with a thousand dollars.
2    Q. A thousand dollars for the 2001 season?
3    A. 2001? Now I'm not sure.
4    Q. Can you look at the fourth page of
5  Exhibit Number 1? The fourth page.
6    A. Okay.
7    Q. Towards the very bottom, the sixth name from
8  the bottom is Maria Flores.
9    A. Uh-huh.
10    Q. Ms. Flores was paid $5,000; is that correct?
11    A. If it says here, yes.
12    Q. Then two names below Ms. Flores is the name
13  Francisco Galvan, Jr.
14    A. Yes.
15    Q. That's the gentleman who kept these records
16  in 2001?
17    A. Yes.
18    Q. Right. Mr. Galvan earned $3,180; is that
19  correct?
20    A. Correct.
21    Q. And right below Mr. Galvan's name is that
22  your name?
23    A. Yes.
24    Q. And you earned $3,468 in 2001, right?
25    A. Correct.

Page 44

1    Q. So Ms. Flores earned more money than you in
2  2002?
3    A. It's like if you say you lend me, because I
4  don't carry any money. I say Maria, lend me your
5  credit card, and then I'll be paying you gradually.
6  Because sometimes I don't have money even for lunches,
7  something that I need. Sometimes I have 10,000,
8  sometimes I don't have five cents. It's a very fast
9  job, it's a job that for us, for the ones who is
10  working their head, their brain. The one who goes to
11  work, no.
12    What I swear here, he's saying a lot about
13  Maria, but I swear hear that if five cents is yours as
14  a worker, I don't keep it. Second, if I earn $10,000
15  and I want to give them to you, I think it's my
16  decision. Right?
17    (Exhibit No. 2 was marked for identification.)
18  BY MR. SANCHEZ:
19    Q. Mr. Martinez, I'm going to hand you a
20  document that's marked as Exhibit 2. Can you identify
21  Exhibit Number 2?
22    A. Yes.
23    Q. What is Exhibit Number 2?
24    A. Here is the address of the -- the motel's
25  address, and here is where they send us the papers by

**Page 45**

1  mail.
2  Q.  Would it be fair to say that the first page
3  of Exhibit Number 2 is a mailing label for something
4  mailed to Pablo and Jim Martell at the Heidelburg
5  Motel?
6  A.  Yes.
7  Q.  And Pablo Martinez, that's referring to you,
8  correct?
9  A.  Yes.
10  Q.  And the Heidelburg Motel, that's referring to
11  a place that you stayed when you detasseled corn in
12  Illinois, correct?
13  A.  Yes, correct.
14  Q.  The initials BLG, do you know what that
15  stands for?
16  A.  Which ones?
17  Q.  The initials on the label, the BLG.
18  A.  I really don't know.
19  Q.  The phone number on the middle of the label,
20  (319) 385-8968, do you know what that number is for?
21  A.  I think if the letter gets lost or something,
22  then they call.  I think that's the motel's telephone.
23  Q.  Can you look at the second page of
24  Exhibit Number 2.  Can you tell me what the second page
25  of Exhibit Number 2 is?

**Page 46**

1  A.  These are the company payroll records, where
2  they gave me the checks.
3  Q.  The company, you're saying this is a payroll
4  service called ADP, correct?
5  A.  Yes, correct.
6  Q.  In 2002, was this the first time you had used
7  ADP payroll service?
8  A.  Correct.
9  Q.  Did you use their services in 2003?
10  A.  Yes.
11  Q.  Did you use their services in 2004?
12  A.  No.
13  Q.  Did you use some other payroll service in
14  2004?
15  A.  Yes.
16  Q.  Who did you use in 2004?
17  A.  Well, the name I can't pronounce in English.
18  Perhaps my friend can say it in English.
19  Q.  You just give us your best pronunciation.
20  A.  The man's name is Rudy, Rudy Salinas, so...
21  THE INTERPRETER:  May the interpreter write
22  it down to see if it's correct?
23  MR. SANCHEZ:  Okay.
24  THE INTERPRETER:  R-U-D-Y, Salinas,
25  S-A-L-I-N-A-S.

**Page 47**

1  BY MR. SANCHEZ:
2  Q.  And Mr. Salinas is located in Weslaco, Texas?
3  A.  Correct.
4  Q.  The ADP service that you used in 2002 and in
5  2003, where are they located?
6  A.  Miami.
7  Q.  Do you know their address?
8  A.  No.
9  Q.  Do you recall who made arrangements to have
10  you use the ADP service in 2002?
11  A.  Yes.  We talked, a representative of ADP came
12  and we talked.
13  Q.  They spoke with you or with somebody else?
14  A.  Well, there were several of us, my brother
15  and others there.
16  Q.  And you went over to the ADP office in Miami?
17  A.  No.  Everything was through the phone.
18  Q.  Everything was by phone.  Where were you at?
19  A.  When we were here, we talked.  When we went
20  there to the job, then we talked, Mr. Martell is the
21  one who talked for that.
22  Q.  Did anyone at Mycogen help you set up that
23  service in 2002?
24  A.  No.  That was an agreement we looked to see
25  who would do the payroll.

**Page 48**

1  Q.  If you look towards the middle of the second
2  page of Exhibit Number 2, you see the name
3  Maria Flores, correct?
4  A.  I don't, no.  I really can't see it.
5  Q.  Do you need glasses to read, Mr. Martinez?
6  A.  To read, yes, not for the distance.
7  Q.  Do you have reading glasses?
8  A.  No.  Because they fell and I stepped on them
9  during work.
10  Q.  Is this going to affect your ability to
11  testify, the fact that you don't have your reading
12  glasses with you today?
13  A.  Well, I don't think so.
14  Q.  So if you look down to the second page of
15  Exhibit Number 2, towards the middle, you see the name
16  Maria Flores, right?
17  A.  Correct.
18  Q.  Does this record indicate to you that
19  Ms. Flores earned $6,000 in 2002?
20  A.  2002, I don't remember.  2002 I don't think
21  that she got that amount, except if they had made me a
22  loan.  I don't remember.
23  Q.  Are there people that loan money to you
24  during the detasseling season, and then you pay them
25  back through the payroll service?

12 (Pages 45 to 48)

Page 49

1    A.  What is he saying?  If I ask the company?
2  What?
3    Q.  No.
4    A.  A loan from the company?
5    Q.  No.
6    MR. HILL:  Can we take a time out?
7    Do you have concern that the interpretation
8  is going well here?  Because we do.  You speak
9  Spanish, Rudy.  Are we off a few words?
10    THE INTERPRETER:  You don't think it's going
11  well?
12    MR. HILL:  No, I don't.
13    THE INTERPRETER:  At all?
14    MR. HILL:  Well, of course there is some
15  understanding, but on fine points I'm just not
16  sure, so.
17    MR. SANCHEZ:  I mean, I have some concerns
18  with I guess the way the testimony is going, the
19  way the answers are coming out, because I think
20  Mr. Martinez is not necessarily answering the
21  questions, there are things that he wants to say.
22  And that makes it hard for the interpreter to give
23  very long sort of stretches, and also --
24    MR. HILL:  The interpretation itself -- and
25  this is -- I mean, there is different, you know,

Page 50

1  New York Spanish can be different than in Florida,
2  and everyone knows that, and I'm just...
3    THE INTERPRETER:  What I was saying before
4  was that sometimes he starts off and it's almost
5  like a mumble, like I can't get what, you know,
6  then I look at him then he repeats then I get it.
7    There are certain ways that he expresses
8  himself that are not, like, straightforward, like
9  he goes like around in circles and he's not really
10  saying.  Do you understand what I'm saying?
11    MR. HILL:  Then do you kind of try to
12  capsulize?
13    THE INTERPRETER:  Well, I repeat exactly what
14  he's telling me, and I think you can hear by the
15  way some things come out that are not exactly
16  like, you know.  That's what I have to do is say
17  exactly what he says.
18    MR. HILL:  It strikes me that short questions
19  might breed short answers.  Compound questions
20  really throw us, and I don't like to object to
21  someone's deposition, but if we could just try
22  when I ask questions, and when Legal Aid asks
23  questions, have a short question, which hopefully
24  would breed a short answer.
25    THE INTERPRETER:  Well, I have to repeat

Page 51

1  whatever the question he asks.
2    MR. HILL:  I understand.  I understand.  But
3  I'm just wondering if -- can we all agree to
4  just --
5    MR. SANCHEZ:  I mean, you know, one is, I
6  don't know what with respect to Mr. Martinez's
7  glasses, I've only shown him two documents, and
8  one is a computer-printed form that's fairly
9  clear.
10    MR. HILL:  Rudy, I know.  I guess I wonder,
11  and I'm not -- but you show him a document and we
12  spend thirty minutes talking about what year is it
13  when it says right on it 2001.  I mean, I don't
14  know why we're doing this drill of just going over
15  documents that are so descriptive.
16    MR. SANCHEZ:  Because this is a document that
17  Mr. Martinez apparently drafted, and he should be
18  able to tell me if it's 2001.
19    MR. HILL:  Well, why don't you show him the
20  2001 and ask him what that means?
21    MR. SANCHEZ:  And he looked at it and tried
22  to go page by page, and this one doesn't have a
23  year on it, he gives me I don't know what year, I
24  think it's 2001.
25    MR. HILL:  I know we're kind of playing hide

Page 52

1  the ball, though.  If you'll just...
2    MR. SANCHEZ:  If he had said that was 2001, I
3  would have stopped right there.  If he had looked
4  at those nineteen pages.
5    MR. HILL:  If you show him the date on it,
6  then maybe he would have said.
7    MR. SANCHEZ:  But he's looking at it, and
8  this is his document what he produced to us.  I'm
9  just trying to understand what Mr. Martinez knows,
10  I'm not trying to be cagey or anything.  I'm not
11  trying to find out what Mr. Martell knows, because
12  we took his deposition yesterday.
13    THE INTERPRETER:  The interpreter will tell
14  you she stands for her rendition.  If I have a
15  question, if I have a doubt, you know, I ask may I
16  ask the question again, or there is a word the
17  interpreter doesn't understand, then she asks.
18  Because there are circumstances where there is
19  things that may not be exactly what I understand,
20  so I have to ask.
21    MR. HILL:  I've noticed that with the lengthy
22  questions and lengthy answers you take notes, and
23  I just wonder --
24    THE INTERPRETER:  I have to.
25    MR. HILL:  -- wouldn't it be better to have

13 (Pages 49 to 52)

**Page 53**

1 short questions and short answers?
2   THE INTERPRETER: Oh, definitely. But the
3 interpreter has to do what the job is in front of
4 him or her.
5   MR. HILL: Well, let's strive for that.
6   MR. SANCHEZ: What I'll do is I'll shorten my
7 questions, and ask Mr. Martinez to shorten his
8 answers.
9   MR. HILL: That would be great.
10   You're doing fine, Pablo. I think this is
11 difficult.
12   THE INTERPRETER: If I have -- the
13 interpreter is stating again, I think you have
14 seen if there is a point where the interpreter is
15 not catching up, you see me put my hand.
16   MR. HILL: Put your hand up. Okay.
17   THE INTERPRETER: Then he'll stop, I'll be
18 able to copy everything, then he can continue. Or
19 I repeat up to that point, the interpreter repeats
20 up to that point. And I think you've noticed
21 that's what the interpreter has been doing.
22   MR. HILL: Well, thank you. And again, I'm
23 not fussing at anyone. We have thirty minutes
24 before lunch, maybe we can do better. I'm just
25 trying to communicate better, which will be of

**Page 54**

1 benefit to everyone.
2 BY MR. SANCHEZ:
3   Q. Mr. Martinez, is Exhibit Number 2 copies of
4 payments that you've made to the workers who detasseled
5 corn in Illinois in 2002?
6   A. Yes.
7   Q. Thank you. And these records show that you
8 paid Ms. Flores $6,000 in 2002, correct?
9   A. Correct.
10   (Exhibit No. 3 was marked for identification.)
11 BY MR. SANCHEZ:
12   Q. Mr. Martinez, in 2002, Mr. Martinez, did you
13 receive any loans?
14   A. Yes.
15   Q. From who?
16   A. The bank.
17   Q. Which bank?
18   A. National Bank.
19   Q. Did you receive any loans from any
20 individuals in 2002?
21   A. I don't remember that I -- I think that I
22 didn't. I used the money from the bank and the money
23 that I make in Florida.
24   Q. Have you ever received a loan from
25 Maria Flores?

**Page 55**

1   A. I don't remember. But if she -- I don't
2 remember. But if I did, it's because I borrowed her
3 card or something, because sometimes I used Martell's
4 or something.
5   Q. So your answer is you don't recall whether
6 Ms. Flores ever loaned you money?
7   A. In 2002?
8   Q. Ever. If she's ever loaned you money.
9   A. No. I don't remember. May I ask a question?
10   Q. Go ahead.
11   A. He's asking a lot about Maria. Is there a
12 problem with Maria? Why is he asking so many
13 questions?
14   Q. I'm just trying to find out what Maria's --
15 what she did for you in 2002, because I'd like to know
16 what things she might be a witness to.
17   A. Okay.
18   Q. Mr. Martinez, I'm going to hand you a
19 document marked as Exhibit Number 3. Exhibit Number 3
20 is Defendant Pablo Martinez's Answers and Objections to
21 Plaintiffs' First Set of Interrogatories. Is that your
22 signature on the first page of Exhibit Number 3?
23   A. Yes.
24   Q. Do you recall preparing this document?
25   A. Yes.

**Page 56**

1   Q. If you look at the second page of
2 Exhibit Number 3, interrogatory number one, the
3 question is: "Please identify each person from whom
4 information was obtained to answer these
5 interrogatories."
6   And the answer is: "Pablo Martinez and
7 Eugene D. Martell." Right?
8   A. Correct.
9   Q. Mr. Martinez, you're appearing in this
10 lawsuit without an attorney; is that true?
11   A. Yes.
12   Q. Did anybody else other than Mr. Martell help
13 you prepare these interrogatory responses?
14   A. Me and Martell were the ones who did this.
15   Q. If you look at the bottom of the second page,
16 interrogatory number four.
17   A. Yes.
18   Q. The answer to that question is that you
19 object because it invades the party communication and
20 joint defense privilege, correct? Is that correct?
21   A. What do you mean? Tell me again in Spanish
22 again.
23   MR. SANCHEZ: I'll have the interpreter read
24   the response to number four again.
25 BY MR. SANCHEZ:

Page 57

1    Q. That's your response to number four, correct?
2    A. I am confused, I'm confused. Okay. Tell me
3  again in Spanish.
4    Q. My only question to you, Mr. Martinez, the
5  information in Exhibit Number 3 was obtained from you
6  and from Mr. Martell, correct?
7    A. Yes.
8    Q. I'm just trying to find out if anybody else
9  helped you fill out these papers other than
10  Mr. Martell.
11    A. Who did we ask to type?
12    Q. We're going to get back to —
13    MR. SANCHEZ: Go ahead and translate this
14  one, please.
15  BY MR. SANCHEZ:
16    Q. I'm just trying to find out what you
17  remember. And if you don't remember, if you don't
18  know, that's fine.
19    A. The truth, I don't remember. But I know it
20  was me and my friend, we filled it out. I don't know
21  who typed it, someone typed it, but...
22    Q. Do you remember where you were when you
23  signed this document marked as Exhibit Number 3?
24    A. I don't know if I signed it in Texas — in
25  Texas we signed it, it seems like.

Page 58

1    Q. Do you know if you were in the valley or you
2  were in Austin?
3    A. The valley. I don't know Austin.
4    Q. Before you signed Exhibit 3, did you review
5  it?
6    A. The little that Martell would tell me, I
7  understood.
8    Q. Could you look at the last page of
9  Exhibit Number 3?
10    A. The last one?
11    Q. Yes. The last page of Exhibit Number 3 is
12  titled Declaration of Pablo Martinez, correct?
13    A. Yes.
14    Q. The last page of Exhibit Number 3 has your
15  signature; is that true?
16    A. Yes.
17    Q. And the second paragraph of Exhibit Number 3
18  says, in part, "I do not read English, and have had the
19  interrogatories read to me. I have done my best to
20  understand the question and provide a response,
21  although some of the questions are difficult for me to
22  understand."
23    A. Correct.
24    Q. Do you recall who read this document to you?
25    A. I think that it was Mr. Martell.

Page 59

1    Q. Do you recall if anybody else was present
2  when Mr. Martell read this document to you?
3    A. No.
4    Q. If you look at the fifth page of
5  Exhibit Number 3, interrogatory number 12, question
6  Number 12 says: "Please describe in detail your
7  relationship to Agrigenetics, Inc."
8    And your answer is "Farm labor contractor."
9  Correct?
10    A. Yes.
11    Q. What do you understand a farm labor
12  contractor to be?
13    A. What do I understand it to be?
14    Q. What do you understand it to be when you put
15  that as your answer, farm labor contractor?
16    A. That I had the card to be a labor contractor.
17    Q. Do you mean that to mean you're registered
18  with some agency as a farm labor contractor, correct?
19    A. Yes.
20    Q. If you look at the next page, Mr. Martinez,
21  interrogatory number 17. This questions asks you to
22  describe the duties, rate of pay, and source of pay in
23  2002 for Mr. Martell.
24    And your answer is "Mr. Martell did paperwork
25  and registration, his rate of pay was approximately

Page 60

1  2,000 for the 2002 season."
2    A. Yes.
3    Q. What paperwork did Mr. Martell do for you in
4  2002?
5    A. To keep the records of all the people, what
6  they earned a day.
7    Q. Would that include records of how many hours
8  were worked by each person each day?
9    A. Yes.
10    Q. What were Mr. Martell's registration duties?
11    A. His job was to take the records of the
12  people, if they were working, if they stayed in the
13  motel, if you needed a certain job. That's enough.
14  Because the papers, every day you have to take each
15  person's how many acres, how many days.
16    Q. But those aren't registration duties, are
17  they?
18    A. What do you mean, registration?
19    Q. Your answer was Mr. Martell did paperwork and
20  registration, right?
21    A. Yes.
22    Q. So what were the registration duties?
23    A. Well, when we go to the office, we had to
24  fill out all the papers, what you have to do for income
25  tax and for all that; it depends on each person,

15 (Pages 57 to 60)

Page 61

1  married or...
2      Q.  So he helps fill out various employment
3  paperwork at the Mycogen office?
4      A.  We fill them all out, and then they give you
5  a video orientation of all that we have to do,
6  everything we have to do.
7      Q.  How was Mr. Martell paid the $2,000, was that
8  in a lump sum, or did he receive a series of payments?
9      A.  In the record, in the payroll, it has to be
10  the record of the check.  He has the check, his check
11  by week, and then whatever is left over.
12      Q.  In 2002, when do you recall giving
13  Mr. Martell -- paying Mr. Martell?
14      A.  I'm not sure if it was $2,000.
15      Q.  When do you recall paying him?
16      A.  In 2002?
17      Q.  When in 2002?
18      A.  What date?
19      Q.  Approximately.
20      A.  It could be in the middle of June.
21      Q.  I believe you said earlier that Mr. Martell
22  also travelled to Iowa before detasseling started,
23  correct?
24      A.  Correct.
25      Q.  And that one of the reasons for his trip was

Page 62

1  to find housing for your workers, correct?
2      A.  Correct.
3      Q.  When he made that trip in 2002, had you
4  already paid him?
5      A.  I don't know if I gave him a loan, I don't
6  remember.  But I know that I paid him $2,000.
7      Q.  What was the basis for Mr. Martell's pay, was
8  it by the acre, by the hour, or by the season?
9      A.  I decide if how many are there, if there are
10  30 people, there are 35, there are 50, then I pay
11  him -- have to pay more.
12      Q.  So would it be fair to say that you paid
13  Mr. Martell more depending on the amount of -- the
14  number of workers you have working for you?
15      A.  Correct.
16      Q.  When do you decide what Mr. Martell -- when
17  did you decide what Mr. Martell's salary was going to
18  be in 2002?
19      A.  I decided in Texas.  I talked to him and met
20  him through a friend, and I told him if he helped me
21  with all the papers that I would pay him well, 2,000 or
22  something, that he would feel happy.
23      Q.  Did you explain to him in Texas that he might
24  get paid more if there were more workers?
25      A.  No.  No.  That's something that I look for in

Page 63

1  the person, according to the effort he makes.
2      Q.  Who is Mr. Gonzalez?
3      A.  This is a man that worked with me years
4  before that used to do the job that Martell does.
5      Q.  Did you have just one conversation with
6  Mr. Martell before you decided to hire him, or did you
7  have a series of conversations with him in 2002?
8      A.  Mr. Gonzalez introduced me to him, he
9  recommended him, he said this is a good person.
10      Q.  So did you have one conversation with
11  Mr. Martell before you decided to hire him, or did you
12  have a series of conversations?
13      A.  I had one.  I had seen him before.  I didn't
14  know him, but I know that he had a good record in the
15  town Mercedes.
16      Q.  When you decided to offer Mr. Martell that
17  job, how long was your conversation with him?
18      A.  Well, we were talking, because at that time
19  one of my brothers had died, and there was a viewing,
20  and we were talking; I'm not sure how long we were
21  talking for.
22      Q.  When you had that conversation with
23  Mr. Martell, did you explain to him what it was you
24  wanted him to do?
25      A.  Yes.

Page 64

1      Q.  What did you tell Mr. Martell in 2002 about
2  what you wanted him to do?
3      A.  To keep the records of the person, to try
4  keep each person's records, that's all.
5      Q.  Do you recall if this conversation was
6  sometime during June of 2002?
7      A.  No.  If I remember the conversation?
8      Q.  Do you remember approximately when this
9  conversation was with Mr. Martell?
10      A.  Okay.  It was, I think, in March.  It was not
11  during the season, because my brother died, and I had
12  to leave Florida to go there.
13      Q.  When you had this conversation with
14  Mr. Martell, when you decided to have him come help you
15  out, did you tell him how much you were going to pay
16  him?
17      A.  I am not very sure, but I had to give him a
18  good offer so that he would come, but I'm not sure.
19      Q.  Do you recall when you had this conversation
20  if you told Mr. Martell how long he would be working?
21      A.  Yes.
22      Q.  What do you recall telling Mr. Martell?
23      A.  Like I tell every person, all persons, we can
24  work 18, 20, 25 days, the whole time, because the
25  weather is the one that talks.

16 (Pages 61 to 64)

Page 65

1    Q.  When you say 18, 20, or 25 days, you're
2  talking about the actual detasseling season, correct?
3    A.  Yes.
4    Q.  Did you explain to Mr. Martell that you also
5  wanted him to do stuff before the detasseling started?
6    A.  I don't remember.  The truth is I don't
7  remember if I send him to look at the fields, I don't
8  remember if I send him to the fields to make sure they
9  were wearing their shoes, that they were protected with
10  goggles.
11    Q.  My question, Mr. Martinez, was, do you recall
12  telling Mr. Martell that you expected him to do things
13  for you before detasseling started.  By that I mean
14  before going to Iowa.
15    THE INTERPRETER:  I'm sorry.
16    THE WITNESS:  That if I ask him?  I think so,
17  because if I took him, he's not going to work in
18    the rows.
19  BY MR. SANCHEZ:
20    Q.  So what sorts of things did you ask
21  Mr. Martell to do before heading up to Iowa?
22    MR. HILL:  What was the question?
23    THE INTERPRETER:  What were the things you
24  asked Mr. Martell to do before going to Iowa.
25    MR. HILL:  And that's what you asked him in

Page 66

1  Spanish?
2    THE INTERPRETER:  Yes.  Why?
3    MR. HILL:  Just curious.
4    THE INTERPRETER:  Do you know Spanish?
5    MR. HILL:  Some.  Could you ask him again?
6    THE INTERPRETER:  No.  Because then you say
7  what was the question.
8    MR. SANCHEZ:  I'll just have the reporter
9  read back the question then you can retranslate
10  it.
11        - - -
12    (Thereupon, a portion of the record was read by
13  the reporter.)
14    THE WITNESS:  What promises I did?  No.  What
15  I told him was there is a job.  I don't make any
16  promises.  Because in three days the job could —
17  in three days the job could end.  The control —
18  it's not the control of the company, it's
19  (indicating).
20  BY MR. SANCHEZ:
21    Q.  Let me try it this way.  You explained to us
22  that in 2002 before the detasseling season started,
23  Mr. Martell went to Iowa to find housing, correct?
24    A.  Yes.
25    Q.  So this was work or activities that he was

Page 67

1  involved in before the 18 to 20 to 25 days you
2  mentioned the detasseling season might last?
3    A.  Yes.
4    Q.  When did you explain to Mr. Martell that you
5  wanted him to find housing for your crew?
6    A.  Okay.  When I get the contract, I tell
7  Mr. Martell it's usually like a week before I tell
8  Mr. Martell, you have a week, go find housing.
9    Q.  Okay.  I'm talking about —
10    MR. HILL:  Rudy, you asked me to remind you
11  when lunch came around.
12    MR. SANCHEZ:  Sure.  Let's go off the record
13  and take lunch.
14    MR. HILL:  Thank you.
15    (Thereupon, a brief lunch recess was taken.)
16    (Exhibit No. 4 was marked for identification.)
17  BY MR. SANCHEZ:
18    Q.  Mr. Martinez, I'm going to hand you a
19  document marked Exhibit Number 4.  It's my
20  understanding that Exhibit Number 4 is the agreement
21  that you signed with Mycogen Seeds in 2002.  Can you
22  look at Exhibit Number 4 and tell me if my
23  understanding is accurate?
24    A.  Which is four, this one?
25    Q.  This document that I just handed you which

Page 68

1  has been marked by the court reporter as
2  Exhibit Number 4.
3    A.  Okay.  That's okay.
4    Q.  It's my understanding that Exhibit Number 4
5  is an agreement you signed to detassel seed corn for
6  Mycogen.
7    A.  Correct.
8    Q.  This is the 2002 agreement with Mycogen,
9  correct?
10    A.  Yes.
11    Q.  At the very top of Exhibit Number 4 it has
12  your name, correct?
13    A.  Yes.
14    Q.  And it also has the name of Agrigenetics,
15  Inc., d/b/a Mycogen, correct?
16    A.  Correct.
17    Q.  It also has date of 28 June, 2002; is that
18  correct?
19    A.  Correct.
20    Q.  And on the very bottom of this document it
21  has page numbers.  For example, right here it says page
22  1 of 11, correct?
23    A.  Correct.
24    Q.  And on the bottom of the second page it says
25  page 2 of 14, correct?

17 (Pages 65 to 68)

Page 69

1    A.  Correct.
2    Q.  Can you turn to the page marked page 8 of 14?
3    A.  This one?
4    Q.  Yes, sir.  Can you tell me is that your
5    signature there on page 8 of 14?
6    A.  It's this one that is here?
7    Q.  Yes, sir.
8    A.  Yes.
9    Q.  And to the left of your signature is the
10   signature for James Sheriff; is that correct?
11   A.  Correct.
12   Q.  Do you recall if you signed this document
13   marked as Exhibit Number 4 on the 28th day of June,
14   2002?  Let me correct that.  I'm sorry, Mr. Martinez.
15   I meant June 28th of 2002.
16       Just to be clear, Mr. Martinez, you recall
17   signing this document on 28th June, 2002, correct?
18   A.  Correct.
19   Q.  On the date that you signed this document
20   marked Exhibit Number 4, were you in Texas or were you
21   somewhere else?
22   A.  June?  It's June or July?
23   Q.  June 28th.
24   A.  No.  This must have been in Iowa.
25   Q.  When you say Iowa, you mean at the Mycogen

Page 70

1    plant in Illinois, correct?
2    A.  Correct.
3    Q.  Do you recall who else was present with
4    you — let me take that back.
5       Were you and Mr. Sheriff both together
6    reviewing this document and then signing it?
7    A.  I think yes.
8    Q.  Do you know if anybody else was present with
9    you and Mr. Sheriff when you both signed this document?
10   A.  I don't remember.
11   Q.  Exhibit Number 4 is written in English,
12   correct?
13   A.  Yes.
14   Q.  Can you read Exhibit Number 4?
15   A.  No.  I can understand parts, but I couldn't
16   tell you.
17   Q.  So you can look through the document and you
18   can understand parts of this agreement?
19   A.  Parts.
20   Q.  Some of the words you'll understand?
21   A.  Yes.  Like this, contractor.  I don't know if
22   it was him and I or there was anybody else, if my other
23   brother was there, because he was working there.
24   Q.  What is your brother's name?
25   A.  His name is Gumaro.

Page 71

1    Q.  Gumaro Martinez?
2    A.  Yes.
3    Q.  Does Gumaro live in Florida, or somewhere
4    else?
5    A.  Florida.
6    Q.  Please wait for the translation so you
7    understand the question.
8    A.  Okay.  I'm sorry (In English).
9    Q.  Does Gumaro also supply workers to do
10   detasseling work?
11   A.  Yes.
12   Q.  Did you and Gumaro both sign agreements —
13   let me take that back.
14       Did Gumaro also sign an agreement similar to
15   Exhibit Number 4?
16   A.  I think so, but that's a part I don't know.
17   I work on my things, I know this only.
18   Q.  Do you know how many acres of seed corn
19   Gumaro agreed to detassel in 2002?
20   A.  No.
21   Q.  Is it your understanding that Gumaro also
22   signed an agreement with Mycogen to work in the same
23   general area that you were going to be working in?
24   A.  I can't tell you if he signed, because I'm
25   with this person.  I don't know what he did, if he

Page 72

1    talked to him or he did anything with him.
2    Q.  When you signed this agreement, you said that
3    it was possible your brother might have been present.
4    A.  Possible.
5    Q.  But you don't know for sure?
6    A.  No.
7    Q.  Does Gumaro speak and read English?
8    A.  Oh, yes.  He went to school and everything
9    here.
10   Q.  When you were up in Illinois in 2002 for the
11   detasseling season, did you ever see Gumaro here?
12   A.  In the cars only, he goes by and I go by.
13       THE INTERPRETER:  I didn't know what he said
14   just then.
15       THE WITNESS:  He does his job, and I do mine.
16   BY MR. SANCHEZ:
17   Q.  Okay.  But do you know if Gumaro had a crew
18   of workers working out of the same plant as you?
19   A.  The same company?
20   Q.  The same plant.
21   A.  The same company?  Well, I know that he was
22   in the same company.  The plant, I don't know what he
23   means by that.
24   Q.  During the 2002 season, where did you go to
25   get your field assignments?

18 (Pages 69 to 72)

**Page 73**

1    A.  By radio.

2    Q.  Who did you speak with?

3    A.  (Indicating.)

4    Q.  You pointed to Exhibit Number 4 to

5  Mr. Sheriff's signature, correct?

6    A.  Yes.  Correct.

7    Q.  So your testimony is that Mr. Sheriff calls

8  on the radio and gave you your field assignments?

9    A.  Of the areas I had to work.

10    Q.  Do you know if Mr. Sheriff also gave Gumaro

11  his field assignments?

12    A.  I think so, because each one has a different

13  area; I have one area, the other one has another area.

14    Q.  Do you know the names of any other

15  contractors who received field assignments from

16  Mr. Sheriff in 2002?

17    A.  No.

18    Q.  Do you know how many workers Gumaro had in

19  Illinois in 2002?

20    A.  Average 20, 20 or 25.  I had an average of

21  40, he had a little less.

22    Q.  Do you know if your brother,

23  Mr. Gumaro Martinez's workers were from Florida, from

24  Texas, or from somewhere else?

25    A.  No.  He lives here in Florida, he doesn't

**Page 74**

1  have anything to do with that.  He has his residence.

2    Q.  The question was, the workers that

3  Gumaro Martinez had, do you know if they were from

4  Florida, from Texas, or from somewhere else?

5    A.  My response was that I know that he lives

6  here, I don't know whether they are from Texas or from

7  here.

8    Q.  So your response is you don't know where his

9  workers were from?

10    A.  Correct.

11    Q.  Mr. Martinez, I'd like you to turn to page 2

12  of 14 of Exhibit Number 4, and I'd like you to look at

13  the second paragraph, the words in the very middle,

14  right here where it says "when recruiting".  If you

15  can't read it, I'll have the translator read that to

16  you.

17    A.  Okay.

18    Q.  Would you like the interpreter to translate

19  that sentence for you?

20    A.  Yes.

21    (Interpreter complied.)

22  BY MR. SANCHEZ:

23    Q.  Did you read a disclosure to each worker that

24  you recruited?

25    A.  Yes, in Spanish.  They get gathered together

**Page 75**

1  before they start.

2    Q.  I'd like you to look at Exhibit Number 4, the

3  page marked Exhibit B, and it says worker disclosure

4  statement, correct?

5    A.  Yes.

6    Q.  So the paragraph we just read instructs you

7  to read this page to workers, correct?

8    A.  Correct.

9    Q.  But Exhibit 4, the page marked Exhibit B is

10  blank.

11    A.  Correct.

12    Q.  Is there some other document that was sent to

13  you to review with workers you were recruiting?

14    A.  The one he has there.  It's in Spanish and in

15  English.

16    (Exhibit No. 5 was marked for identification.)

17  BY MR. SANCHEZ:

18    Q.  Mr. Martinez, I'm going to hand you a

19  document market as Exhibit Number 5.  Now, a minute ago

20  you kind of pointed over in my general direction and

21  said that you read a document I had somewhere in my

22  stack of papers, and I've pulled out this record that

23  is marked as Exhibit Number 5, and it's in Spanish, and

24  it says in Spanish.

25    A.  Yes, correct.

**Page 76**

1    Q.  Is this the document that you claim you read

2  to each worker that you recruited?

3    A.  There it is, look.  Here it is.  The kind of

4  work, what they earn by hour, and it's printed in

5  Spanish.

6    Q.  My question for you, so we can go as fast as

7  we can, Exhibit Number 5 is two pages, correct?

8    A.  Yes.

9    Q.  Is it your testimony that you read both pages

10  of Exhibit Number 5 to each worker that you recruited?

11    A.  Correct.

12    Q.  Do you recall if you read that document

13  marked as Exhibit Number 5 to each worker when they

14  were in Texas, or when they were in Illinois, or

15  someplace else?

16    A.  Okay.  This is a little long.  Here comes

17  Pablo and say okay, here is application, look at it.

18    Q.  In Texas?

19    A.  Well, I gave him the application in Texas, in

20  Texas, in Texas.  Okay.  After one day – after he

21  finishes the day or two, I ask him did you understand

22  it, because not everybody who works with me understands

23  English – Spanish.

24    Q.  So it's your testimony that you provided to

25  each worker that you recruited the information

**Page 77**

1  contained in Exhibit 5 in Texas?
2      A.  Yes.
3      Q.  In your answers to interrogatories, I believe
4  you stated that you recruited every person on page
5  DEF 0104 and DEF 0105; is that correct?
6      MR. HILL: Object to the form.
7      THE WITNESS:  That I had recruited?
8  BY MR. SANCHEZ:
9      Q.  Yes.
10     THE INTERPRETER:  The interpreter is asking
11  for clarification.  The interpreter is asking to
12  change the word "recruiting."  He said recruiting.
13  Let me think about that word.  So I said employed.
14     MR. SANCHEZ:  No.
15     THE INTERPRETER:  It's not really?
16     MR. SANCHEZ:  No.
17     THE INTERPRETER:  That is the word.
18     THE WITNESS:  Tell me again.
19  BY MR. SANCHEZ:
20     Q.  I'm going to find the reference in your
21  interrogatory answer, then we can try it that way.
22     Why don't we just do it this way.  If you
23  look at Exhibit Number 2, the page marked DEF 0104 and
24  DEF 0105, this is a list of people who worked with you
25  in Illinois in 2002, correct?

**Page 78**

1      A.  Yes.  Correct.
2      Q.  Did you read the information contained in
3  Exhibit Number 5, the two pages in Exhibit 5, to each
4  person on that list?
5      A.  Correct.  The person knows everything that
6  he's going to do.  They don't go with closed eyes, they
7  know what they're going for.
8      Q.  But you understand my question.  My question
9  was, did you read the document marked as
10  Exhibit Number 5 to each person on page DEF 104 and
11  DEF 105 of Exhibit 2?
12     A.  Correct.
13     Q.  Do you recall whether you read that document
14  to those workers as a group, or was it individually?
15     A.  Room by room.  When they go to the jobs, do
16  that again, because that's when they go through
17  orientation and everything is explained.
18     Q.  So this was as a group?
19     A.  In the motel, it's room by room.
20     Q.  So it's my understanding you do this on
21  several occasions; is that your testimony?
22     A.  Yes.
23     Q.  One time you did it room by room at the hotel
24  in Iowa?
25     A.  Yes.

**Page 79**

1      Q.  And another time was at the Mycogen plant in
2  Illinois?
3      A.  Correct.
4      Q.  At the orientation session?
5      A.  Correct.
6      Q.  Did you do this -- did you also review
7  Exhibit Number 5 with this group of workers in Texas?
8      A.  Yes.
9      Q.  Do you know who filled in the information on
10  Exhibit Number 5?
11     A.  This was the company.
12     Q.  By "the company" you mean Mycogen?
13     A.  Or this.  They send me this form.  They send
14  them to me for each worker.
15     Q.  Who sends this to you for each worker?
16     A.  The company.
17     Q.  What company?
18     A.  Mycogen.
19     Q.  By Mycogen you're referring to the defendant,
20  Agrigenetics, d/b/a Mycogen, correct?
21     A.  Yes.
22     Q.  When you reviewed Exhibit Number 5 with the
23  workers in Texas, did you do that as a group, or did
24  you do that individually?
25     A.  Okay.  Martell knows you have a job, these

**Page 80**

1  are the conditions that you have for work, that --
2  let's suppose it is, okay.  Sometimes they come back,
3  because a hundred go to talk with you, and twenty are
4  really going.
5      Q.  I'm going to repeat my question, because I
6  don't think you answered it.
7      When you reviewed Exhibit Number 5 with the
8  workers in Texas, did you do it in a group, or
9  individually?
10     A.  Individually, because they come to see me
11  individually.  They don't come in a group.
12     Q.  When you reviewed Exhibit Number 5 with
13  workers in Texas, was Mr. Martell present on some
14  occasions?
15     A.  He accompanies me sometimes when I was going
16  to see some workers, I would be going with him.
17     Q.  When you reviewed Exhibit Number 5 with
18  workers in Texas on those occasions when Mr. Martell
19  was present, did he also explain Exhibit Number 5 to
20  the workers?
21     A.  No.  That is me.  Martell was watching,
22  looking, listening, but I'm the contractor.
23     Q.  Did you ever introduce Mr. Martell to any of
24  the workers that you were reviewing Exhibit Number 5
25  with?

20 (Pages 77 to 80)

Page 81

1     A. Yeah. Yes. I would say this is Mr. Martell,
2  perhaps that he's going to have to deal with them.
3     Q. Did you explain that Mr. Martell was working
4  with you?
5     A. I explained it to them, yes, but at the
6  moment it wasn't for sure, because I didn't know if
7  they were going to be working with him or not.
8     Q. Did you explain what Mr. Martell's duties
9  were going to be to any of these workers?
10    THE INTERPRETER: I'm sorry. Would you
11  repeat the question for the interpreter?
12  BY MR. SANCHEZ:
13    Q. Did you explain to any of these workers what
14  Mr. Martell's duties were going to be in 2002?
15    A. Correct.
16    Q. What do you recall telling these workers
17  about what Mr. Martell was going to be doing?
18    (Mr. Hill left the deposition room.)
19    THE WITNESS: The workers come, they arrive,
20  let's say it's 35, 40 workers. I say okay, this
21  gentleman is the one who is going to give you your
22  time, he's going to -- the acres that you're going
23  to do during the week, that's the job of
24  Mr. Martell.
25  BY MR. SANCHEZ:

Page 82

1     Q. Did you explain to any of these workers that
2  Mr. Martell was going to find housing for them?
3     A. No. Because they talk to me, not with
4  Mr. Martell. Now, in Iowa, that's when they are more
5  in contact with me.
6     Q. I'm going to look at Exhibit Number 9 (sic)
7  and I'm going to read something to you in Spanish,
8  Mr. Martinez, and I'd like the interpreter to translate
9  it into English.
10    Exhibit Number 5. Exhibit number 5, and it's
11  number nine, it's Exhibit 5, but line number nine. The
12  question reads: "En el caso de los trabajadores
13  migrantes que necesiten alojamiento, el tipo de
14  alojamiento disponible y el costo, si corresponde:"
15    THE INTERPRETER: Okay. In the case of the
16  migrant workers who need housing, the available
17  housing and the cost, if it applies, and it says
18  none, and the cost says not applicable.
19    (Mr. Hill returned to the deposition room.)
20    THE WITNESS: Okay. Yeah. The workers that
21  go there, they don't get charged for any rent or
22  any charges for anything like that, that's what it
23  says there.
24  BY MR. SANCHEZ:
25    Q. Do you understand this to say that workers

Page 83

1  will be provided housing?
2     A. Yes. That they're not going to have any --
3  yes, housing.
4     Q. And you explained to workers when you review
5  Exhibit Number 5 that they're going to be provided
6  housing?
7     A. Yes.
8     Q. Do you explain to the workers what kind of
9  housing they're going to receive?
10    A. Yes.
11    Q. What do you recall telling the workers in
12  2002 in Texas about the housing they were going to
13  receive?
14    A. All those people have years of working with
15  me, so it is the same, they have the same thing.
16    Q. So it is your testimony that you explained to
17  them it's the same as last year?
18    A. Correct.
19    Q. In 2002, the workers that you recruited --
20  let me take that back.
21    In 2002, the workers you were talking to in
22  Texas, what did you explain to them about what they
23  were going to be paid?
24    A. They were going to get paid seventy an acre,
25  which is that form, which is form four.

Page 84

1     Q. And you're referring to Exhibit Number 5, the
2  second page?
3     A. Yes. It explains to the people what they
4  earn, I explain that to each person. To each person I
5  tell them don't get mistaken, this is what's going to
6  be paid to you.
7     Q. Did you mention anything at all about page
8  one, number three, where it says 6.50 per hour?
9     A. If I told them, the workers?
10    Q. Yes.
11    A. Yes.
12    Q. In the middle of the first page of
13  Exhibit Number 5, it has your name and address in
14  Mercedes, correct?
15    A. Yes. This one I have here is my mother's.
16    Q. And right above that it has the name of
17  Jim Sheriff and Mycogen seeds, correct?
18    A. Correct.
19    Q. What is that information referring to?
20    A. This here?
21    Q. Where it has Jim Sheriff, a phone number, and
22  Mycogen Seeds and an address in Indianapolis.
23    A. Well, it means that the company has to give
24  an address, and I had to give another address.
25    Q. Would you read right before it says

21 (Pages 81 to 84)

Page 85

1  Jim Sheriff, can you read out loud what it says in
2  Spanish?
3      A.  It's here.  Name and address of the insurer,
4  of the insurer.
5      Q.  Do you know what's meant by that?
6      A.  Yes.
7      Q.  What?
8      A.  That he is like the higher up that is going
9  to talk to me in the company.  If I have a problem with
10 the worker, they go complain to him.  That's why they
11 put his name down, somebody has to take care of it.
12     Q.  Okay.  I'd like to look back at
13 Exhibit Number 4 again and I'd like you to look at the
14 second page of Exhibit Number 4.
15     A.  This one?
16     Q.  Yes.  Under (b) it has location of services,
17 and it says contractor agrees to perform services
18 checked in section 1(a) in approximately 800 acres
19 located in Henderson and Mercer Counties, State of
20 Illinois.
21         How many years of experience do you have
22 detasseling seed corn?
23     A.  Like fifteen years.
24     Q.  Based on your experience, about how many
25 workers would you need to detassel 800 acres of seed

Page 86

1  corn between July and August 1, or the end of June and
2  the beginning of August?
3      A.  Forty.
4      Q.  Do you recall how many workers you had
5  detasseling seed corn for you in 2002?
6      A.  It was an average of about 63, something like
7  that, 53.
8      Q.  In 2002 did you have more workers than you
9  really needed?
10     A.  Okay.  I'm going to give you, what you call
11 it -- forty people is when you have professionals.  And
12 since I know the people, I go oh, there is about twenty
13 professionals, so I need fifty to do this amount.
14         Another thing, the maize (sic) when I look at
15 it, there is little ones.  Mr. Sanchez, how many acres
16 do you have.  He says two acres, but the next day there
17 may be only one acre because there may be tall, tall
18 corn.
19         (In English)  So it depends on the weather.
20 Some people have good luck, good corn; some people
21 don't have good luck, only $7 day, some people $300
22 day.  The fields, the seed corn, everybody is
23 different.
24     Q.  Would it be fair to say you can't tell me how
25 many workers you need just looking at the time frame

Page 87

1  and the amount of acres?
2      A.  No.  No.  If I know them all, yes, it would
3  be forty professionals.
4      Q.  When you refer to a professional, what
5  exactly do you mean?
6      A.  Okay.  A person who knows how to do the job
7  as a professional.  Like he's a lawyer, like I'm a
8  professional.  The job that you tell me, I can tell you
9  about, labor.
10     Q.  Is it hard to teach someone how to detassel
11 corn?
12     A.  Very difficult.  It's easy if you look at it.
13 But you have to have the position, the arms, the stalk,
14 you know.  Because sometimes the stalk is over
15 stressed.  If a guy presses too hard, it's going to
16 break it off, which is -- I had a lot of people have
17 broken a lot of corn, and the company hasn't fired me
18 because they're good with me.
19     Q.  Do you interview people to see if they've had
20 experience before you hire them to detassel?
21         THE INTERPRETER:  I'm sorry?
22 BY MR. SANCHEZ:
23     Q.  Do you hire people that don't have experience
24 detasseling?
25     A.  Yes.

Page 88

1      Q.  How long does it take you to train them to do
2  that work?
3      A.  The first season, that's all.  The second,
4  they can do it alone.
5      Q.  Do you pay people who work the first season
6  less than someone who has experience?
7      A.  Not for the detasseling, because that's paid
8  by acre.  So you have to pay all of them $70, whatever
9  they do.
10     Q.  The people without experience, do you tell
11 them you'll pay them less than 6.50 an hour?
12     A.  No.
13     Q.  Okay.
14     A.  Because me, if I see a person who can't make
15 the, you know, the 6.50 an hour, I get someone in to
16 help him, I'm the one who does it.
17     Q.  On the second page of Exhibit Number 4, right
18 after it mentions Exhibit B, it says that the
19 contractor will obtain a signed and dated
20 acknowledgment from each and every such worker stating
21 that the worker received and reviewed the disclosure
22 document.
23     A.  Yes.
24     Q.  Did you do that in 2002?
25     A.  Yes.

22 (Pages 85 to 88)

Page 89

1    Q. What did you do with those documents?
2    A. When you went to see them, did you give them
3  that document?
4    Q. No.
5    A. Because he went to see them first, because I
6  was here in Florida, I didn't know if he gave them the
7  documents.
8    Q. So your testimony is that you got those
9  documents and you gave them to Mr. Martell?
10    A. The forms they fill out, they look at it,
11  they sign it -- (In English) Pablo sign it, Jim say
12  Pablo, how many workers? Forty. How many
13  applications? Forty.
14    Q. Mr. Martinez, we are using the interpreter
15  because we want to make sure that your testimony is
16  accurate. Okay? Now, if you'd like, we can do this in
17  English, it would be much faster.
18    A. No. But if I don't know, then I have to
19  stop.
20    Q. Okay. Then you need to go ahead and listen
21  to the translation and wait for the translator to
22  translate your answer back. Okay?
23    A. Okay.
24    Q. So you said, and correct me if I am wrong,
25  that you obtained a signed and dated acknowledgement

Page 90

1  from each and every worker stating that the worker
2  received and reviewed a disclosure document, correct?
3    A. Correct.
4    Q. And then I believe you also stated that after
5  you obtained that document that you gave it to
6  Mr. Martell?
7    A. Correct.
8    Q. And then you stated that you thought
9  Mr. Martell had done something with that document but
10  you were not sure; is that true?
11    A. Correct.
12    Q. Do you recall when you gave those documents
13  to Mr. Martell?
14    A. I don't remember. But I don't remember well,
15  truthfully I don't remember.
16    Q. Do you recall whether those acknowledgements
17  were signed in Texas or in Illinois or in Iowa or
18  somewhere else?
19    A. The workers that's coming with me gives it to
20  me, it's already signed.
21    Q. In Texas?
22    A. In Texas, yes.
23    Q. And after you collect all of them, then you
24  give them to Mr. Martell, or do you give them to
25  Mr. Martell as you get them signed?

Page 91

1    A. When I collect them all.
2    THE INTERPRETER: The interpreter wants to
3  say something. Sometimes he starts speaking while
4  I'm still talking to --
5    MR. HILL: We can take a little break.
6    THE INTERPRETER: I'm okay. But sometimes he
7  speaks when I'm still talking, and the interpreter
8  can't catch what he's saying.
9  BY MR. SANCHEZ:
10    Q. You need to wait for the interpreter to
11  finish, because she's having a hard time.
12    A. Okay.
13    Q. Can you turn to the third page of
14  Exhibit Number 4.
15    A. Three?
16    Q. Yes. Towards the bottom of the page it has
17  paragraph E, safety training. It says contractor will
18  provide management of the personnel performing the
19  services, including training in all levels of field
20  leadership.
21    A. Yes.
22    Q. In 2002, what management of personnel
23  training did you provide?
24    A. The same company.
25    Q. In 2002, did you provide training in field

Page 92

1  leadership?
2    A. Yes.
3    Q. What training did you provide in field
4  leadership?
5    A. Okay. When there is a problem, for example,
6  when it's raining and there is lightning and thunder,
7  go get up on the bus, and to be careful not to slip.
8    Q. Anything else?
9    A. Yes. That they're wearing their shoes, the
10  goggles to protect their vision, because some of them
11  take them off.
12    Q. Did you provide goggles to all the workers in
13  your crew?
14    A. The company gives us all that.
15    Q. Mycogen gives you all that?
16    A. (Witness nodded head up and down.)
17    Q. Yes?
18    A. Yes.
19    Q. You have to answer verbally.
20    It says contractor will provide management of
21  the company's policies with regard to safety, including
22  workers' protection, safety, and first aid.
23    Is that what you had already mentioned about
24  the shoes and getting on the bus when it's lightning
25  and raining?

**Page 93**

1    A. Yes.

2    Q. Are there any other company policies that

3  you're aware of?

4    A. Yes. The same, it's only them, the ones that

5  he said a little while ago, the company.

6        (Mr. Hill left the deposition room.)

7  BY MR. SANCHEZ:

8    Q. Right below that it has paragraph (f), record

9  keeping. What did you do to comply with this

10  paragraph?

11    A. To keep all the -- what is it that you said,

12  what is that word, repeat the word again.

13    Q. What did you do to comply with the

14  record-keeping provisions of this paragraph?

15    A. The company has them all.

16    Q. So all the records that you kept for 2002 you

17  gave to the company?

18    A. Yes. And the ones they have.

19    Q. The very last sentence of that provision says

20  the contractor will maintain those records for at least

21  three years following the end of each season of work

22  under this agreement. Did you keep those records for

23  three years?

24    A. Yes.

25    Q. So you still have those records?

**Page 94**

1    A. Yes. They have the ones for 2002, the 2002

2  they have.

3    Q. So you don't have the records for 2002; is

4  that your testimony?

5    A. No. I don't have them. Those are the papers

6  that he has.

7    Q. So your answer is you don't have the payroll

8  records you're required to keep for three years, yes or

9  no?

10    A. Yes.

11    Q. I think I asked the question wrong.

12      You don't have those records?

13    A. Yes, I have them.

14    Q. Where are they?

15    A. Okay. I have them, but 2002, they have it.

16      THE INTERPRETER: He's pointing at you.

17      THE WITNESS: The problem with this lawsuit,

18    they have all those papers.

19  BY MR. SANCHEZ:

20    Q. So it's your testimony that you tendered the

21  original copies of all your records for 2002 to us?

22      (Mr. Hill returned to the deposition room.)

23      THE WITNESS: I gave them all, of 2002.

24  BY MR. SANCHEZ:

25    Q. Right.

**Page 95**

1    A. Let me think. All the records, the papers of

2  2002. No. No. The records -- the 2002 records, the

3  ones he has there.

4    Q. No.

5    A. No. He wants others?

6    Q. That's not what my question is. My question

7  is, the records you kept for 2002, is it your testimony

8  that you provided us the original copies?

9      MR. HILL: Objection, form.

10      THE WITNESS: Okay. 2002. 2003 I have the

11    papers. 2002? 2002, that's the papers that he

12    has. 2001, 2002, I don't have, 2003 I still have

13    them.

14  BY MR. SANCHEZ:

15    Q. So it's your testimony that you do not have

16  any originals or any copies of any records pertaining

17  to 2002 in your possession?

18      MR. HILL: Objection, form.

19      THE WITNESS: I don't think so. Those are

20    all the papers I have.

21  BY MR. SANCHEZ:

22    Q. I don't mean what I have, just so we're

23  clear. I don't want to know what you've given me, I

24  want to know what you have.

25      MR. HILL: Objection, form.

**Page 96**

1  BY MR. SANCHEZ:

2    Q. Do you have any records in your possession

3  pertaining to the year 2002?

4    A. Yes. I have them, I think I have those

5  records.

6    Q. Where do you have those records?

7    A. I think I have them in Texas.

8    Q. At your home in Texas, at your mother's home,

9  or some other place?

10    A. In the place I have them, I think I have the

11  original.

12      THE INTERPRETER: May the interpreter clarify

13    that, what he just said?

14      MR. SANCHEZ: Sure.

15      THE INTERPRETER: Yes. He did say I have the

16    originals, I think some looks like it.

17      MR. HILL: Is that what you're asking, Rudy?

18    I'm lost myself. The originals, is that all

19    you're asking, the originals of what he gave you

20    he keeps?

21      MR. SANCHEZ: I have a box of documents, some

22    that I got from you, some that I got from

23    Mr. Martell, some that I got from the department

24    of labor, and he hasn't seen any of these

25    documents, and he points and says that I have all

24 (Pages 93 to 96)

**Page 97**

1  the documents. And I just want to know just, so
2  I'm clear --
3      MR. HILL: If he has something other.
4      MR. SANCHEZ: -- if he has -- and he's
5  implying that he gave me documents and didn't keep
6  copies of them, that I have the only copies of
7  them. So I'm just trying to determine if he has
8  anything in his possession, original or copies,
9  pertaining to 2002, so I can maybe compare to what
10  I've got.
11      MR. HILL: Other than what you have.
12      MR. SANCHEZ: No. Including what I have.
13      MR. NORTON: There have been a lot of
14  documents mentioned.
15      MR. SANCHEZ: I just want to know if he has
16  records, because --
17      MR. HILL: He's probably confused if you're
18  asking him -- he's given you documents, and he's
19  pointing to them.
20      MR. SANCHEZ: We've made copies of documents.
21      MR. HILL: I know. And now you're acting
22  like those don't exist, so that's his problem.
23      MR. SANCHEZ: I'm not acting like those don't
24  exist, I'm just asking if he kept a set of records
25  for himself.

**Page 98**

1      MR. HILL: The originals?
2      MR. SANCHEZ: Sure.
3      MR. HILL: Okay.
4      MR. SANCHEZ: Or he also suggested he gave us
5  original documents, and that's why they weren't
6  around anymore, is what I think he's saying, and I
7  just want to see if that's accurate or not.
8  BY MR. SANCHEZ:
9      Q. At the end of the 2002 season, did you
10  provide a copy of all the records that you kept to
11  comply with paragraph (f), record keeping, to Mycogen?
12      A. It looks -- it seems like Mycogen has them,
13  yes.
14      Q. Paragraph (g) says rules and regulations.
15  Can you tell me what the company's temporary
16  agricultural employee safety regulations are?
17      A. Well, it's safety rules. It's not to play at
18  work, there are pathways, that wait until the bus
19  parks. When they have pesticides and all that, then
20  nobody gets near. The company has put all the signs.
21      Q. Anything else?
22      A. No.
23      MR. SANCHEZ: Let's take five.
24      MR. HILL: Sure.
25      (Thereupon, a short recess was taken.)

**Page 99**

1  BY MR. SANCHEZ:
2      Q. Mr. Martinez, back to Exhibit Number 4. Can
3  you flip to page 4 of 14, just the next page. Are you
4  okay?
5      A. A little, I don't know, sinus.
6      Q. Do you need to take a few minutes?
7      A. No. It's okay.
8      Q. Paragraph (a), quality of personnel. And
9  below that paragraph, it says "The company reserves the
10  right to approve or disapprove, including the right to
11  withdraw such approval at any time, the assignment of
12  any individual to perform the services."
13      What do you understand that sentence to mean?
14      A. The phrase means that if we do some damage to
15  the job, they can stop me.
16      Q. They can stop you or stop the worker from
17  working?
18      A. Me, myself. I'm the one responsible for all
19  of them.
20      Q. Do you know whether Mycogen had the authority
21  in 2002 to fire any of your workers?
22      A. No. They've never got involved with the
23  people; any time there is a problem, I'm the
24  responsible one.
25      MR. SANCHEZ: Objection, nonresponsive.

**Page 100**

1  BY MR. SANCHEZ:
2      Q. Mr. Martinez, my question was whether they
3  had the authority, not whether they exercised it.
4      A. Did they have authority? Yes. They have the
5  authority to stop them, to be able to stop them, if
6  we're doing some harm to the company.
7      Q. Towards the bottom of Exhibit Number 4, page
8  4 of 14, it has paragraph two, indemnification and
9  insurance, and it says "Contractor agrees to indemnify
10  and defend company."
11      What do you understand that to mean?
12      A. I understand that you had to watch the
13  interest, the property of the company, damages. There
14  is workers that just, like, for pleasure go and stick
15  the tires of the tractors, you know, stab them, and it
16  has happened.
17      Q. The next page, 5 of 14 of Exhibit Number 4,
18  it has insurance provided by contractor, paragraph
19  number one, workers' compensation.
20      A. Yes.
21      Q. What was the process for obtaining workers'
22  compensation insurance to comply with that paragraph?
23      A. The company is the one that is responsible
24  for all of this. They pay me 175 per acre, and from
25  that they take the cost of insurance, of working.

**Page 101**

1     MR. SANCHEZ: Workers' comp.
2     THE INTERPRETER: Workers' comp. Thank you.
3 BY MR. SANCHEZ:
4     Q. Exhibit Number 4, the page 6 of 14, which is
5 the next page, it has paragraph number three, payment
6 for services. And it says: "Company will pay
7 contractor upon work completed to the satisfaction of
8 company and in compliance with the terms of this
9 agreement."
10     Did you understand that to mean that you
11 would be paid each time you completed a field, or after
12 you completed the estimated 800 acres?
13     A. 800 acres.
14     Q. Did you receive any money from Mycogen prior
15 to completing the 800 acres?
16     A. They give me a certain amount of money per
17 week to cover people's payroll.
18     Q. The payroll for people who are working with
19 you?
20     A. Yes.
21     Q. Did they give that money directly to you, or
22 did they wire it to a bank account, or how did that
23 work?
24     A. Bank account. I don't touch any of that.
25     Q. The bank account, was that in Illinois or in

**Page 102**

1 Florida, or somewhere else?
2     A. In 2002 it was in Florida.
3     Q. Do you still have that account?
4     A. No.
5     Q. Did you set up that account for the 2002
6 detasseling season?
7     A. Yes.
8     Q. And at the end of the season you closed that
9 account?
10     A. Yes. Because the work that ADP did for me, I
11 didn't like, so I change accountants.
12     Q. The next page of Exhibit Number 4, page 7 of
13 14, and it has paragraph (c), loan advances. And it
14 says: "Should company advance the contractor any loan
15 of funds for start-up expenses, such loan shall be
16 documented by the execution by contractor of a
17 promissory note."
18     A. Yes.
19     Q. Did you execute any promissory notes in 2002?
20     A. To him, to the company, or to whom?
21     Q. You with Mycogen.
22     A. Well, they paid me by the contract. And when
23 I come in, of course they give me a loan to support
24 myself.
25     Q. This is before the season started in 2002?

**Page 103**

1     A. Yes.
2     Q. Did you execute a promissory note with
3 Mycogen when you were provided that money?
4     A. The agreement, my agreement with the company,
5 I signed the company, and then when I'm in Iowa, that's
6 when I ask for a loan for 5,000 or 4,000.
7     Q. And you asked for a loan in 2002 from
8 Mycogen?
9     A. I'm not sure. It seems like I did, but I'm
10 not sure. In Texas is when I ask for a loan, to the
11 bank.
12     Q. In 2002 did Mycogen advance you any money to
13 help you pay for housing?
14     A. I'm not sure. See, I'm not sure if I asked
15 the bank or not.
16     Q. Has Mycogen ever advanced you money to
17 provide you housing to your workers?
18     A. No. They lend me, but I'm not sure if I
19 asked that year, I don't remember. The relationship we
20 have is like just do the contract and that's all,
21 that's what we have.
22     Q. But you don't recall whether they've ever
23 advanced you money to provide -- whether Mycogen has
24 ever advanced you money to provide housing for your
25 workers?

**Page 104**

1     A. I don't know if I -- in 2002 if I gave a
2 check of mine, Pablo Martinez, to the motel for the two
3 weeks that I was going to. It could be changed. I did
4 a check, I wrote a check for two weeks, and I told him
5 in two weeks you can cash it, he accepted it.
6     Q. So in 2002 you think that you provided a
7 check to the Heidelburg Motel, and your understanding
8 was they couldn't cash that check for a couple of
9 weeks?
10     A. Yes. Because he knows me.
11     Q. And you asked him to hold on to that check
12 because you didn't have the funds in your account?
13     A. Well, I put it like that, I gamble with it,
14 and he accept it.
15     Q. The man who runs the Heidelburg Hotel, his
16 name is Lewis Pang?
17     A. Yes.
18     Q. When do you recall the first meeting with
19 Mr. Pang?
20     A. It's like been like about six years.
21     Q. How did you meet Mr. Pang?
22     A. With the other company.
23     Q. You're referring to the predecessor to
24 Mycogen, Cargill?
25     A. Cargill, before it was Cargill.

Page 105

1  Q. Then Cargill became Mycogen?
2  A. Something like that, yes.
3  Q. Who introduced you to Mr. Pang?
4  A. When I was in Cargill, we looked for a motel,
5  and we started to relate to each other. Almost every
6  year we change hotels, because either there is some
7  damage or the owner doesn't like it.
8  Q. In 2002, you had workers at the Heidelburg
9  Motel and the Iris Motel, correct?
10  A. Yes.
11  Q. Was that for both the detasseling and the
12  sorting season in 2002?
13  A. No, no. It was for detasseling.
14  Q. In 2003, when you had workers detasseling,
15  where did they stay?
16  A. In 2003? In the same one right there, in the
17  same one.
18  Q. The Heidelburg?
19  A. Yes.
20  Q. And in 2004, for detasseling?
21  A. I changed to Iris Motel.
22  Q. Is it Irish with an "H", or Iris with just an
23  "S"?
24  A. Iris.
25  Q. In 2002, how many rooms did you reserve at

Page 106

1  the Heidelburg Motel?
2  (Mr. Hill left the deposition room.)
3  THE WITNESS: An average of twelve.
4  BY MR. SANCHEZ:
5  Q. And how many rooms did you reserve at the
6  Iris Motel in 2002?
7  A. An average of three.
8  Q. So you had about fifteen rooms total for your
9  crew?
10  A. Yes.
11  Q. How many people were living in each room?
12  A. Four. Four.
13  Q. How many beds did each room have?
14  A. Two.
15  Q. Were there unrelated male workers sharing
16  beds?
17  A. Yes.
18  Q. Exhibit Number 4 has several blank pages.
19  For example, page number 9 of 14, and number 10 of 14,
20  and the last page. Do you know why those pages are
21  blank?
22  A. No.
23  Q. But you still signed this document anyways,
24  right?
25  A. Yes.

Page 107

1  (Mr. Hill returned to the deposition room.)
2  BY MR. SANCHEZ:
3  Q. Mr. Martinez, you've never been in the hotel
4  business, right?
5  A. Correct.
6  (Exhibit No. 6 was marked for identification.)
7  BY MR. SANCHEZ:
8  Q. Mr. Martinez, I'm going to hand you a
9  document marked as Exhibit Number 6, and I understand
10  Exhibit Number 6 to be an application or a document
11  that you submitted to the Illinois Department of Labor;
12  is that correct?
13  A. Yes. This is signed by the work contractors,
14  Pablo Martinez.
15  Q. Did you fill out the document marked as
16  Exhibit Number 6?
17  A. This here?
18  Q. Yes. The handwritten information on here.
19  A. Yes.
20  Q. In here on Exhibit Number 6, you list
21  Jim Sheriff as your employer; is that correct?
22  A. Correct.
23  Q. You list that you're going to be doing some
24  work with seed corn?
25  A. Yes.

Page 108

1  Q. And you also list that you anticipate it will
2  be eight to ten hours of work per day?
3  A. Yes.
4  Q. And that work will last six days a week,
5  correct?
6  A. Correct.
7  Q. And that's your signature on the bottom of
8  Exhibit Number 6, correct?
9  A. Correct.
10  Q. There is a signature right below yours. Did
11  that individual sign this in front of you, or did you
12  mail this in and have it sent back to you?
13  A. With this signature -- they send it back with
14  this signature.
15  (Exhibit No. 7 was marked for identification.)
16  BY MR. SANCHEZ:
17  Q. Mr. Martinez, I'm going to hand you a
18  document marked as Exhibit Number 7, and this document
19  was provided to us by you, and it's my understanding
20  that this lists the work you did and the amounts of
21  monies you were paid by Mycogen in 2002 for detasseling
22  and rouging. Is my understanding accurate?
23  A. Yes.
24  Q. Are you able to look at Exhibit Number 7 and
25  describe to me what the columns of information mean?

Page 109

1    A.  Okay.  Number 7.  Here it is.  This is the
2  block number, this is the name of the farmer, these are
3  the gross acres that are there, these are the fertile
4  acres, the ones that are going to harvest, these are
5  the female acres, sterile female acres, male acres,
6  this is the date when I did it.
7    Q.  And you're looking at the --
8    A.  -- when you cut it.
9    Q.  And you're looking at the column that says
10  first pass?
11    A.  Yes.
12    Q.  And then second pass, what does what refer
13  to?
14    A.  This is like when you do the removing the
15  plants that are not suitable, or the ones that are not
16  needed.
17    Q.  And then the rate per acre, what does that
18  refer to?
19    A.  $100 per acre.
20    Q.  That's the paid per acre, right?
21    A.  Yes.
22    Q.  Right before that it has rate per acre?
23    A.  Yes.
24    Q.  What does that mean?
25    A.  What they pay me.

Page 110

1    Q.  Then it's paid per acre, and then it has
2  total due?
3    A.  Yes.
4    Q.  That's the amount you're owed for each field;
5  is that correct?  The total due is the amount that
6  you're owed for each field?
7    A.  Yes.
8    Q.  And next to that is paid, and those are the
9  amounts that are paid to you prior to the end of the
10  detasseling season, correct?
11    A.  No.  Right here is what they already paid me,
12  the total of the acres.
13    Q.  But I'm looking at right here this column,
14  "paid."  That's how much they paid you before the end
15  of the season, correct?
16    A.  No.  When it was finished.
17    Q.  What is this column here, left for
18  settlement?
19    A.  Okay.  Because there is times that there are
20  like blocks that don't pass, the inspector comes in and he
21  says this is not -- this is no good.  And then they
22  bring a machine and they go over it again, and this is
23  what they charge, and they charge this over.
24    Q.  So you're paid before the work is actually
25  completed?

Page 111

1    A.  They pay me at the end.  It takes two weeks
2  to three weeks for them to pay what is mine.
3    Q.  Okay.  The middle part of Exhibit Number 7,
4  it has rouging and an amount, then it has detasseling
5  and it has an amount.  Those are the total amount of
6  monies that you're owed, correct?
7    THE INTERPRETER:  May the interpreter ask a
8  clarification.  Did you say the amount that you
9  owe?
10    MR. SANCHEZ:  The amount that he's owed.
11    THE INTERPRETER:  That's what I said.  Thank
12  you.
13    THE WITNESS:  That's what they discount.
14  That's what they are going to pay me, but then
15  they take out all of this.
16  BY MR. SANCHEZ:
17    Q.  Well, Exhibit Number 7, the column that says
18  rouging, it has the amount of $1,190.10, correct?
19    A.  Uh-huh.
20    Q.  That's the amount of money you're owed for
21  performing rouging work in 2002, correct?
22    A.  Correct.
23    Q.  Right below that it has detasseling, and it
24  has the amount of $120,600.  That's the amount of
25  monies that you're owed for the detasseling work that

Page 112

1  was done by you and your crew?
2    A.  Yes.
3    Q.  And then it has bus, it has $1,465.  The
4  amount for the bus is deducted from those earnings,
5  correct?
6    A.  Yes, correct.
7    Q.  Then below that it has van and it has a
8  thousand dollars?
9    A.  Correct.
10    Q.  And that's the amount of monies that Mycogen
11  deducted for the van that was rented?
12    A.  Correct.
13    Q.  And below van it has workers' compensation
14  and it has $8,142, and that's the amount of money that
15  was deducted for workers' compensation for your crew,
16  right?
17    A.  Correct.
18    Q.  Then below that it has paid, $87,440.20, and
19  that's the amount of monies that you were paid before
20  the season ended, correct?
21    A.  That's what they pay me, but when I finish
22  the season.
23    Q.  What is this amount here at the bottom of
24  paid?
25    A.  This is what he paid me the acres, the

28 (Pages 109 to 112)

**Page 113**

1   company.
2       Q.  During the season?
3       A.  Yes.
4       Q.  Then the last item here in the middle,
5   settlement, that's what you're paid after the season is
6   over, right?
7       A.  Correct.
8       Q.  On the second page of Exhibit 7, on the very
9   bottom it says rouging settlement.  I believe earlier
10  you said you didn't do any rouging, but does this jog
11  your memory that you did any rouging in 2002?
12      A.  There was a year that I helped my brother, I
13  placed some people.  Here it is, rouging male.  Here it
14  is, 300-and-something acres.
15      Q.  Could you tell me what the difference is
16  between rouging first, rouging second, and rouging
17  male?
18      A.  The first rouging you got the people in for
19  the first -- for the first --
20      MR. HILL:  Pass.
21      THE INTERPRETER:  The first pass.  You can
22  use that.  Okay.
23      THE WITNESS:  They pay let's say $5 an acre;
24  the second one $3 an acre; sometimes they do a
25  third one, $2 an acre.

**Page 114**

1   BY MR. SANCHEZ:
2       Q.  The rouging male, would that be the third
3   pass, or is that some different type of work?
4       A.  There is some fields that are extremely
5   dirty.
6       Q.  Dirty as in lots of weeds, or lots of mud?
7       A.  No.  The males that come up, and the one that
8   goes cutting doesn't see them.
9       Q.  It also has the name Vela and the name Gumaro
10  on this Exhibit Number 7, correct?
11      A.  Correct.
12      Q.  Is it your understanding that the name Gumaro
13  is referring to your brother, Gumaro Martinez?
14      A.  Yes.
15      Q.  Do you know who Vela is?
16      A.  I know him, but I really don't have a
17  friendship with him.  I just say hi.
18      Q.  Do you know his name or her name?
19      A.  No.  Vela.
20      Q.  Somebody with the last name of Vela is a
21  contractor for Mycogen also?
22      A.  Well, it's here, he's here.  I don't know.
23      (Exhibit No. 8 was marked for identification.)
24  BY MR. SANCHEZ:
25      Q.  Mr. Martinez, I'm going to hand you a

**Page 115**

1   document marked as Exhibit Number 8, and at the bottom
2   of Exhibit 8 it has what appears to be Jim Sheriff's
3   signature and your signature, correct?
4       A.  Yes.
5       Q.  Could you tell me this agreement that's
6   labeled contract labor agreement, can you tell me what
7   this document is?
8       A.  Here Jim verifies the field number:  105,
9   107, 114.
10      Q.  The document marked Exhibit Number 8, is it
11  used after you finish doing a field to kind of
12  summarize what work you did and how much you're
13  supposed to get paid for it?
14      A.  Yes.  Because here it says 726, and here it's
15  always -- it's towards the end of the run, so these
16  blocks, they pay me at this amount.
17      Q.  So Exhibit Number 8, is this something that
18  you would sign before you finish the work or after you
19  finish the work for a particular field?
20      A.  These blocks are already done, they're
21  passed.
22      Q.  We were provided a number of documents like
23  Exhibit Number 8 for different fields.  To save time
24  and not look at each of those documents, do you recall
25  in 2002 whether your explanation -- let me take that

**Page 116**

1   back.
2       The purpose of those documents in 2002 are
3   the same as Exhibit Number 8, correct?
4       A.  Correct.
5       (Exhibit No. 9 was marked for identification.)
6   BY MR. SANCHEZ:
7       Q.  Mr. Martinez, I'm going to hand you a
8   document marked Exhibit Number 9, and it's written in
9   English, but at the very top it says Mycogen Seeds
10  Field Worker Safety Guidelines.  Is Exhibit Number 9
11  one of those documents that's reviewed by you at the
12  orientation session?
13      A.  Yes.
14      Q.  And by reviewed by you, I mean that you
15  review with the workers that you've recruited.
16      A.  Yes.
17      (Exhibit No. 10 was marked for identification.)
18  BY MR. SANCHEZ:
19      Q.  Mr. Martinez, I'm going to hand you a
20  document marked Exhibit Number 10.  Exhibit Number 10
21  is a letter dated May 7th, 2003 from Mycogen Seeds and
22  I believe Jim Sheriff, and I believe that was provided
23  by you to us.  Is that correct?
24      A.  I don't remember.
25      Q.  Do you recall receiving -- I believe you said

29 (Pages 113 to 116)

**Page 117**

1  that you received materials from Mycogen Seeds before
2  the start of the detasseling season.
3     A.  Yes.
4     Q.  When you received those documents, do they
5  normally come with a letter from Mycogen, or are they
6  just documents without an explanation of what was sent?
7     A.  It comes with a seal, Mycogen, and it comes
8  with all the forms for the workers, everything that I
9  have to explain to them.
10    Q.  And those documents are sent to you in Texas,
11 correct?
12    A.  Texas.  If I'm in here in Florida, they send
13 it to me here.
14    Q.  Do you recall where they were sent in 2002?
15    A.  And truthfully, I don't remember.
16    Q.  In 2002 do you recall having any phone
17 conversations with Mr. Sheriff before he sent you any
18 documents or before you decided to detassel corn for
19 Mycogen?
20    A.  If he talks to me, Pablo, are you ready again
21 to work with me.  Yes, I'm ready.  Okay.  I'm going to
22 send you all the documentation for the workers.
23    Q.  Does he normally call about the same time of
24 year?
25    A.  More or less.

**Page 118**

1     Q.  More or less what time of year is that?
2     A.  The end of May is when he talks to me.
3     (Exhibit No. 11 was marked for identification.)
4  BY MR. SANCHEZ:
5     Q.  Mr. Martinez, I'm going to hand you a
6  document marked Exhibit 11, it's one page, and I'd like
7  to know if you can tell me what this document is.
8     A.  It's of the fields.
9     Q.  Do you know what this document is used for?
10    A.  This I don't use.  This could probably be
11 used for -- like I said before, there are three
12 processes:  Volunteer, rouging, and detasseling.  I
13 don't use this.  Perhaps others, but...
14    Q.  What is this form used for?
15    A.  It's used for those who have the long rows,
16 short rows, sterile frames.  This could be used by
17 those who do the rouging.  They just had the obligation
18 to send this to me also, so they send it to me.
19    Q.  Mr. Martinez, detasseling is just one part of
20 the process of creating, of growing seed corn, right?
21    A.  Correct.
22    Q.  If detasseling is not properly done, the seed
23 corn crop will be ruined, correct?
24    A.  Correct.
25    Q.  And I'm not a farm worker, but just to

**Page 119**

1  produce seed corn, you have to plant it, then you have
2  to tend to it, you have to rouge and detassel it,
3  correct?
4     A.  Correct.
5     Q.  And then you harvest a crop?
6     A.  Well, the farmer.  I don't do any harvesting,
7  I just do the detasseling, and about two months later.
8     Q.  Right.  But to produce the crop, you have to
9  go through those phases, correct?
10    A.  Yes.
11    Q.  And detasseling and rouging are part of that
12 process?
13    A.  Correct.
14    Q.  Okay.
15    A.  Like this.  Excuse me.  The first process you
16 plant it.  It's about the volunteers, the ones that
17 come up on their own, you have to get people in, that's
18 a process.  Then comes the rouging.  But sometimes you
19 have to go three times in the blocks.  And then it's my
20 process, which is the detasseling.
21    Q.  And then someone else does the harvest?
22    A.  Yeah.  Those are the farmers, because that's
23 all machinery.
24    (Exhibit No. 12 was marked for identification.)
25 BY MR. SANCHEZ:

**Page 120**

1     Q.  I'm going to hand you a document marked
2  Exhibit 12.  Exhibit Number 12 consists of eight pages,
3  but I'm going to try to not talk about all the pages.
4  If you look at Exhibit Number 12, this is an
5  application for workers' compensation insurance,
6  correct?
7     A.  Correct.
8     Q.  And the second page of Exhibit Number 12 has
9  your signature, correct?
10    A.  Correct.
11    Q.  Now, this is the application that Mycogen
12 helped you fill out and submit for workers' comp
13 insurance in 2002, correct?
14    A.  Correct.
15    Q.  On the third page of Exhibit Number 12, it
16 has handwritten in there that "worked as an employee of
17 Mycogen in past."  Did you write that, or did somebody
18 else write that?
19    A.  No, I didn't.
20    Q.  Did you work with Mycogen prior to 2002?
21    A.  I don't remember.  2002.  Or perhaps this say
22 that it was with the same company before.
23    Q.  So in other words, you're referring to --
24 maybe it's Cargill that you're referring to?
25    A.  Yes.  Yes.

30 (Pages 117 to 120)

Page 121

1    Q.  If you look at the last page of this exhibit,
2  it says towards the very bottom, it said do you work
3  for other companies as an independent contractor, and
4  there is a box checked no.
5    A.  No.
6    Q.  You don't provide the sort of work you
7  provided to Mycogen to any other companies, correct?
8    A.  No.
9    Q.  Did you provide any advances to any of the
10 plaintiffs before they traveled to Iowa in 2002?
11   A.  Correct.
12   Q.  Yes, you did?
13   A.  Yes.
14   Q.  When you rent the rooms at the Iris Motel,
15 did you deal with a gentleman by the name of Mr. Patel?
16   A.  Correct.
17   Q.  Do you know Mr. Patel's full name?
18   A.  No.
19   Q.  Do you know the address for the Iris Motel?
20   A.  I don't have anything right with me.  It
21 would be with all the papers now that I paid the rent.
22   Q.  The workers on your crew who were living over
23 at the Iris Motel in 2002 were taken to and from the
24 fields in a van; is that true?
25   A.  2002?

Page 122

1    Q.  Yes.
2    A.  If it is in the contract that the company
3  used a van, then a van was used.  They use them for
4  rouging.
5    Q.  The van?
6    A.  Yes.
7    Q.  Do you know who drove the van?
8    A.  Andres Lopez.  I don't remember.  I'm not
9  sure.
10   Q.  So it's possible that in 2002 Andres Lopez
11 drove the van but you're not sure?
12   A.  Correct.
13   Q.  If your crew had any problems with the
14 housing at the Heidelburg Motel, were they instructed
15 by you to --
16   A.  Yes.
17      MR. SANCHEZ:  I think you might have missed
18   my translation on that, let me repeat the
19   question.
20 BY MR. SANCHEZ:
21   Q.  Were your crew members instructed that if
22 they had problems with the housing that they could
23 complain to you or to Mr. Martell or to Mr. Pang or
24 somebody else?
25   A.  The problem that I had that year was that the

Page 123

1  people destroyed a room, that was all, so we had to
2  pay.
3    Q.  So in 2002, you had a problem because some
4  crew members destroyed a room; is that correct?
5    A.  Correct.
6    Q.  And you're responsible for the rooms because
7  you were paying for the rooms?
8    A.  Yes.  I had to pay all the damages, correct.
9    Q.  So my question is, since you were responsible
10 for the rooms, were the workers instructed to talk to
11 you if they had any problems about their room?
12   A.  Like when I stay at night, I explain to
13 people about their rooms, if you have problems in the
14 room, talk to Mr. Martell.  Because I get at in eight,
15 at ten, eleven, from work, from the field.
16   Q.  And if Mr. Pang had problems with your crew,
17 did he also go to Mr. Martell to try to straighten out
18 the situation?
19   A.  Yes.  It's difficult to find me, because I'm
20 all day gone all over.
21   Q.  Did you have a similar person assigned with
22 that responsibility at the Iris Motel?
23   A.  Mr. Martell.
24   Q.  Did Mr. Martell have use of a vehicle in
25 2002?

Page 124

1    A.  Yes.
2    Q.  Whose vehicle?
3    A.  It seemed to be the bus driver's vehicle, and
4  he would lend it to him.  But he doesn't use it very
5  much, only when he goes to McDonalds or for coffee.
6    Q.  How many days did the 2002 detasseling season
7  last?
8    A.  Well, I'm not sure.  I'm not very sure if it
9  lasted, like, sixteen days.
10   Q.  Do you recall whether it lasted longer or
11 shorter than you had expected?
12   A.  It lasted less, because the sun came out hot,
13 hot, and so it pushes the plants, so they put them a
14 week earlier.
15   Q.  When the workers arrived in Iowa at the
16 Heidelburg, did they fill out paperwork there, and then
17 go to the orientation session in Gladstone?
18   A.  They get to their motel, because sometimes
19 they said they're coming to the motel from Texas, but
20 they don't show up, and then when they get to the hotel
21 you give them their room, how many are going to live
22 there, if it's three, because from one day to the next,
23 the people have to arrive.
24      And the next day you have to take them to
25 orientation, and then they fill out their applications.

31 (Pages 121 to 124)

Page 125

1  The forms, they fill it all out there, and then we put
2  them out. And the ones we send to the government, the
3  one who gets the taxes.
4      Q.  Then they come back to the hotel?
5      A.  If the job is very strong, then we have to
6  put them to work.
7      Q.  In 2002 do you recall if you went straight
8  from orientation to work?
9      A.  I don't remember.
10     Q.  Okay.
11     A.  But that's how you work in the fields.
12     Q.  Okay. And were you in the fields every day?
13     A.  From five in the morning until ten.
14  Sometimes it gets dark at ten, right, in the north, up
15  north?
16     Q.  Who was responsible in 2002 for how many rows
17  equalled an acre?
18     A.  Part was Maria, I was training her, and part
19  was Mr. Renderos.
20     Q.  So Maria Flores and --
21     A.  Roberto Renderos.
22     Q.  -- Roberto Renderos?
23     A.  Yes. My team was the field workers, two
24  workers: Maria, Martell, and the driver and me. I pay
25  them a salary, it doesn't go with the acres, I pay that

Page 126

1  from my salary.
2      Q.  They get paid a salary by you and they don't
3  get paid by acre?
4      A.  No.
5      MR. SANCHEZ:  I don't think that answer was
6  clear, so I'd like to repeat the question. That's
7  a compound question.
8  BY MR. SANCHEZ:
9      Q.  Those three people got paid a salary by you?
10     A.  It's five.
11     Q.  Could you name those five people again?
12     A.  Martell, Maria, Roberto Renderos,
13  Eusebio Martinez, and Celestino Lopez.
14     Q.  Those are five people you would consider to
15  be your supervisor sort of personnel?
16     A.  Yes. Make sure that the people, they have
17  enough water and that everything is running well.
18     Q.  Did each of those folks have a radio to keep
19  communication with each other?
20     A.  Yes.
21     Q.  Who provided those radios?
22     A.  I rent them.
23     Q.  You rent them?
24     A.  Yes.
25     Q.  From who?

Page 127

1      A.  A company that is there in Burlington.
2      Q.  Were there portable toilets in the field
3  where you were working every day?
4      A.  Correct.
5      Q.  Was it the same number of portable toilets
6  every day?
7      A.  Yes. There is a field here, and in each
8  field there are several.
9      Q.  Do you recall how many were in each field in
10  2002.
11     A.  The toilets?
12     Q.  Yes.
13     A.  It depends. Some blocks have 180 acres, but
14  the whole time they always have two bathrooms.
15     Q.  It's my understanding that some of those rows
16  can be more than a mile long; is that true?
17     A.  Never, never. A mile is too far. There are
18  half a mile, three quarters of a mile, that's the
19  longest.
20     Q.  Where are toilets put, at both ends of the
21  field, or at one end of the field?
22     A.  They put one in the middle and one at each
23  end. Each one is a quarter mile apart.
24     Q.  Do you know a worker by the name of
25  Everardo Garcia?

Page 128

1      A.  I never going to forget him, yes.
2      Q.  Was there an incident with Mr. Garcia in
3  2002?
4      A.  I think with me he didn't have anything. He
5  got a little discontent for one of the checks. Because
6  they went to Texas and I didn't sign them, and they had
7  to go back to Florida so I could sign them. Perhaps if
8  I'd been in Texas, this probably wouldn't have
9  happened.
10     But perhaps because my -- and my body. It
11  was his first year, maybe he thought that he was
12  cheated and he wasn't doing a good job. That's what
13  happens. Those people have years working with me,
14  eight, nine years.
15     Q.  Was there ever an incident where
16  Everardo Garcia passed out in the field in 2002?
17     A.  No, never.
18     Q.  In 2002, did you ever sell soda to workers in
19  the field?
20     A.  Soda? Not me.
21     Q.  Did somebody?
22     A.  Someone goes and sells soda, yes.
23     Q.  Who was selling sodas in 2002?
24     A.  That person didn't work with me. That person
25  comes from another place and sells sodas.

32 (Pages 125 to 128)

Page 129

1    Q.  Do you know that person's name?
2    A.  No.  Because the people go hey, bring us
3  sodas. I can't.  Because they are going to say that
4  I'm doing business with them.
5    Q.  Did you make any arrangements to have that
6  person come and sell sodas in 2002?
7    A.  No. No.
8    Q.  How many different fields did you — the
9  fields you were working in, were they close to each
10  other?
11    A.  An average of 5 miles.  There is a section of
12  5 miles, there is like 500, 400 acres, and then you go
13  like thirty miles and there is another one for 400.
14    Q.  And how far was this from Mount Pleasant,
15  Iowa?
16    A.  About 40 miles.
17    Q.  The person who was selling sodas, do you know
18  where that person was coming from?
19    A.  She came from another field.  I didn't know
20  if it was my brother's, or from the town, that they
21  know that people were coming.
22    Q.  Were there ever occasions when the tags you
23  had out in the rows would fall off?
24    A.  Yes.  Because sometimes there comes a very
25  strong storm, and then they come off.  Not all of them.

Page 130

1  Then Maria has to go over the book and find each row.
2    Q.  Were there ever any times when that happened
3  and people complained that they weren't being credited
4  with the rows they had detasseled?
5    A.  Tell me again.  Were there people...
6    Q.  Were there people who complained about not
7  being properly paid for the detasseling that they did?
8    A.  No.  The whole time when I finished the job,
9  the company checked the 800 acres that I worked, they
10  check everything so that they pay the 800 to the people
11  for sure.
12    Q.  So Mycogen reviews the records to make sure
13  that if you detassel 800 acres, that people get paid
14  for detasseling 800 acres?
15    A.  Correct.  For a half an acre I have to do all
16  of it all over again.  The company tells me I gave you
17  800, 800 you're going to pay for.
18    Q.  And you're going to pay at $70 an acre?
19    A.  Correct.
20    Q.  Who decided to pay the workers $70 per acre?
21    A.  That's a meeting that they did before when
22  the other company, Cargill, was around.  Because there
23  are people who said Pablo, I want to work, I don't want
24  hours.  Because there are people who earn 200 a day,
25  and if they pay by the hour, that's $65.

Page 131

1    Q.  So who set the rate at $70 per acre and not
2  some other rate?
3    A.  $70 per acre, not per hour.
4    Q.  Right, $70 per acre.
5    A.  They got together among themselves, they came
6  to an agreement.  I don't know.
7        The company that I work for paid 65 cents per
8  box.  When you have new people — because you have to
9  pay the minimum wage — because you train them and
10  train them and train them, and a week later, they're
11  already over doing the job, and then you pay them the
12  65 cents a box.  And the acres are figured out the same
13  way.
14    Q.  Okay.
15    A.  The bosses in the company do that.
16    Q.  So Mycogen instructs you to pay your workers
17  $70 per acre?
18    A.  Yes.  For people to be happy.  And one who
19  doesn't like to work, you can give them a thousand
20  dollars, and they're never going to be happy.
21    Q.  Mr. Martinez, you don't own any of the land
22  where any of the corn you detasseled is grown, correct?
23    A.  Correct.
24    Q.  Do you have any financial investment in the
25  seeds that were planted on that ground?

Page 132

1    A.  No.
2    Q.  Did you provide any equipment to detassel the
3  seed corn?
4    A.  No.
5    Q.  About how soon after the work ended did the
6  crew members receive their last paycheck?
7    A.  When they worked the first week, they get
8  their check.
9        MR. SANCHEZ:  Okay.
10        (Thereupon, a short recess was taken.)
11  BY MR. SANCHEZ:
12    Q.  Did all the workers that worked for you in
13  2002 finish the season?
14    A.  There was some who didn't finish, they had
15  problems, fights, so that's it, you pay them and that's
16  it.
17    Q.  Are you okay?
18    A.  Yes.
19    Q.  Did all of the plaintiffs successfully finish
20  the season?
21    A.  The ones I'm saying, there is some that
22  didn't, there is like two or three who didn't.
23    Q.  Do you recall their names?
24    A.  There is a Sanchez.  No one Sanchez?
25  Rudy Sanchez?

33 (Pages 129 to 132)

Page 133

1    Q.  That's me.
2    A.  But there is a Sanchez who was the one with a
3  fight problem, and there is others.
4    Q.  If you look at Exhibit Number 3, there under
5  interrogatory number 22, it has all the names listed of
6  plaintiffs.  So it's your understanding that
7  Higinio Sanchez-Ramoz didn't finish the season?
8    A.  Not for sure.  (In English).
9        But I know that one, Hugo Martinez, and
10  Sanchez, they did not finish the season.  There are
11  four of them, but I don't remember them all.
12    Q.  So you remember two of them, you think, and
13  you think there are two others, correct?
14    A.  Right.
15    Q.  Do you know what happened?  Was it one
16  incident involving all four of them, or was it separate
17  incidents for each of them?
18    A.  They were all in the same room, and they were
19  drunk or drugs something, they did something.  So at
20  three o'clock in the morning, the manager of the hotel
21  calls me and he said Pablo, they are destroying the
22  room.
23    Q.  And what happened?
24    A.  I controlled them.  Please, this and that,
25  and that.  So after three or four hours when the dawn

Page 134

1  came, I said, here, this is what I owe you, the drop
2  has kind of gone away some.
3    Q.  Then you —
4    A.  The motel, I told them the — I didn't fire
5  them from work, but they left the motel.
6    Q.  But they were thrown out of the hotel?
7    A.  Yes.
8    Q.  And they returned to Texas right after that?
9    A.  They left in the bus, it seems like.
10    Q.  Did you take them to the bus station?
11    A.  No.  When I came back, they were not there
12  any more.
13    Q.  Who roomed with you in 2002?
14    A.  I was with — I don't know if I was with my
15  buddy.
16    Q.  Meaning Mr. Martell?
17    A.  Martell.  Or I was with Xavier, let's see,
18  Gonzalez.  I don't know if it was that year.
19    Q.  So you were with one other person but you
20  don't recall who that person was?
21    A.  No.  Because I was with my buddy or the
22  chauffers.  I get home at ten o'clock at night, get a
23  shower, and boom.  Get home at ten o'clock, I take
24  shower, my partner is asleep, and then I sleep only
25  three or four hours a night.  By the time you get a

Page 135

1  shower it's 11:30.  Like four o'clock in the morning,
2  you're up and you are calling the people, knock, to go
3  to work.
4    Q.  Okay.  I don't know if I understood the
5  answer to my question.  You shared a room with one
6  other person?
7    A.  Yes.
8    Q.  But it was Mr. Martell, or it was not
9  Mr. Martell?
10    A.  It was Mr. Martell, it was Chino.  It was my
11  son, Pablo Martinez, Jr., in another room.  But since
12  he only lasted a week, he didn't behave well, I send
13  him back.
14    Q.  Your son you sent back?
15    A.  My son.  He's young.  Like he lays in the
16  motel, no.  (In English)
17    Q.  So you four people shared a room, or you four
18  people had two rooms?
19    A.  The field workers, the workers have one room,
20  and Martell and the driver have another one.  Most of
21  the time, but sometimes we can't.  So where I lay down,
22  where I take a shower, I just find a little place
23  there.
24    Q.  So in other words, you don't have a room, you
25  just kind of go to wherever there is space for you?

Page 136

1    A.  Why am I going to want it for by myself, why
2  am I going to pay for it?
3    Q.  For three hours.
4    A.  Because you have to sleep, the three hours
5  you sleep.  That's why Martell and the chauffeur are
6  alone.
7        MR. SANCHEZ:  I'll pass the witness.
8        (Exhibit No. 13 was marked for identification.)
9        MR. HILL:  It's just 13 is the same as 33,
10    we'll double mark one.
11           CROSS (PABLO MARTINEZ)
12  BY MR. HILL:
13    Q.  Mr. Martinez, do you understand that my name
14  is Frank Hill, and that I represent Mycogen Seeds in
15  this litigation?
16    A.  Yes.
17    Q.  Can you tell the jury, please, when you first
18  started working in the fields?
19    A.  The fields, what age I started?  About
20  sixteen years old.
21    Q.  And what were you doing in the fields at the
22  age of sixteen?
23    A.  Cleaning lettuce, I started like that.  I
24  started cutting it.  I started to pack, pack.  And then
25  that's how I started relating until the company gave

34 (Pages 133 to 136)

Page 137

1   me -- advanced me like fifteen years later.
2       Q.  When you were a young man working in the
3   fields, how many hours a day did you work?
4       A.  From six o'clock -- well, from six o'clock in
5   the morning until five or six.  Plus at night I used to
6   go work stocking the trailers.  If you look at one of
7   my checks when I started, I earned $800, which nobody
8   earned that, whoever worked in the field at that time,
9   no.
10      Q.  How many hours total a week would you work?
11      A.  A week, seventy hours, average.
12      Q.  And you're harvesting lettuce today, are you
13  not?
14      A.  The company gave me the opportunity now to
15  take care of all the lettuce department, which it's
16  millions what they're dealing with, and they give me
17  some.
18      Q.  So yesterday when you were working in the
19  fields, what time in the morning did you get up and
20  what time in the morning did you quit?
21      A.  I start, I get up at 4:30 in the morning, at
22  5:00 I go to work, check the fields.  I check the
23  trucks, everything is running.  At 7:00 people arrive.
24  There are six buses with people, and each have their
25  own foremen.  Then I send them to the different areas

Page 138

1   where the job, the work is needed.
2       Q.  Are you working as a farm labor contractor
3   now?
4       A.  No.  I'm just an employee, employee of the
5   company.
6       Q.  What time do you usually quit?
7       A.  Regularly, right now the way it is, I don't
8   know, six o'clock in the afternoon.
9       Q.  And have you worked in the fields all your
10  life?
11      A.  With the company, I have thirty-one years
12  with the company.
13      MR. HILL:  I mean, from the age of sixteen to
14      the age Mr. Martinez is today, has he worked in
15      the fields?
16      THE WITNESS:  At fourteen years old I came
17      from Mexico, I worked in Texas for two years in
18      the fields.  At fourteen years old I came to
19      Texas, I started to work in the fields, and at
20      sixteen I came to Florida.  That's when I started
21      to work at the company where I'm at.
22  BY MR. HILL:
23      Q.  So you have worked how many years in the
24  fields?
25      A.  Thirty-five years.

Page 139

1       Q.  Have you found it to be a hard life?
2       A.  To me -- for many, that's a life that is
3   impossible, but to me, God has given me a strength that
4   I never have enough work, I always want more, more,
5   more.
6       Q.  Do you have compassion for agriculture
7   workers who work in the field?
8       A.  A hundred percent.  Because I started there.
9   I know it's a pain, I know what that is like.
10      Q.  You understand that a number of plaintiffs
11  have sued you in a lawsuit?
12      A.  Yes.
13      Q.  Have any of these plaintiffs in the Alonso
14  case come to you person to person and said Pablo, I
15  have a complaint against you?
16      A.  Well, I didn't have the opportunity to talk
17  with these persons, but if I had had the opportunity, I
18  would tell them give me the opportunity and I try to
19  fix it.
20      Q.  So no one has told you person to person what
21  to fix?
22      A.  No.  Because these people, these people -- I
23  saw Armando Cisneros, and when I saw him, I asked him,
24  I say what's the problem, because I behave the best
25  with you guys.  These people have years working with

Page 140

1   me, Augustin, Everardo, this person, because he is an
2   alcoholic I was trying to take along, but he took to --
3   he drunk too much, Everardo Garcia.  I was afraid that
4   he was not going to really do the job, and I didn't
5   bring him, sometimes I tried not to.
6       Q.  Do you know of any plaintiff in this lawsuit
7   that you have done wrong?
8       A.  I swear for my children who are alive that I
9   didn't take one penny out of these persons to pay
10  Martell or to pay Maria.  What's theirs is theirs, they
11  worked hard, they have to be paid.
12      Q.  Have you failed to pay Armando Alonso?
13      A.  No.
14      Q.  Have you failed to pay Armando Cisneros?
15      A.  No.
16      Q.  I'm not going to list all the names of the
17  people who have sued you, but have you failed to pay
18  anybody?
19      A.  I got a little bit confused.  What do you
20  mean, failed to pay?
21      Q.  Have you failed to pay any worker who
22  detasseled corn in 2002?
23      A.  Every people got paid what they worked.
24      Q.  Did you cheat any man or woman on the list
25  out of one penny?

35 (Pages 137 to 140)

Page 141

1     A. No.
2     Q. Do you swear to God that that is true?
3     A. For my children, for God, if it's a lie, may
4 the earth open up and take them, because if I tell
5 lies, I never took a penny from them.
6     Q. Did you loan money to these people, some of
7 them, anyway?
8     A. All of these I have lent money, all the ones
9 who are here.
10     Q. Did you every require them to pay back more
11 than they borrowed from you?
12     A. Never.
13     Q. Did you try and keep track of their hours and
14 make sure they got credit for all hours worked?
15     A. Correct.
16     (Exhibit No. 17 was marked for identification.)
17 BY MR. HILL:
18     Q. Let me hand you Exhibit 17, which is out of
19 order, but is this a listing of hours worked by the
20 plaintiffs the first week at Mycogen. Actually, I'm
21 sorry, the first couple of weeks.
22     A. Yes.
23     Q. Do you think you cheated anyone out of any
24 hours?
25     A. No. I don't think so. No. Perhaps there

Page 142

1 was a mistake that the payroll made, but I don't think
2 that Martell...
3     Q. Can you look at Exhibit 7.
4     A. Seventeen?
5     Q. Seven. Oh, I'm sorry. This. Exhibit 5.
6 Can you turn the page to the second page. This says
7 transportation to and from the fields will be provided.
8     A. Yes.
9     Q. Underneath that it says the workers will be
10 paid to the field but not from the field.
11     A. Correct.
12     Q. Did you abide by this term in the contract?
13     A. Correct.
14     Q. It says that the workers are to be paid at
15 least 6.50 an hour. Do you see that?
16     A. Yes.
17     Q. Did you pay any worker less than 6.50 an
18 hour?
19     A. No.
20     Q. Also there is a way that workers can make
21 bonuses.
22     A. Yes. What is left over after they worked
23 their hours, and then what's left over, it's paid as a
24 bonus.
25     Q. Did you fail to pay any worker his bonus or

Page 143

1 her bonus?
2     A. No.
3     Q. The disclosure that you gave to the workers
4 says that you would make available workers'
5 compensation insurance.
6     A. Correct.
7     (Exhibit No. 16 was marked for identification.)
8 BY MR. HILL:
9     Q. Let me hand you Exhibit 16. Is your
10 signature on Exhibit 16, which is the workers'
11 compensation policy?
12     A. Correct.
13     Q. Did you provide the workers with workers'
14 compensation coverage as you told them that you would?
15     A. Workers' comp, yes.
16     Q. Does that contract reflect the insurance you
17 provided?
18     A. Yes.
19     (Exhibit No. 15 was marked for identification.)
20 BY MR. HILL:
21     Q. Mr. Sanchez asked you some questions about
22 fields. Let me hand you Martell Exhibit 15 -- my
23 apologies -- Martinez Exhibit 15. Can you flip through
24 there? Is that the contract between you and Mycogen
25 for many fields?

Page 144

1     A. Yes, correct.
2     Q. All the work that you did for Mycogen, was it
3 pursuant to a contract?
4     A. Yes.
5     (Exhibit No. 18 was marked for identification.)
6 BY MR. HILL:
7     Q. Exhibit 18, are those the farm labor
8 contractor cards that you presented Mycogen before
9 beginning work for them in 2002?
10     A. Correct.
11     Q. Did you agree pursuant to the contract to
12 abide by all laws related to the work?
13     A. Correct.
14     Q. Did you try to do that?
15     A. Yes.
16     Q. Are you aware of harm coming to any plaintiff
17 because you failed to not abide by a law?
18     A. Yes. But I did not break any rules, I tried
19 to follow all the rules.
20     Q. Well, my question may not have been
21 understood.
22     Do you know if any plaintiff was harmed by
23 you?
24     A. No.
25     Q. Mr. Martinez, can you tell me if you

36 (Pages 141 to 144)

Page 145

1 recognize Exhibit 13?
2    A. Yes. Here is everything about the state, the
3 pay, the minimum, all the state rules, and all that.
4 Here is the number of the block, whatever the field,
5 103, and these signs when you cannot trespass.
6    Q. Do you recall that being in the Mycogen corn
7 fields in the 2002 detasseling season?
8    A. Yes.
9    (Exhibit No. 14 was marked for identification.)
10 BY MR. HILL:
11    Q. Let me hand you Exhibit 34 (sic).
12    (Note: Martinez Exhibit No. 14 was also marked as
13 Martell Exhibit No. 34 on 12/20/04).
14      THE WITNESS: Yes.
15 BY MR. HILL:
16    Q. These are posters that are not on the board
17 that I just showed you. But I ask you this, could you
18 look through Exhibit 34 and tell me if those are the
19 same types of posters that were posted in the field by
20 Mycogen?
21    A. Correct.
22      MR. HILL: The answer was?
23      THE INTERPRETER: Correct.
24 BY MR. HILL:
25    Q. Okay. Did you have the signs posted anywhere

Page 146

1 yourself?
2    A. Yes. We put the signs in the buses, plus
3 this that is here.
4    Q. And did you do that trying to comply with the
5 law?
6    A. Correct.
7    Q. You stayed in the Heidelburg Hotel yourself,
8 Mr. Martinez?
9    A. What season? In the 2002 season?
10    Q. The detasseling season, 2002.
11    A. Yes.
12    Q. Did the hotel have hot water?
13    A. Yes.
14    Q. Soap?
15    A. Yes.
16    Q. Clean beds?
17    A. Yes.
18    Q. Towels?
19    A. Yes.
20    Q. Was the floor vacuumed every day?
21    A. Yes.
22    Q. Were new towels provided every day?
23    A. Every day.
24    Q. Did any worker ever complain to you that the
25 hotel was not suitable to stay in?

Page 147

1    A. No. Everybody was in agreement.
2    Q. Were you comfortable there?
3    A. Oh, yes, very comfortable.
4    Q. Do you know what an independent contractor
5 is, Mr. Martinez?
6    A. Yes.
7    Q. Were you an independent contractor for
8 Mycogen throughout all of 2002?
9    A. Yes.
10    Q. Were you ever an employee of Mycogen?
11    A. No.
12    Q. Did the people who worked for you detasseling
13 corn in 2002 understand that they worked for you?
14    A. Correct, yes.
15    Q. Are you aware of any misunderstanding they
16 may have had?
17    A. Well, the ones that are giving me trouble, I
18 think that there is a misunderstanding.
19    Q. Well, my question was a misunderstanding only
20 as to who they worked for.
21    A. No.
22    Q. Did any plaintiff ever tell you they thought
23 they worked for Mycogen?
24    A. No. That I was the contractor.
25    Q. Did you pay the plaintiffs' wages?

Page 148

1    A. Yes.
2    Q. If Mycogen inspected a field and decided it
3 was no good, what would happen?
4    A. When the inspectors checked them, they don't
5 pass, there is too many shoots, so you had to bring
6 people back or the people who did the wrong thing
7 there.
8    Q. Does Mycogen tell this to Mr. Martinez, or
9 does Mycogen go to the people who did the field?
10    A. To me.
11    Q. Does Mycogen even know what workers you put
12 in the fields?
13    A. Yes.
14    Q. Do they choose the workers, or do you choose
15 the workers to go to a particular field?
16    A. Me.
17    Q. Who taught the workers who needed training
18 how to detassel corn?
19    A. I.
20    Q. Did Mycogen ever tell you how to recruit
21 workers?
22    A. No.
23    Q. Did they ever tell you how to house workers?
24    A. No.
25    Q. Did you assume the responsibility for housing

37 (Pages 145 to 148)



**Page 149**

1  workers?
2      A.  Correct.
3      Q.  Do you believe you fulfilled that
4  responsibility well?
5      A.  I think so.
6      Q.  Now, Mycogen did tell you the information
7  contained on Exhibit 5 to pass on to the workers; is
8  that correct?
9      A.  Yes.
10     Q.  When you passed on that information to the
11 workers, were you simply trying to comply with the law?
12     A.  Yes.
13     Q.  Mr. Martell here, was he your employee?
14     A.  Yes.
15     Q.  Was he ever a Mycogen employee?
16     A.  No.
17        (Thereupon, a short recess was taken.)
18 BY MR. HILL:
19     Q.  Did you ever expect Mycogen to pay
20 Mr. Martell?
21     A.  No.
22     Q.  Mycogen had nothing do with providing housing
23 to the plaintiffs; is that correct?
24     A.  Correct.
25     Q.  Did you rent a bus from Mycogen in order to

**Page 150**

1  move the workers around?
2      A.  A bus of Mycogen, Mycogen's bus?
3      Q.  Well, actually, did you rent a bus in order
4  to transport workers?
5      A.  Rented, yes.
6      Q.  Was it a nice bus?
7      A.  Cool bus, brand new.
8      Q.  Did all the plaintiffs have a seat on the
9  bus?
10     A.  Correct.
11     Q.  Did you ever see not enough room on the bus
12 for everyone to sit?
13     A.  There was enough, it was enough for seventy
14 passengers.
15     Q.  Did any plaintiff ever complain about the
16 bus?
17     A.  Not that I know.  I never got a complaint.
18     Q.  Did any plaintiff ever complain about the
19 toilets out in the field?
20     A.  No.
21     Q.  When you went to the toilets, were they
22 clean?
23     A.  Yes.
24     Q.  Was there toilet paper?
25     A.  Yes.

**Page 151**

1      Q.  Was there paper towels to dry the hands?
2      A.  Yes.
3      Q.  Did you provide water for the workers?
4      A.  Yes.
5      Q.  Did you provide single-use cups?
6      A.  Disposables.
7      Q.  Did any worker ever complain that they didn't
8  have water?
9      A.  Well, there were times that -- no.  Because
10 they were times that they all forty came out, and I
11 would say hold on, give me some time.
12     Q.  Okay.  So when anyone asked for water, were
13 they provided water quickly?
14     A.  Quickly.  There was a container at a certain
15 distance, and I was in the truck back and forth.
16     Q.  Did you ever ignore the need of any plaintiff
17 to have water or to have hand-washing facilities or to
18 have a place to go to the toilet?
19     A.  I never denied that to anybody.
20     Q.  Do you know of any harm that you've caused
21 the plaintiffs?
22     A.  I think 100 percent that I didn't hurt them.
23 Perhaps unknowingly, unconsciously.
24     Q.  No man is perfect, any man can make a
25 mistake, but are you aware of any mistake you made?

**Page 152**

1      A.  Well, if I made a mistake, I'm not seeing it,
2  because I've been working like that all the time,
3  always trying not to make a mistake, many years.
4      Q.  Did you tell the workers all of the
5  information contained in Exhibit 5?
6      A.  Correct.
7      Q.  Did you pay them all the money you owed them?
8      A.  Yes.
9      Q.  Did they stay in a good hotel?
10     A.  Good hotel, good hotel.
11     Q.  In the field did you make sure they had water
12 and toilets and toilet paper?
13     A.  Correct.
14     Q.  No one ever complained to you that they
15 lacked anything?
16     A.  Nothing.  Okay.  Of course I can't -- you
17 know, there is forty of them, so I can't always do at
18 the instant what they need, so I would say wait, wait
19 for it.
20     Q.  Are you aware that Mr. Martell arranged for
21 them to have medical care?
22     A.  Yes.
23     Q.  Does your contract with Mycogen even require
24 that?
25     A.  No.  Those are people that the state sends to

38 (Pages 149 to 152)

Page 153

1  the hotel to work in the fields. And Mr. Martell got
2  them the help, the people to see the doctor and with
3  the English. He tried all the time to help the people.
4      Q. Did any plaintiff ever complain that there
5  was inadequate medical care?
6      A. No.
7      Q. Did Mycogen require you to loan money to the
8  plaintiffs?
9      A. No. The situation was I had a contract with
10  Mycogen. If I had something with the workers, it was
11  me, it wasn't Mycogen.
12      Q. If Mr. Martinez loaned money to the workers,
13  was it to help them?
14      A. Yes.
15      Q. Did you ever try and collect more money than
16  you loaned them?
17      A. Never.
18      Q. Mr. Martinez, you are not represented by
19  counsel in this case. Is there anything that you want
20  to say in your defense?
21      A. Well, that I all my life have tried to be
22  honest and work and not hurt anyone. The people who
23  have worked with me who have a lot less respect for my
24  bosses, my superiors, my workers. Well, I've tried to
25  be a person to be well, not too -- I don't want to ever

Page 154

1  be rich. I like my heart to feel well, to help them,
2  and that's what I feel. The people who need it, I feel
3  well to help them, to give them a thousand dollars.
4      Q. Do you feel that you are nicer to your
5  workers than most farm labor contractors?
6      A. A hundred percent. I have gone to fight for
7  contractors here for jobs that are not even mine.
8      Q. Were you surprised when you were sued by
9  these workers, even though they had never come to you
10  with a complaint?
11      A. No. Because they had years working with me,
12  years. And I knew that Everardo Garcia was like a bomb
13  ready to explode, because that's the problem that he
14  did. Because I'm pretty sure that that's how the
15  problem started, it was Everardo Garcia. Because I
16  used to go and bail him out of jail, go to the jails in
17  Mexico, everywhere.
18      Q. Did you ever have a chance to resolve this
19  with the plaintiffs before the lawyers jumped in?
20      A. We went with Attorney Norton and with
21  Mr. Martell to try to talk to them, but they never
22  really came to face me.
23      Q. When you went to talk to Legal Aid, did you
24  go by yourselves or with an attorney?
25      A. Alone. Because I didn't feel that I had

Page 155

1  stolen money from anyone, I didn't feel guilty, I
2  didn't feel bad.
3      Q. Did you tell Legal Aid essentially what you
4  told this jury today?
5      A. Yes.
6      Q. Do you know Mr. Martell gave an affidavit
7  even without a lawyer present?
8      A. Yes. What happens is that I don't think that
9  he committed any crime. If he did anything, I don't
10  think he did it intentionally. I don't know. With
11  Mr. Martell, the way he talks, perhaps people thought
12  that he was reprimanding them, but I know that he
13  didn't, he's a good person.
14      Q. My question is very simple. Have you seen
15  the affidavit that Mr. Martell gave to Legal Aid before
16  the two of you even had a lawyer?
17      A. No.
18      Q. Please believe me, yesterday we marked an
19  affidavit from Mr. Martell that Mr. Martell gave Legal
20  Aid before. Is that okay with you?
21      A. That Mr. Martell showed himself or presented
22  himself to them before? If he went, it's because he
23  hadn't done -- didn't have any crime.
24      Q. Did you always try and tell the truth?
25      A. In the case of papers or something, all the

Page 156

1  time.
2      Q. Let's talk about that. Have you received a
3  lot of papers in the mail?
4      A. Yes.
5      Q. Are you able to read and understand those
6  papers?
7      A. Well, I don't understand. I might just look
8  a little bit, understand little bits, little pieces.
9      Q. Do you try and ask Mr. Martell what they are
10  about?
11      A. Yes. But Martell is in Texas and I'm here.
12  Sometime he helps me with something, I say buddy, what
13  is this.
14      Q. You have been asked hours and hours of
15  questions about those documents that are now in front
16  of you. Are you a paperwork man, or a man of the
17  field?
18      A. A hundred percent field. I didn't have
19  schooling, but I had the opportunity because of
20  working, you get ahead, you go up.
21      Q. Is one reason you hired Martell to help you
22  with paperwork --
23      Let me just ask, is one reason you hired
24  Eugene Martell to help you with paperwork?
25      A. Yes.

39 (Pages 153 to 156)