Page 211

today's 14:13
told 23:19 24:24 26:10 40:2
  40:13 59:23 60:23 61:19
  63:10,13 69:2 76:25 78:13
  78:19 90:7 91:23 99:7
  102:6 109:17 116:21
  120:13 122:25 124:2,8,16
  130:17 135:4,5 148:20
  154:22 167:13 190:17
  193:4,10,14,18,25
tomorrow 14:18 157:25
  163:5 189:12
tonight 114:14
top 20:19 38:12 43:1 54:14
  70:3 86:16 88:3,19 106:7
  106:17 109:5 114:19
  141:19 153:15 167:19
  169:10 170:6,11 172:12
  175:1 179:21 180:4 190:2
  190:4
topics 85:17
total 58:10 78:4 109:2,3
  126:4 130:24 139:11
  140:10 149:18 165:18
totaling 76:18
totally 41:10
totals 111:7 120:5 130:15
touch 26:12 97:10 123:22
towels 49:7
town 14:25 44:15 64:1
  112:20
track 87:9 100:1 103:14
  131:10 150:23 152:14
trade 94:21
trailers 66:13
train 94:8
transcript 197:16
transcription 197:8
transfer 36:7
transit 25:13
translated 133:21
translates 139:14
transportation 79:18
travel 62:10 93:20 100:25
traveled 78:24 173:13
traveling 46:20 101:13
  102:23 120:24 158:13
trespass 42:18
trespassing 42:15
tried 26:4 31:3 110:13
trip 106:18,22
trips 53:8 58:17 79:24
trouble 116:23
truck 72:5,14,19
true 70:13 116:14 185:6
  197:8
trust 80:22 90:10
truth 6:6 197:7
truthfully 6:9
try 6:4,11,16,20 22:5 35:8
  42:7 45:23 46:7 49:8
  51:13 52:6 58:25 93:14
  94:8 98:13 133:4 163:12
trying 13:4 18:19 20:16
  21:17 25:11 29:5 32:20
  39:3 40:22 42:16 46:22
  48:1,2 59:11 66:24 72:2

92:21,23 96:2 99:4 101:4
  107:20 108:22 112:19
  114:17 115:13 116:23
  119:25 138:21 141:18
  146:21 160:3,10,14
  165:12 174:5
Tuesday 107:17
turn 55:20 77:6,10
turned 79:11,13 176:16
TV 49:8
twelve 177:1
twenty 47:8 63:2 77:9 86:12
  89:8 105:14 165:6,10
  166:3
twice 46:16 126:12,16,18
  134:21 191:3
two 7:14,14 8:11,23 28:15
  32:3 35:7 39:10,18,23
  41:12,15 46:8 48:22 49:25
  50:3,8 54:11,15 56:23
  57:21 63:25 64:12 66:8
  67:12 68:3 69:23 70:6,22
  75:21 76:9 81:10 84:1
  85:10 87:7,18 88:1 93:8
  94:12 101:7 102:15 104:7
  104:9 108:23 116:13
  126:23 136:25 142:25
  143:5,13,20 156:24 157:1
  161:15 167:20,25 168:1,3
  169:25 170:2 175:12,24
  179:13 190:1 191:9 193:7
two-page 132:15
type 8:9 10:18 21:18 34:24
  65:4,11 90:12,24 97:12
  113:22 126:24 142:8
  194:19
typed 126:12
types 146:11
typewritten 145:3
typical 33:14
typically 16:25

U

uh-huh 9:11 17:23 26:23
  53:2,23 58:2 65:9 70:16
  71:18 83:20 92:14 93:7
  96:18 106:8,19 107:10
  113:11 118:12 119:16
  125:7 126:14 127:11
  128:16 135:18 142:21
  154:3 155:14 156:18,22
  158:5 161:8 165:7 183:16
  190:6 191:5 194:25
uncomfortable 50:17
underaged 196:4
understand 6:3,8 7:23 9:21
  14:17 19:22 23:20 26:14
  35:5,7 38:8 45:23 57:12
  58:9,21,24 59:12 61:21
  66:9 72:25 80:11 83:16
  95:16 96:2,6 104:25 108:3
  112:6 116:15 128:17,22
  138:14 143:23 160:3
understanding 22:16,25
  38:21 45:13 52:7 63:5
  83:12 88:8 94:17 96:10
  97:10 117:1 120:3 121:12

122:5 133:21 140:4,13
  147:21 153:5 176:17
  177:3,20 181:1 192:7
  193:13
understood 37:23 83:23
  115:25 116:25 123:15
unfair 75:2
United 1:2 174:16
unpaid 94:25 95:2 96:25
unskilled 95:8,10,24 96:1
upper 169:7 192:4
upset 69:10
use 21:12 84:23 86:18 101:9
  131:6,10,11,15 134:2
  141:3,8
usually 8:22 48:12 68:14
  86:11 90:8 94:4 125:25
  165:21

V

Valdez 106:13
valley 185:24
van 81:3
varies 11:17 98:24
various 26:15 71:21 72:15
  79:1
vary 11:25 12:4,23
vehicle 80:2 101:13 120:24
vehicles 101:12 185:13
verbal 6:12
verbally 21:13 59:5 135:5
Veronica 167:5
versus 13:19
Videotaped 1:13 5:3
visit 31:14 73:23 92:5 97:18
  97:21
visiting 81:2
visualize 52:4
voice 6:19
Volume 1:14 3:4 4:4 195:12
vs 1:9

W

wage 131:12 139:8
wages 11:12 118:24 149:19
wait 31:19 32:1 90:15
  128:23 136:6,6,6
want 24:14 25:1 31:1,23,25
  49:18 52:5 64:23 72:21
  73:1 74:1,2 75:1 79:19
  80:4,4,6,21,22 81:12 82:1
  82:23 86:22 88:13,18
  89:19,19 90:15,16 91:2
  94:20 96:10 97:19,20,25
  104:14,15 116:21 118:21
  124:19 144:3 163:13
  167:7 168:8 176:3 177:9
  177:11,15 178:2 180:7
  181:14 189:12,13 192:9
wanted 23:18 24:14 30:21
  40:13 46:19 60:24 77:10
  81:10 83:22 86:17 89:18
  90:14 91:1,4 96:23,24
  102:23 111:19,25 112:6
  115:25 116:25 118:20
  172:8 174:1 175:5,5 178:9
wants 64:12 80:24 96:7

105:4,8,15 124:15 136:4
wasn't 9:12 22:10,13 48:3
  49:17 50:11 61:3,10 64:12
  68:1 76:1,3 86:18 87:20
  90:14,14 95:3 117:20
  124:24 139:5 156:2 182:6
  190:16
watch 188:8
water 6:24 96:9
way 7:22 12:25 19:20 22:14
  25:19,21 32:6 33:7 38:4
  38:16 43:18 46:8 50:15
  51:14 63:9,23 64:1 72:3
  73:8 75:3 77:1 83:17 84:8
  84:13,17,19 85:9 87:8,10
  94:13,15 96:12 104:1,14
  104:17 119:20 125:24
  126:17 130:17 140:4
  144:15 150:7 152:7 153:8
  158:12 166:5 169:7
  172:14 176:3 177:16
  179:6 180:21 182:25
  184:11,14 193:7,7
weather 62:23 163:15,18
week 11:10,11,11,18,22 12:2
  16:22 60:17 63:24 68:14
  86:12 100:11 127:6,7
  130:21
weekly 11:6 24:15 71:21
  74:11,12
weeks 63:7,10,17,21,25
  64:12,12
weird 180:25 183:17
went 13:4,6 15:1,2,19,24
  16:20,21 18:14,20 20:17
  22:22 23:6 29:8 32:21
  41:6 45:15 53:4 66:1
  68:14 73:25 81:1,5 87:11
  100:18 116:23 134:23,25
  156:7,13 158:23,24 166:5
  166:7 168:16 182:18
weren't 30:25 46:7 76:25
  77:2 107:21 139:3 164:6
  169:20
Weslaco 2:5 7:10 14:6 71:10
  71:11 171:4,7 174:5
West 1:18,23
we'll 25:16 35:9 51:5,20
  81:15 85:14
we're 10:5 12:13 28:21 39:7
  39:8 48:8,8,10,15 65:22
  65:24 66:9 75:20 76:22
  97:19 98:25 114:16
  121:21 125:24 138:8
  151:4 152:5,15 153:20
  154:18 160:3 177:13
  193:19
we've 16:9 47:6 59:3,4,5,8
  59:12 105:14 123:21
  134:21 135:15 143:23
  152:4 183:15
WHALEN 1:22 5:4 196:12
  197:5,21
whatnot 79:10
white 174:16
wife 7:15 69:9 168:7,7
  171:14 173:7,9,13

Page 212

**wife's** 92:4 171:15
**wing** 96:8
**withdraw** 165:2
**withholding** 56:10 127:18
**witness** 2:13 23:3 115:1,15
  123:10 133:15 161:23
  166:14 196:5 197:6
**witnessed** 166:21,25
**witnesses** 29:21
**witnessing** 166:22
**woman** 27:23
**women** 8:7 167:17,23,23
  168:4
**word** 21:12 51:23 67:25
  80:19,23,23 82:9 83:10
  84:23 103:2 105:1 109:8
  109:20 137:9,16,17,21,24
  142:14 143:16 152:10
  169:10 175:8
**wording** 143:3
**words** 13:21 28:6 42:1 48:20
  51:19 52:2 58:14 64:10,11
  68:4 72:18 73:12 84:14
  91:14 105:6 172:10
  175:11 188:23
**work** 8:10,13,15,20,21 9:6,8
  9:15,25 10:3,11,18,24
  12:5,10,14,16 13:2 15:18
  15:23 16:23,24 17:13
  18:15 23:6 25:23,23 26:24
  27:4 28:20,22 29:3 33:22
  35:4,12 36:4 39:11 40:6
  43:21 46:3,8 52:6 55:5,23
  57:13 62:20,21,21,24,24
  63:15,18,19,25 65:1,5
  66:23 67:4,6 71:22 73:20
  74:7 75:8 77:4,10 78:25
  79:1,2 80:10,17,22,24
  81:21 82:1,22 83:15 84:21
  85:19 93:15 94:24 95:8,8
  95:11,13,15,16,17,23
  96:16 98:10,14,24 99:1,18
  102:5,7,9 104:24 105:11
  105:21 106:5 107:12,14
  107:16,17,22 108:4,8,25
  113:14,17 115:17 130:8
  132:25 133:6,9 134:18,24
  135:25 136:5,23 137:8
  147:19 149:14 150:6,24
  151:5,9 152:2 153:24
  157:16,18 159:6,18
  162:19 163:8 172:10
  175:5 177:10,11,25 178:3
  179:7,8 185:24 188:5
  189:4 193:23
**worked** 10:13 12:7,11 15:7
  15:13 18:7,11,23 23:3,4
  31:16 33:14 39:25 41:22
  54:22 59:14,16 60:18
  63:11 66:2 71:18 75:18,21
  76:2 77:23 78:17 94:18,18
  94:25 96:21,24 97:5,15
  98:6 108:1 125:22 127:7
  130:20,22,24 147:16
  155:24 156:6,20,24 157:4
  157:8,10,23,24,25 158:8
  158:16,24 159:3 162:9,11

**173**:12,16 181:5
**worker** 33:15 76:4 95:1
  95:2 98:6
**workers** 22:19,25 36:21
  45:5 49:12 52:13,14 55:18
  56:3,14,25 57:2 64:25
  65:12 71:23 73:19 76:19
  77:14,19 78:2,24 79:1,12
  79:17,17 80:9,14,16 81:20
  81:22 82:13,18 83:3 93:4
  93:17 94:3 96:16 98:14
  99:4,6 100:25 101:18
  107:23 109:12 111:16
  130:5 138:18 139:2,14,18
  140:1 142:8 143:2,6,11
  150:25 168:23,24 173:14
  176:22 178:19 179:25
  180:10 181:3 184:10
**working** 3:15 7:25 9:8,12,17
  9:18 12:10 13:24 16:10,19
  18:17 26:7 27:8 28:15
  29:10 32:13 41:23 55:21
  61:17,23 62:18 69:15 73:2
  73:10,11,12 75:24 76:3,6
  78:3 94:7 95:3,5 99:24
  104:10 105:20,21 152:15
  159:13 167:18 169:1
  175:4 176:2,4 177:7,14,21
  178:6 179:2 181:10
**works** 20:14,25 27:16 28:2
  28:15,16 98:1 122:10
  138:22 185:25
**worth** 63:24,25 166:2
**wouldn't** 7:5 19:23 39:4
  42:17 45:12 50:15 95:2
  120:4 146:10 148:2
  150:23 155:6 168:8
  188:21
**write** 7:19,21,22 21:15 34:7
  55:16 58:7,13 83:20
  149:12 156:7 157:5,20
  158:11 159:7 167:9
  184:19 190:23
**writing** 58:9,11 83:21
  109:20 155:6 158:23
  184:18 189:15
**written** 83:17 85:7 112:25
  124:9 156:9 159:20
  182:13
**wrong** 77:13 95:22
**wrote** 58:8,15 85:9 103:2
  110:25 121:17 129:14
  156:4,5 159:15 166:23,24
  175:20 188:19 189:10
**W-2** 4:15 57:17,20
**W-2s** 79:9
**W-4s** 79:7 176:6 183:25
  185:1

**X**

**X** 2:12 3:2 4:2 164:11
  166:18
**Xeroxed** 164:15

**Y**

**yeah** 9:5 15:22 16:6 41:4
  55:4 62:4 79:8 81:12

**102**:5 103:6,9 105:13
  116:4 127:11 137:17
  138:2 146:21 149:23
  156:22 159:7 180:20
  183:10 191:24
**year** 8:12 9:10,15,25 10:4,10
  10:13,14,25 12:12,17,18
  13:15 15:23,24 16:15,16
  17:17 18:12 21:19 22:9
  26:13 29:6,12 32:20 40:9
  41:2,5 44:12,14,19,19,21
  45:13,15 51:8 56:17,19
  59:13 60:22 63:11 64:18
  65:3,4,25 76:3,11 81:10
  84:10 92:22 94:5 101:6
  134:24 136:11 146:7,18
  146:21 147:3 150:15
  152:19 153:1 176:12,13
  181:15 193:23
**years** 7:15 15:11 40:20
  45:11 46:8 71:20 75:19
  76:5,9,12 81:10 92:1
  138:5 168:7
**year-to-date** 126:2
**yesterday** 157:24,24
**yo** 63:15
**young** 94:8
**YTD** 38:13

**Z**

**Zecher** 27:10,13,17 29:24
**zero** 169:12
**zero-something** 87:16
**Zionsville** 139:23
**zip** 7:10

**$**

**$1,000** 188:10
**$100** 107:8,19 109:1
**$1100** 128:11
**$1500** 118:4,5 126:12,19
  127:3,10,12,13,15 128:11
**$1600** 35:24
**$2,000** 32:13 62:11 65:19
  67:3,6 74:15 187:13
**$20** 89:9 110:5 165:24
  166:12
**$200** 81:3
**$25** 86:16,25 87:6,8,9 88:14
  88:19,21 89:12 90:4 94:13
  94:14,15 106:24 108:25
  109:3,11 110:5 170:16,22
**$3,000** 127:13
**$30** 86:12
**$300** 129:24 130:12,19
  139:1
**$40.38** 127:21
**$400** 124:1,7,14,14 128:1,2
  128:11 129:9
**$50** 102:25 105:15 109:18
  164:7,9,9,12 166:21,25
  167:9,13 168:19
**$6** 131:18
**$6,000** 33:11
**$6.50** 138:17,19
**$60** 82:6 83:1 171:7 173:11
**$70** 82:7,24 134:12 137:13

**178**:15

**0**

**0001** 135:11 136:8
**0002** 135:12 136:8
**0003-0016** 57:25
**001** 160:5
**0014** 155:18
**0017** 144:9,22 145:10,13
**0023** 147:7
**0023-36** 57:25
**0035** 144:9,22
**0043** 164:22
**0045** 174:22
**0046** 179:13
**0047** 118:2 179:14
**0048** 183:22
**0049** 186:13
**0050** 192:2
**0093** 30:12,15 160:5
**0104** 41:13 43:1
**0105** 30:15 41:13
**02** 89:9 103:3
**04** 75:24 155:10
**04/25/07** 196:13

**1**

**1** 3:6 30:1,2,5,6,12 32:4
  35:22 36:10 37:12 38:12
  41:13 71:1 76:13 93:3,9
  110:19 111:10,11 117:10
  117:12,13 118:8,16
**1/28/04** 4:12
**10** 3:15 155:15,22 156:1
  162:7 164:15,19
**10th** 133:7
**100** 108:20
**101** 43:10 153:22 175:1
  178:15 192:5
**102** 3:10 156:24 175:1
**103** 159:1
**104** 32:4,5
**105** 32:4
**106** 153:3
**11** 3:16 163:19,22 164:20,22
  165:5,24 166:14 167:1
**110** 3:11 153:3
**112** 153:4
**114.75** 127:16
**1151.20** 118:6 127:14,23
**12** 3:17 168:10,13,20 169:8
  170:5,24 172:23 173:23
**120** 175:2 189:24,25
**1230** 165:13,18,20 166:6
**13** 3:18 174:18,21 177:4
**13th** 163:12
**132** 3:12
**1344.88** 125:8 129:4,6,16
**14** 3:19 179:9,12,12 181:2
  182:21 183:14
**14th** 127:7 162:14,18,19
  163:11
**144** 3:13
**15** 3:20 183:19,22
**15th** 13:18 162:11,15,16
  163:11
**1500** 126:17,18 128:6,15

| | | | |
|---|---|---|---|
| **151** 3:14 | **171:17** 172:1 173:16,18 | **33401** 1:18 | **8** |
| **153.99** 127:19 | 176:14 177:18,22,25 | **34** 4:22 | **8** 3:13 144:17,20 145:2,13 |
| **155** 3:15 | 178:11 179:22,24,25 | **35** 88:17 144:8 | 146:2 147:1,6 148:9,13,16 |
| **16** 3:21 186:7,10 191:2,15 | 180:11 181:4,5 182:6 | **350** 11:10 131:4 | 148:19 149:4 151:13,16 |
| **16th** 157:1 170:16,18 | 188:12,18 | **38** 107:8 | 151:17 |
| **163** 3:16 | **2003** 12:16,17,18,19 13:3,6 | **385-8968** 37:13 192:23 | **80** 107:1,5 |
| **168** 3:17 | 13:9 18:20 44:12,17,24 | **39** 107:8 | **800.330.6952** 1:24 |
| **17** 3:22 144:8 191:18,21 | 76:10 150:13 161:5 | | **86** 3:9 |
| 192:1 194:19 | 173:18 | **4** | |
| **174** 3:18 | **2004** 1:15 9:21,23 12:13 | **4** 3:9 86:3,6,8 87:12 88:22 | **9** |
| **179** 3:19 | 44:12,21 75:20 76:2,12 | 92:13 | **9** 3:14 151:21,24 152:9,19 |
| **18** 4:6 88:13 | 77:18 136:10 152:20 | **4/25/07** 197:23 | 153:6,15 154:14 155:13 |
| **1800** 19:8 33:6 | 155:13 196:9 197:18 | **4/29/04** 70:15 | 158:3 160:23 |
| **183** 3:20 | **209** 4:6 | **40** 52:17 107:8 | **9th** 133:8 |
| **186** 3:21 | **21** 4:9 | **400** 118:5 120:18,20 121:25 | **9:20** 1:16 |
| **19** 4:7 88:13 | **210** 140:23 | 131:4 | **9330** 139:23 |
| **19th** 89:8 | **217** 4:7 | **41** 107:8 | **956** 7:12 141:11 |
| **1900** 2:9 | **22** 4:10 | **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** 32:10 | **96** 15:15,21 18:15,23 41:3 |
| **191** 3:22 | **22nd** 103:3 107:6 164:4 | **45** 52:17 | 76:8 |
| **193453** 196:14 197:22 | 170:18,21 | | **968-2756** 7:12 |
| **1949** 13:18 | **222** 4:8 | **5** | **97** 15:15,21 18:15,23 41:3 |
| **1967** 13:16 | **225** 4:9 | **5** 2:15 3:10 102:11,14,15,16 | 76:8 |
| **1980** 165:12 | **227** 4:10 | 102:18 105:23 106:7 | **98** 2:9 |
| | **23** 4:11 | 109:7 123:25 164:4,8,24 | |
| **2** | **23rd** 163:25 164:7 | 168:16 169:18 | |
| **2** 3:7 52:18,21 53:1,3,11,16 | **24** 4:12 92:13,19,25 | **5th** 133:6 | |
| 54:10 60:7 83:5,6 | **241** 4:11 | **5.15** 131:13,17,21 | |
| **2nd** 187:3 188:12 | **244** 4:12 | **5.50** 131:18 | |
| **2,000** 33:6 54:25 60:7 67:9 | **247** 4:13 | **5:56** 1:16 | |
| 165:15 | **25** 4:13 89:19,20 92:13,19 | **50/50** 72:2 | |
| **20** 1:15 4:8 106:23 166:7 | 93:1 106:23 169:13,19 | **514-1277** 141:12 | |
| 169:13,19 | **250** 189:20,23 | **515** 1:17 | |
| **20th** 127:8 | **255** 4:14 | **52** 3:7 | |
| **200-P** 1:17 | **26** 4:14 | **55** 88:12 184:16,22 | |
| **2000** 18:19 165:6 166:6 | **26th** 127:6,9 | **561.659.4155** 1:24 | |
| **2000s** 18:18 | **262** 4:15 | | |
| **2001** 40:19,21 76:3,7,8 | **263** 4:16 | **6** | |
| 146:4,7,8,9,13,23 147:5 | **27** 4:15 | **6** 3:11 110:7,10,18,22 111:3 | |
| 147:16,19 148:4,7 173:17 | **276** 4:17 | 111:9,15 115:20,23 116:9 | |
| 173:18 | **28** 4:16 | 117:2,9 119:5,7 131:25 | |
| **2002** 12:7,9,10,14 15:7 | **28th** 162:12 | 133:7 139:1,13 140:19 | |
| 18:19 21:1 22:5,7 23:7,16 | **280** 130:25 | **6.50** 139:6,10 | |
| 24:22 25:9,25 26:18 29:3 | **282** 4:18 | **60** 88:12 | |
| 29:5,6 32:12 33:14,17 | **286** 2:16 4:19 | **620** 7:9 71:9 | |
| 34:3,12 35:24 37:2 39:2 | **29** 4:17 | **63** 184:7 | |
| 40:18,25 41:17 43:20 | **29th** 70:16 75:24 | **654** 129:9 | |
| 44:10,11 45:2,5 46:10,20 | **290** 4:20 130:25 | **69** 3:8 | |
| 47:1,12,25 49:12,15 50:2 | | **692164-A** 1:23 | |
| 51:1,3,4 52:14 53:6 54:17 | **3** | | |
| 54:25 55:6,19 56:2,7,14 | **3** 3:8 69:20,23 70:2,6 71:8 | **7** | |
| 59:13 60:8,10 61:17,24 | 74:10 75:18 78:23 79:15 | **7** 3:12 132:12,15,22 133:24 | |
| 63:11 65:7,20,21,24 67:3 | 135:15 | 134:8 135:11 137:4 138:7 | |
| 67:13,23 68:9,17,19 69:1 | **3/11/04** 4:13 | 138:13 142:24 143:4,5,12 | |
| 69:5,12,15 71:20,25 73:14 | **30** 3:6 4:18 | 143:19 | |
| 74:10,12,17 75:10 76:3,10 | **300** 2:5 11:10 130:25 131:4 | **7/14/2002** 127:1 | |
| 76:17 77:14 78:3 80:8 | 131:18 | **7/16** 87:16 170:10,22 | |
| 90:11 93:6 94:19 100:7,9 | **302** 4:21 | **7/19** 107:2 | |
| 100:14,20 101:1,5,5,6 | **304** 4:22 | **7/19/02** 87:13 | |
| 103:22 107:23 113:19,20 | **305** 2:17 | **7/20/2002** 127:1 | |
| 122:23 123:7 131:12 | **31** 4:19 | **7/22** 170:7 | |
| 134:9,16,18 135:22 | **31st** 196:9 197:18 | **7/22nd** 102:25 168:17 | |
| 136:16,17 137:24 138:4 | **317** 2:18 | **7/22/02** 170:7 | |
| 138:18 143:8,11 147:3 | **318/324/328/330** 2:19 | **7/24/2002** 194:14 | |
| 148:18 149:1 150:13 | **319** 37:13 192:23 | **750** 165:12,17 166:6 | |
| 153:7 156:10,13,14 | **32** 4:20 | **78596** 2:5 7:10 | |
| 157:11 158:20 159:9,21 | **320/327/329** 2:20 | **78701** 2:9 | |
| 161:2,6,17 163:25 167:18 | **33** 4:21 184:7 | | |

**Page 1**

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF TEXAS
3  BROWNSVILLE DIVISION
4
   Civil Action No. B-04-005
5
6  Armando Alonso, et al.,
7       Plaintiffs,
8  -vs-
9  Agrigenetics, Inc., et al.
10      Defendants.
11
12  VIDEOTAPED DEPOSITION OF EUGENE MARTELL
13                    VOLUME II
14
15     Monday, December 20, 2004
       9:20 - 5:56 p.m.
16
17     515 N. Flagler Drive, Suite 200-P
       West Palm Beach, Florida 33401
18
19
20
21  Reported By:
    TERESA WHALEN, RPR
22  Notary Public, State of Florida
    Esquire Deposition Services
23  West Palm Beach Office Job # 692164-B
    Phone:  800.330.6952
24        561.659.4155
25

**Page 2**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3     RODOLFO D. SANCHEZ, ESQUIRE
       NATHANIEL C. NORTON, ESQUIRE
4     TEXAS RIO GRANDE LEGAL AID, INC.
       FARM WORKER DIVISION
5     300 S. Texas
       Weslaco, Texas 78596
6
7  On behalf of the Defendant:
8     FRANK L. HILL, ESQUIRE
       THOMPSON & KNIGHT
9     98 San Jacinto Boulevard, Suite 1900
       Austin, Texas 78701
10
11
12            INDEX
13  WITNESS:              PAGE
14  EUGENE MARTELL
15  Direct By Mr. Sanchez (Contd).  202
16  Cross By Mr. Hill            286
17  Redirect By Mr. Sanchez     305
18  Recross By Mr. Hill         317
19  Further Redirect By Mr. Sanchez  318/324/328/330
20  Further Recross By Mr. Hill   320/327/329
21
22
23
24
25

**Page 3**

1
2            - - -
       EXHIBITS
3            - - -
4       (VOLUME I)
5  NUMBER    DESCRIPTION          PAGE
6  Ex. No. 1  ADP payroll records        30
7  Ex. No. 2  Responses to interrogatories  52
8  Ex. No. 3  Affidavit              69
9  Ex. No. 4  Advanced money list        86
10 Ex. No. 5  Advanced money list       102
11 Ex. No. 6  ADP payroll records       110
12 Ex. No. 7  Mycogen form            132
13 Ex. No. 8  Handwritten payroll records  144
14 Ex. No. 9  Mycogen spreadsheet       151
15 Ex. No. 10 Working dates/hours       155
16 Ex. No. 11 Advanced money list       163
17 Ex. No. 12 Advanced money list       168
18 Ex. No. 13 Field list            174
19 Ex. No. 14 Employee list          179
20 Ex. No. 15 Employee list          183
21 Ex. No. 16 Advanced money list       186
22 Ex. No. 17 ADP information         191
23 (Continued)
24
25

**Page 4**

1
2            - - -
       EXHIBITS
3            - - -
4       (VOLUME II)
5  NUMBER    DESCRIPTION          PAGE
6  Ex. No. 18  Handwritten tabulations   209
7  Ex. No. 19  Field maps (composite)    217
8  Ex. No. 20  Mycogen field document    222
9  Ex. No. 21  Receipts            225
10 Ex. No. 22  Independent contractor    227
                agreement
11 Ex. No. 23  Safety guidelines       241
12 Ex. No. 24  Letter dated 1/28/04     244
13 Ex. No. 25  Letter dated 3/11/04     247
14 Ex. No. 26  EasyPay pay stub       255
15 Ex. No. 27  W-2 form            262
16 Ex. No. 28  Copy of business card     263
17 Ex. No. 29  Contractor personnel agreement  276
18 Ex. No. 30  Handwritten calculations   282
19 Ex. No. 31  Contractor personnel agreement  286
20 Ex. No. 32  Mycogen disclosure document  290
21 Ex. No. 33  Photocopy of field photograph  302
22 Ex. No. 34  Photocopies of posters    304
23
24
25

Page 5

1          PROCEEDINGS
2              - - -
3       Videotaped deposition taken before TERESA
4   WHALEN, Registered Professional Reporter and Notary
5   Public in and for the State of Florida at Large, in
6   the above cause.
7              - - -
8          (Continued from Volume I).
9       DIRECT EXAMINATION (EUGENE MARTELL)
10  BY MR. SANCHEZ:
11      Q.  Mr. Martell, I guess we're back on the
12  record.
13          Mr. Martell, can you tell me how long the
14  plaintiffs' employment lasted in 2002 for the
15  detasseling season?
16      A.  If my memory serves me correct, and I think
17  that it was that time that the normal -- it was not
18  like the normal season, like it lasted less, less days,
19  you know.  Normally it lasts around 20, 21 days, and
20  this time for some reason it was like less, you know, I
21  don't remember it lasting that long.
22      Q.  So you don't remember how long it lasted, but
23  you believe it was less than 20 or 21 days?
24      A.  Yes.  Because as a matter of fact, we were
25  looking at the dates a few minutes ago where it shows

Page 6

1   on the hours there, and I noticed -- and I know, like
2   according to the schedule Mycogen Seeds has, it shows
3   the exact day we arrived and the day it ended, so I
4   know it wasn't the full three weeks.  But then, as I
5   say, it's never an actual promise of that many days,
6   because it all depends on the weather and lots of
7   different things.
8       Q.  Okay.  So your understanding is that in 2002
9   the season was shorter than normal?
10      A.  Yes, sir.
11      Q.  Do you recall in 2002 how many times each
12  plaintiff or how many times the plaintiffs actually
13  received a paycheck?
14      A.  That's another one of the reasons it lasted
15  shorter, because I know for a fact that we got two
16  checks, I know for a fact that those are the ones we
17  got there.
18          But when we requested the payroll from ADP,
19  that would show all that was paid, and the -- because
20  see, I was submitting -- I would submit whatever we
21  did, okay, we did this and then a check, and then
22  another one.  So aside from the actual two checks, I
23  know that the money that was advanced, that's to help
24  them along until they get their full amount, but if it
25  was a two-week period, I mean, you can see why there

Page 7

1   wouldn't be three checks, you know.
2       Q.  Right.  Not referring to the advances that
3   were given out during the time the workers were there,
4   but the actual checks they got that said ADP, it's your
5   understanding they received two of those?
6       A.  Because if there would have been three
7   checks, it would mean we worked three weeks, and we
8   didn't work three weeks.
9       Q.  Have you ever held yourself out as a business
10  associate of Mr. Martinez?
11      A.  No.  From the time -- well, we became friends
12  first, that's how I met him.  And I've helped him and
13  this and that, but as a business associate, no.  Like
14  when he's in Texas, I'm with him, or we visit places or
15  we go to a bar or to a place to, you know, have a good
16  time.  But as far as me being an associate of his, no.
17      Q.  Have you ever held yourself out as someone
18  who recruits workers for him?
19      A.  No, sir.  I tell people like when I'm
20  talking, like somebody is looking for work, you pass
21  the word, I say a friend of mine, Mr. Martinez, he
22  needs people most of the time to either work in
23  Florida -- right now they need people over here -- or
24  they need people over there.  And I say that's the man
25  if you're ever looking for work, because I know they're

Page 8

1   always looking for work for people here in Florida,
2   which is his primary job.
3       Q.  So you've never told people you recruit
4   workers for him but you have told people about work
5   that Mr. Martinez has?
6       A.  Yes.  In other words.  Because like I said,
7   and I'll rephrase it again, that you can never have
8   enough people.  See, like right now, here in Florida,
9   there is still people coming for work.  And whenever
10  there is work and there is not enough people, I mean,
11  the crop has to be out of the field, you know.  So a
12  lot of people sometimes ask, do you know who are these
13  people in Florida.  But here, like I said, he works for
14  Duda, but he is the foreman at the fields, but he's in
15  charge of people.
16      Q.  You stated that you used the -- I think you
17  said you can never have enough people, correct?
18      A.  Right, sir.
19      Q.  I thought you testified earlier that in 2002
20  you had too many people?
21      A.  That's what I mean, see.  You tell people --
22  okay.  Let's say for example, I'm trying to be as
23  simple as possible.  Because you need let's say 30
24  people to work in the detasseling, so you tell 30
25  people, and out of those 30 people, maybe 20 show up.

2 (Pages 5 to 8)

Page 9

1  So you hope that the ones that say they're going will
2  go. And then some that say they're not going, you have
3  to look for more people.
4      If I come to Rudy and I say, Rudy Sanchez, is
5  your family going, yeah, we're going, it's four of us,
6  he makes a list of the people that are going. Then,
7  when it's close to the time to go, he talks to
8  Rudy Sanchez again, and Rudy says Mr. Martinez, I'm not
9  going to go after all, because I'm going to go
10  somewhere else. And this happens all the time. So
11  he's got to find more people, like we're going.
12      Then Rudy Sanchez's family, for "X" reason,
13  didn't go where they were thought they were going, so
14  they say I know where there is work, let's go to Iowa,
15  see. So that's what I mean, see. If people would bond
16  to that, say we're going, then you don't have to search
17  any more.
18      I don't know if that makes any sense to you.
19  But it's like when you invite ten people, out of those
20  ten, all of them going.
21      Q. I'm just trying to understand. You said on
22  the one hand you said you can never have too many
23  people, yet you said in 2002 you had too many people?
24      A. Yes. Because more showed up than what
25  expected, they had said they would go, and they showed

Page 10

1  up.
2      Q. But they were all people that had been spoken
3  to?
4      A. Right. Because some of them, from what I
5  understand, they said they weren't going, but then they
6  showed up. So he couldn't turn them away, either,
7  because they're already there. So what do you tell
8  them? It's field work, we've got to work.
9      Q. And when these extra people show up, you also
10  have to find a place for them to stay, correct?
11      A. What?
12      Q. You have to find a place for them to stay,
13  too?
14      A. That's what I'm saying. They had enough
15  rooms at the motel there with Mr. Pang, but he had to
16  get more rooms because there was more people.
17      Q. When they said set aside the number of rooms
18  that he thought he was going to need, did he
19  guesstimate that based on a number of people per room,
20  or how did he do that?
21      A. Yes. Because I think the way it's done, if
22  you say okay, we got a man and his wife, that's one
23  room, because you can't put anybody else with them.
24  You've got four guys that come alone, that's a room for
25  them, and they get a big room, because there are small

Page 11

1  rooms and there are big rooms. If it's just a
2  couple -- see, he makes the arrangements with
3  Lewis Pang, or we call him and we say we need so many
4  rooms, Lewis, and some with one bed or some with two
5  beds, and some big rooms. And if he doesn't have them,
6  then he's got to get rooms somewhere else. Normally
7  everybody's comfortable, it's not a crowded thing.
8      Q. None of the rooms had more than two beds; is
9  that true?
10      A. Two beds, and sometimes, and I think in some
11  cases, if somebody -- if it's like two brothers, they
12  don't mind sleeping together, but if it's an extra
13  person, he provides like a small cot for them, you
14  know, an extra bed to put in there.
15      Q. So there were some occasions in 2002 when two
16  guys were put in one bed?
17      A. Well, I don't know how they sleep, but I'm
18  saying like brother and brother, you know, that's
19  nothing, it's family, it's not like a different person.
20  But how they make the arrangements in there, I cannot
21  say I went there and I checked in the rooms, no. I
22  know the rooms are -- when they are giving out the
23  rooms, they start saying, so Mr. Martinez assigns the
24  rooms, okay, because he knows the people better than
25  me, he knows who is coming with who, see.

Page 12

1      Q. Did you have any role at all in the
2  assignment of rooms?
3      A. No.
4      Q. But you do know that there were rooms where
5  there two beds and more than two people?
6      A. Yes.
7      Q. So that would lead you to conclude that some
8  people were doubling up in a bed or sleeping on the
9  floor?
10      A. Yes. And like I said, I know that for
11  someone else to sleep, I know Mr. Lewis Pang provided
12  cots, because I know Pablo said that they're going to
13  get cots extra for the other guys. But like I say, I
14  don't know how the actual accommodation was done.
15      (Exhibit No. 18 was marked for identification.)
16  BY MR. SANCHEZ:
17      Q. Mr. Martell, you've been handed a document
18  marked as number 18, and it consists of two pages.
19  Okay?
20      A. Yes, sir.
21      Q. First question, do you know whether this
22  document is from 2002?
23      A. Yes, sir. I would say it is.
24      Q. Can you tell me what Exhibit Number 18 is?
25      A. Exhibit Number 18 is a document showing the

**Page 13**

1 production of the people. That list on top, you will
2 see the blocks, because they go by number, it's block
3 one through 107 -- 102 through, and there's also 114
4 there.
5    Q. So those would be field numbers, correct?
6    A. Yes. Because every block in the field is
7 assigned to a number.
8    Q. Then right below that you have numbers and
9 then a column that goes from one to 32 on the first
10 page?
11    A. Yes, sir.
12    Q. And on the second page it goes from 33 to 51,
13 correct?
14    A. Yes, sir.
15    Q. What does that stand for?
16    A. Okay. Those are the numbers of the people
17 that are -- the way they are assigned numbers to the
18 field. One through 60?
19    Q. Well, actually I see the first number on the
20 first page on the right-hand side it says number and it
21 has one, and the first page goes to 32, correct?
22    A. Yes, sir.
23    Q. And then on the second page it has -- the
24 second column says number, and it goes from 33 to 51,
25 and then there is a zero below that?

**Page 14**

1    A. Right. Okay. Those are the numbers for the
2 people that are assigned. They get a number, like I
3 said before, and this is how we know who is who. And
4 these numbers correspond to the name of the person.
5    Q. And on the second page of Exhibit Number 18
6 it has another column there, correct?
7    A. Yes, sir.
8    Q. What's that for?
9    A. Because it's not all clear. The number sign
10 on top designates that's the number of the employee.
11    Q. Right.
12    A. You're asking me about the one on the
13 left-hand side, right?
14    Q. On the second page.
15    A. On the left-hand side, right?
16    Q. Right.
17    A. I don't see what it has to do. I see what it
18 is. I see what it is. If you see, there is an arrow
19 on top, something is missing when it was copied, a
20 portion was missing. From the 108, what it was, if you
21 note the "X"s, when we figured what came to there, it
22 was a different figure, so I had to do a change, and I
23 changed it over. But it's not the full -- that thing
24 complete is not there, because there was no room. So I
25 went to the left with the arrow, and the figures under

**Page 15**

1 108 should be on the left. That's what that is.
2    Q. Okay.
3    A. But like I said, on the page where it was
4 copied from, it's there complete, the whole page.
5    Q. And the handwriting on Exhibit Number 18,
6 that's your handwriting?
7    A. Yes, sir.
8    Q. If you can look down on the first page of
9 Exhibit Number 18, under the rows four and five. Go
10 all the way to the right-hand side. Rafael Garces,
11 right?
12    A. Yes, sir.
13    Q. And it has two amounts listed there for him?
14    A. Uh-huh.
15    Q. Do you know what that's referring to?
16    A. Okay. Rafael Garces. Oh, okay. This was a
17 family, if I remember correctly. I think there were a
18 father and son and two brothers, I think. What they
19 wanted -- I don't remember how they wanted this done,
20 Rafael Garces -- I forget what his son's name was, I'm
21 trying to remember why we designated it like that.
22 They wanted it combined, I remember, because one of
23 them I think owed the other money or something like
24 that, so they wanted us to make the check under one of
25 the guys and he would settle with him. That was their

**Page 16**

1 understanding, whatever they had, see. That's why we
2 put it together those two. I think that's the way it
3 went down. I don't really remember offhand.
4    Q. Okay. And right beneath that, it has the
5 name Martin Garces, and it also has two numbers for
6 that?
7    A. Yes. These people all came together, see.
8    Q. And if you go further down on the first page
9 of Exhibit Number 18, lines 24 and 25, it also has or
10 it says 2,000, Pacheco?
11    A. Right.
12    Q. And it has two figures, 945 and then 1051.
13    A. That's correct.
14    Q. Did the Pachecos have that same sort of
15 arrangement, that you paid one's wages to the other?
16    A. I don't remember what the deal was with
17 Pacheco, but that was the total amount. There is two
18 figures in here I know. I don't remember offhand.
19    Q. I also looked at other documents that show
20 that there was 63 workers, correct?
21    A. Okay.
22    Q. Is that correct, some of these other records
23 that we looked at?
24    A. Uh-huh.
25    Q. Do you know why Exhibit Number 18 only has 51

4 (Pages 13 to 16)

**Page 17**

1   rows listed?
2     A. Are you talking about the numbers?
3     Q. Right.
4     A. No, Rudy, I don't.
5     Q. Do you know why -- if you look at
6   Exhibit Number 18 and then you look at
7   Exhibit Number 15 -- can you get Number 15 out of
8   there? Do you know why those employee numbers from 15
9   don't match up with the employee numbers from
10   Number 18?
11     A. Well, what it could be, and then again,
12   Mr. Martinez would probably know, because maybe if
13   this -- this is the number of people that showed up.
14   Now, what I don't know is if all of these people
15   worked. If they're not on here -- this is a list of
16   the people that worked, and this is a list of people
17   that were assigned numbers as they showed in, see.
18     Here I know if I go one by one -- and then
19   again, Mr. Martinez would know because he's the one
20   that handled the field work. First of all, like
21   here -- yeah, that would be the only way to do it, for
22   him to go over. He knows exactly like how many people
23   he had out there, because we only had 51. You can see
24   here, these guys, 45 and 44, those guys didn't work.
25   There is a line across, they didn't work.

**Page 18**

1     Q. For example, you have on Exhibit Number 15,
2   number two, employee number two would be Maria Flores?
3     A. Right.
4     Q. And if you look at employee number 2 on
5   Exhibit Number 18, you have the name Trujillo.
6     A. Okay. Okay. This, when we did this -- I
7   know what it is, I think we have a different list.
8   Because we were writing them like this, because see,
9   you'll notice even my name is not on here, I'm not
10   number four, you will notice that, see, Rafael Garces.
11     What it is, when they came in -- I remember
12   now. When they came in, I started running numbers, we
13   started with the top, which is us, and then we started.
14   And then when it actually came time to work, the
15   numbers were changed, because you can tell, they should
16   have started at number two, and then gone to number
17   five, excluding Pablo, Chino, and me. This is actually
18   in the field out there. No. I'm sorry. Including
19   Maria. Because this is people actually doing
20   production. It should have started with number five.
21     So somehow over there, they got the numbers
22   crossed, that's why the numbers don't match with this
23   one. But there's another list that shows these guys
24   for these numbers. This is the first list we made when
25   they started walking in.

**Page 19**

1     Q. So where would that other list be that shows
2   that?
3     A. It would be with all the papers that we gave,
4   because it would have to be in there, see. Because it
5   was one of the very first pages I did when I got the
6   numbers. And I assigned them the numbers when they
7   were coming in, that's why I remember, I said we're
8   going to start with number five as the first employee,
9   see.
10     Q. I mean, you gave us -- in your response to
11   the request for production of documents, you reference
12   these documents one through 93, and then you gave us a
13   supplemental of 94 to 105. We're getting close to
14   covering all those documents, and you keep referring to
15   some documents that I haven't seen.
16     A. No, no. I'm saying this page is somewhere.
17   Because see, these numbers correspond to the names.
18   This is the correct one, this is the way the book was
19   done. Because this guy, that's his number right there,
20   Gallardo, so he was number two. Because over there
21   when they went to the field, they disregarded this
22   list, see.
23     Q. Right. But for example, the first exhibit we
24   saw, the payroll ledger, we saw Maria Flores' name on
25   there, and she earned $6,000, correct?

**Page 20**

1     A. Well, as an employee, but she didn't
2   necessarily do work in the field. This production
3   sheet is people who actually did detasseling. See,
4   like my name wouldn't be on here because I'm not
5   detasseling.
6     Q. That clears it up. This would include people
7   who were doing the supervising or the payroll or --
8     A. Right. That's why I omit those numbers. But
9   over there, when they went over there, then they gave
10   me this list of numbers, so that overrode this, see.
11     But this is the actual production of the --
12   these are the actual people that were in the fields.
13   These should be the people that got checks from ADP as
14   far as the detasseling.
15     Q. The other people on the other list, they also
16   got checks from ADP, it's just that it wasn't for
17   detasseling?
18     A. Right. Because ADP paid for everybody. We
19   submitted the amount everybody was going to get paid,
20   and that's what they got paid.
21     (Exhibit No. 19 was marked for identification.)
22   BY MR. SANCHEZ:
23     Q. This is a big exhibit, but it's going to be
24   fast, because I only have two or three questions about
25   it.

5 (Pages 17 to 20)

Page 21

1    This document 19, Mr. Martell, is a
2 compilation of documents you provided to us, and I
3 believe the third page says DEF 0061, and the last page
4 is DEF 0090.
5    A. Yes, sir.
6    Q. And I believe the first two pages are
7 DEF 0060 and DEF 0059, but it's not on the page. And
8 these were given to us by you.
9    A. Okay.
10    Q. And they appear to be field maps, correct?
11    A. Right, sir.
12    Q. And if you look very quickly through all
13 these documents, you'll see that these are field maps
14 for 2004; is that true?
15    A. I would think so, yes. It's '04. This
16 wouldn't be for 2002.
17    Q. Do you know if there are maps that either you
18 or Mr. Martinez have for the fields that the
19 detasseling crew worked in in 2002?
20    A. I wouldn't have those if they were, because I
21 know he handles that personally. Because when they're
22 out in the field, he's the one that goes in the field,
23 He gets together with Mr. Sheriff and they discuss the
24 whole field and then they put the people to work. But
25 I don't actually see the work, they're the ones that

Page 22

1 handle the maps.
2    Q. Have you ever been present when Mr. Martinez
3 and Mr. Sheriff discuss which fields are going to be
4 worked?
5    A. No, sir. They do it out there themselves.
6    Q. So it's your understanding they do that, but
7 you've never heard them?
8    A. No, sir. They meet every morning, or the day
9 in the afternoon, and he will tell them tomorrow we'll
10 go to the other field, whatever.
11    Q. Mr. Sheriff will tell Mr. Martinez?
12    A. See, they tell him according to the way it
13 has to be done, because of the weather, if the rows are
14 ready, the corn is ready to be detasseled. So they
15 know which fields are next.
16    Q. If you look at the maps that we have in
17 Exhibit Number 19, you can look at say look at 0090.
18 That's the shape of a field being detasseled, correct?
19    A. Yes. I'm afraid some of these fields don't
20 really...
21    Q. Can you just describe the process for me for
22 keeping -- and it's my understanding the crew lines up
23 and goes into the field, right?
24    A. If I remember correctly, I think one meeting
25 we had at your office, Mr. Martinez and Mr. Hill were

Page 23

1 present, and I think because for this, he is the best
2 and can tell you how they actually do this because it's
3 confusing. It's an agreement with everybody, and they
4 decide it out there, and if my life depended on it, I
5 could not tell you how they do it, because they're the
6 ones that give me the information.
7    Q. So you looking at these maps couldn't tell
8 me --
9    A. No, sir.
10    Q. -- how many rows you would do?
11    A. No. Mr. Martinez, if he looked at this map,
12 he will tell you, he will tell you out in the field,
13 because that's his field, he's a field man all the way,
14 he's in the field.
15    Q. And is it your understanding this is done --
16 there is a determination made on how big a -- how many
17 acres are going to be done before the person gets in
18 there, or is that done after they get out?
19    A. There is a system they use on this, and I'm
20 not going to quote or guide anybody in the wrong
21 direction, because if I have to explain it I couldn't,
22 but he can explain it.
23    Q. Let me put it to you this way, I think you
24 testified earlier that you don't go out to the fields
25 that often?

Page 24

1    A. Right.
2    Q. So you know there is a system, true?
3    A. Right.
4    Q. But are you aware of the particulars of that
5 system?
6    A. No. Because a lot of things, a lot of
7 factors are taken into consideration, and that would be
8 like the way this thing is done, there is some that are
9 slopy and some that are longer, and so whatever is put
10 together, it's in accordance with everybody, and that's
11 the way they do it. But like I said, I do not know how
12 they do it.
13    Q. And it's true that these maps are for fields
14 that were detasseled in 2004, but is it true that the
15 fields in 2002 had similar sort of shapes?
16    A. Right. I could not tell you that they're all
17 alike, because see, every year, like this year he might
18 have got these fields and the year before the other
19 fields. And that map we showed the first time that
20 shows all the blocks, they decide at the main office
21 who gets what, because there are different contractors.
22    So they will say Pablo Martinez gets this,
23 this, and this blocks, and somebody else gets this and
24 this blocks, because there is different groups out
25 there, not just ours. And they are the ones that

6 (Pages 21 to 24)

Page 25

1  assign to him what he will take, and then they decide,
2  they get together out there. And when they bring me
3  the information, it's basically the production of what
4  everybody did.
5     (Exhibit No. 20 was marked for identification.)
6  BY MR. SANCHEZ:
7     Q.  Mr. Martell, you've been handed Exhibit
8  Number 20. Have you seen this document before?
9     A.  No, sir.
10    Q.  So you have no information, you don't have
11 any knowledge about any of the information contained in
12 this document?
13    A.  No. It's probably about the fields, because
14 it shows there the frames and fields and rows, but I
15 don't know, I've never seen that.
16    Q.  What do those terms, "frames" and "field" and
17 "rows" mean?
18    A.  In the first one, the field, that will tell
19 you the block numbers. Like I said, here see, these
20 are a lot of blocks, so in this group here Mr. Martinez
21 might have had certain blocks and somebody else certain
22 blocks, because there are different crews out there
23 from different contractors. Then you've got the
24 frames, which it doesn't show it there. And see, this
25 would apply to them out there in the field. This would

Page 26

1  be like a map to them, this tells them what they're
2  dealing with out there.
3     Q.  Did you meet -- you mentioned that there were
4  different contractors out there?
5     A.  Yes, sir.
6     Q.  Did you meet any other contractors?
7     A.  No, sir. Because I know that when we were
8  staying there at the other motel, there was another
9  group there, they were from Brownsville, but I don't
10 know who they were.
11    Q.  You mean there was another group at the Iris
12 Motel?
13    A.  It's a big motel, yes.
14    Q.  And you know they were from Brownsville but
15 you don't know who their contractor was?
16    A.  I know they were from Brownsville, because
17 one of the guys that was with the other contractor, he
18 was telling me that their boss, or their -- because
19 they had a big bus there, they were telling me they
20 came from Brownsville.
21    Q.  You don't remember that gentleman's name?
22    A.  No, sir, I don't.
23    Q.  Do you recall if he told you how many workers
24 they had in that group?
25    A.  No. Well see, that hotel is really big. We

Page 27

1  were in one end, they were in the other end. In
2  conversation, you know, you talk, like where are you
3  guys from, we're from Weslaco, well, we're from
4  Brownsville, but nothing long discussion.
5     Q.  Did you have any conversations with this
6  gentleman about the housing they had there at the Iris
7  Motel?
8     A.  No. Because one of the guys that was talking
9  to us was an employee of that group. So just in
10 passing, where are you guys from, nothing where you can
11 make a big conversation.
12    Q.  But it was just your understanding that he
13 was somebody who was detasseling corn?
14    A.  Oh, yes. They were doing the same thing we
15 were.
16    Q.  For Mycogen also?
17    A.  Yeah.
18    Q.  And they were staying at the Iris Motel?
19    A.  Yes.
20    Q.  Do you know were there any other crews at the
21 Heidelburg?
22    A.  What it was, we didn't get rooms this time at
23 the Heidelburg, because construction is going on at the
24 big highway there into Mount Pleasant, so the
25 construction company took most of the rooms because

Page 28

1  they were working that area. So for them it was a lot
2  easier, because they stay there, and they're working
3  about a quarter mile from the hotel. So they took
4  basically all the rooms.
5     Q.  This was in 2002?
6     A.  I'm sorry. No. This was 2004, I'm sorry.
7     Q.  In 2002 were there any other crews at the
8  Heidelburg Motel aside from Mr. Martinez?
9     A.  No, no. In 2002 it was just us. This I was
10 talking to you about Brownsville, Texas, I take it
11 back, it was this year, 2004.
12    Q.  Okay.
13    A.  I got ahead of myself there.
14    (Exhibit No. 21 was marked for identification.)
15 BY MR. SANCHEZ:
16    Q.  Mr. Martell, you've been handed a document
17 marked as Exhibit 21, and at the very bottom it says
18 DEF 092, and it looks like three receipts from the
19 34 Truck Stop in West Burlington, Iowa, correct?
20    A.  Correct.
21    Q.  And at the bottom of each of these receipts
22 it has the date: The first one says 7/10/04, the
23 second one says 7/14/04, and the third one says 7/9/04;
24 is that correct?
25    A.  That's correct, yes, sir.

Page 29

1    Q. So these receipts are from 2004, right?
2    A. Yes, sir.
3    Q. Do you have any receipts similar to this from
4  2002?
5    A. No. Because usually what this is is probably
6  where they stopped to get fuel for the bus and they
7  pick up the ice and everything, usually Mr. Martinez
8  keeps all of that.
9    Q. But this is in 2004 and you don't recall that
10  there are any receipts in your possession for 2002?
11   A. No. Because like I said, I don't know how he
12  uses that. And whenever they go in the bus, they go in
13  the morning, so they're the ones that fuel and pick up
14  the ice and all that.
15   Q. On the very bottom on Exhibit Number 21, the
16  bottom receipt there, it looks like a credit card
17  receipt, right?
18   A. I think so.
19   Q. It has the name Maria P. Flores?
20   A. Right, sir.
21   Q. Is this the same Maria P. Flores that we've
22  been talking about who earned $6,000 in 2002?
23   A. What it could be — and I'm just speculating
24  here — what it could be, maybe because sometimes,
25  believe it or not, he is caught off balance to where he

Page 30

1  doesn't have any money on hand, and this lady that
2  works for him over there in the fields, he might have
3  borrowed her card to buy the — what else did they buy,
4  ice or something, I don't know what it was.
5    Q. Okay. But you don't — it says 18.38 G, $34
6  at 1.84 per G. Would that kind of indicate that that's
7  for gas or diesel or something?
8    A. Yeah. This might be, because there it is at
9  the bottom, 1.84, so it was probably gasoline they
10  bought, see. And believe me, because it's a Shell
11  card, I can see that. It could be that — because I
12  know it happens, sometimes he would be short of cash or
13  whatever, and somebody there, and he would give them
14  back the money or whatever. That's probably what I'm
15  thinking. But again, I'm just speculating, I don't
16  know for a fact. Because it's gasoline there, you can
17  see that.
18   Q. Did you ever pay for gas in 2002 for the bus?
19   A. No, sir. I'm never in the bus with them when
20  they go to the field.
21   (Exhibit No. 22 was marked for identification.)
22  BY MR. SANCHEZ:
23   Q. Mr. Martell, I believe that you said that on
24  occasion you do go to the fields correct?
25   A. Yes, sir.

Page 31

1    Q. You've never ridden in the bus to the fields?
2    A. No.
3    Q. In 2002, how did you get to the fields?
4    A. Well, there's a pickup there. Yes. In other
5  words, when I rode up there like in 2002, it was Chino,
6  his pickup. So whoever I ride with, the pickup
7  stays — like the bus driver, he takes the bus, so in
8  case he needs me for something, he'll call me at the
9  hotel, come, I need you over here for this or that, and
10  I go to the field.
11   Q. Can you recall in 2002 what reasons he called
12  to have you come to the field?
13   A. Well, sometimes it might be — one particular
14  time I remember, I think two of the guys somehow the
15  bus left them, because they were not ready and the bus
16  took off and they thought they were on it, so I took
17  them out to the field. They stayed, and so they
18  wouldn't miss work, I took them out to the field on
19  this one particular occasion.
20   Q. Do you recall who that was?
21   A. No, sir. It was two guys. For some reason,
22  unfortunately, you know, you think everybody is on
23  there, and these guys were not on the bus. So they
24  came — he called me and sent them to the hotel, and
25  said I need those guys to come, because the bus left

Page 32

1  them, so I took them to the field.
2    Or on occasions, if they need something out
3  there that they need at that point in time, they need
4  something, I go out there, you know.
5    Q. For example, like what, what would he need
6  out there?
7    A. Okay. Let's say — this is just like a long
8  shot. Maybe let's say the markers they use, for some
9  reason they run out of markers, I need some markers,
10  and I take them out there. Usually they have enough,
11  but, you know, people will go — his truck is parked
12  out there with the bus, and other people, when they go
13  to eat their lunches, they sit in his truck and they
14  open the glove box or whatever, you know, and people
15  shouldn't, but sometimes they run out of pens, people
16  just will take them, you know. So that might be an
17  example.
18   Q. So the truck is there, but do they leave you
19  the keys, just in case, or how does it work?
20   A. No. The truck is open, see, because some
21  people like to leave their lunches in there in the
22  pickup.
23   Q. But to turn it on and drive it, you have to
24  have keys, right?
25   A. Yes.

Page 33

1    Q. So where were the keys left, in the truck?
2    A. Yeah, they're there. Under the seat, you
3 know, you have emergency. Nobody moves the vehicle.
4 In case of emergency it's good to know the bus driver
5 is here, he needs to move the truck, keys are there.
6    Q. Exhibit Number 22 is another document that
7 was provided to you by us, and on the bottom it has
8 DEF 0013?
9    A. That's correct.
10    Q. And the last page is DEF 0016.
11    A. Yes, sir.
12    Q. Have you seen document before today?
13    A. Before today?
14    Q. Yes.
15    A. Yes, sir.
16    Q. When do you recall the first time seeing this
17 document?
18    A. I don't remember the first time I saw it, but
19 I know it has to do with the work that's involved.
20    Q. When was the last time you saw this document?
21    A. It might have been last season when we were
22 up there.
23    Q. By last season you mean 2004?
24    A. Yes.
25    Q. So you're saying that you saw a document, if

Page 34

1 you look at the first page of Exhibit Number 22, it has
2 a date under there where it says the 28th day of June,
3 2002, correct?
4    A. Yes, sir.
5    Q. So are you saying that you saw a document
6 similar to this one in 2004, or are you saying you saw
7 this document in 2004?
8    A. They're the same, it just changes the date on
9 them.
10    Q. And did you also see a document like this for
11 2003?
12    A. Yes. They have one for every year.
13    Q. It's your understanding that it's the same
14 agreement year in and year out, correct?
15    A. Yes. The only thing that changes are the
16 dates. And the acreage, too. I take it back. And the
17 acreage. See, like here they're showing how many acres
18 roughly they're going to get. It could be more, it
19 could be less, but usually that is a variation.
20    Q. And if you look at the amount paid per acre
21 on the sixth page of Exhibit Number 22.
22    A. 0006?
23    Q. I believe it actually says 6 of 14 in the
24 very little letters.
25    A. Okay. I see it now.

Page 35

1    Q. It has the base rate of 175 per female acre?
2    A. I see it, yeah. I see that.
3    Q. So that's the rate it has been for the
4 last -- since -- for the last three years you've been?
5    A. No. I don't remember, because I don't know
6 if that changes every year. From this figure, from my
7 understanding from Mr. Martinez, that is the total for
8 the whole thing, I think. Then he pays $70 to the
9 employees, and from his share he has to pay the motel,
10 he has to pay everything, all the expenses.
11    Q. Right. But my question to you is this
12 amount, $175 per female acre, that's the amount that's
13 being paid to Mr. Martinez, correct?
14    A. Yes, sir.
15    Q. And that amount hasn't changed over the last
16 three years?
17    A. I don't know, because he's never told me what
18 he gets every year. I just know the figure that's paid
19 to the people.
20    Q. The $70 figure that you referenced to the
21 workers, has that changed over the last three years?
22    A. I don't know, because like I said, in 2002 --
23 in 2003 it was 70, prior to that I don't know if it was
24 less.
25    Q. How about in 2004?

Page 36

1    A. It was 70, yes.
2    Q. So for 2002, 2003, and 2004, it's been 70?
3    A. As far as I know, it's been 70, yes.
4    Q. If you look at the very top of the first page
5 of Exhibit Number 22, it says agreement between
6 Agrigenetics d/b/a Mycogen Seeds, and it has their
7 address of 101 Elm Street, correct?
8    A. Yes, sir.
9    Q. Then it has Pablo Martinez and his address in
10 Florida; is that correct?
11    A. Yes, sir.
12    Q. Did you ever talk to Mr. Martinez about this
13 agreement marked as Exhibit Number 22?
14    A. If I ever asked him what, sir?
15    Q. Did you ever discuss this agreement with him?
16    A. No.
17    Q. Did Mr. Martinez ever show you this agreement
18 in 2002 just to have you look at it?
19    A. No. Because he gets this.
20    Q. Did Mr. Martinez ever tell you that this
21 document marked as Exhibit Number 22 contained
22 information about the work that he was going to be
23 doing in Illinois in 2002?
24    A. No. Because like this form was with the
25 other papers he gets. So whenever I look for something

9 (Pages 33 to 36)

Page 37

1  in the package, I look for something he's looking for,
2  you know, but I don't browse through the whole thing,
3  you know. I know the understanding he has for what the
4  people get paid, but if I had to read every page for
5  page, I wouldn't know what every thing is in there.
6      Q. If you look at the second page of Exhibit
7  Number 22, right there at the very middle, under
8  paragraph number two, towards the middle of that
9  paragraph it says: "When recruiting workers to work
10  for contractor on the company's property, contractor
11  will, as required by law, provide and read aloud to
12  each such worker --
13      A. I'm sorry, Rudy, but I'm missing. What page
14  was that? This one here, this 2 of 14?
15      Q. Right. Page 2 of 14 of Exhibit Number 22.
16      A. Okay.
17      Q. And in paragraph number two, it has: "When
18  recruiting workers to work for contractor on the
19  company's property."
20      A. I'm trying to find it. Oh, okay. I found
21  it. Okay.
22      Q. "Contractor will, as required by law, provide
23  and read aloud to each such worker a worker disclosure
24  statement of the terms and conditions of their
25  employment in a form substantially in a form attached

Page 38

1  to this agreement as Exhibit B."
2      Do you see that?
3      A. Uh-huh.
4      Q. Do you know if Mr. Martinez did that in 2002?
5      A. Yes. Because the form they send us, that
6  disclosure form where they have to sign and be aware of
7  all that's involved.
8      Q. If you look at Exhibit Number 22, the page
9  that is marked as page 10 of 14, all right, it says
10  Exhibit B, and it has paren worker disclosure
11  statement, right?
12      A. Right.
13      Q. And it's blank.
14      A. Well, I know that they've got them, because
15  that's the form that's turned in to the company before
16  they even go into the fields.
17      Q. So is there some other information or some
18  other document that shows what Mr. Martinez is supposed
19  to be reading to these workers that he's recruiting?
20      A. No. That worker disclosure form that says in
21  a nutshell everything, and I know it's filled --
22  everything is filled in, that is taken to the company,
23  that way they know that they have signed the form. And
24  at the orientation itself they explain over again this
25  is what they're going to be doing, what's involved,

Page 39

1  what's expected of them.
2      Q. If you look at Exhibit 22, the one that says
3  page 8 of 14.
4      A. Okay.
5      Q. Could you verify those signatures there?
6      A. All right. Well, on the left-hand side is
7  James Sheriff, and on the right is Mr. Martinez.
8      Q. You weren't present when this document was
9  signed, were you?
10      A. No, sir.
11      Q. Also if you look at the first page of
12  Exhibit Number 22, on the very bottom it says page 1 of
13  11.
14      A. Okay.
15      Q. And on the second page it says page 2 of 14.
16      A. Okay.
17      Q. Do you know why that has a difference in
18  numbering there?
19      A. I didn't even notice. I don't know. Maybe
20  what I can think of, maybe it should have been 1 of 14
21  at the beginning instead of 1 of 11.
22      Q. All right.
23      A. If there are 14 pages.
24      Q. So your answer is you don't know, you're
25  taking a guess?

Page 40

1      A. Right. I don't know why the numbers is.
2      Q. If you look at the second page of Exhibit
3  Number 22, it's your understanding that Mr. Martinez
4  was going to detassel approximately 800 acres of seed
5  corn for Mycogen?
6      A. He told me not by looking at this form, but
7  when we get out there, he says roughly we got. And
8  that not is the actual exact, it could be 810 or 820,
9  that is like a rough figure. Because without the
10  acreage, how can you actually chop down to the exact
11  number?
12      Q. If you look at the first page of that
13  exhibit, it says that that work is going to be
14  performed between I guess between the date it was
15  signed, on the 28th of June, and August the 15th;
16  correct?
17      A. I'm trying to see what they're saying up
18  here. They're saying effective date of 28th of June.
19  Okay. I see it, August 15th. There, it's a span in
20  there that they're showing. Because normally it could
21  start June 30th, it could start June 28th, July. Those
22  are the figures that they play with, because they
23  themselves don't know for sure the exact amount, even
24  though they try to. Like I said, it's based on the
25  weather, soil conditions, temperature, everything,

Page 41

1  that's all a factor that determines when they actually
2  start.
3      Q.  I believe you had said earlier that you had
4  been a farm worker or a field worker since you were
5  seventeen years old?
6      A.  All my life.
7      Q.  Based on your experience as a field worker,
8  how many workers would you need to detassel 800 acres
9  of corn between --
10     A.  I've got to confess to you, Rudy, I worked in
11 the fields, but this is the first time I worked with
12 Mr. Martinez and had ever worked in detasseling.  So I
13 know he can tell you, like a lot of people like
14 Jim Sheriff can tell you also, because that's their
15 nature, that's their background.  I couldn't tell you
16 how many workers you would need.
17     Q.  But you can tell me that Mr. Martinez
18 couldn't do it by himself?
19     A.  He can tell you, he can tell you.  He can go
20 into a field, he can look at a field and walk it and
21 tell you much more or less closer to what they're going
22 to do.
23     Q.  You had mentioned earlier about an
24 orientation session?
25     A.  Yes, sir.

Page 42

1      Q.  And you said at the orientation session that
2  terms of employment are discussed; is that correct?
3      A.  I know because the very first time I went
4  with him and I went to work in the fields, helping him
5  at the orientation, this was back when Cargill was the
6  company, they go over everything, they go over the
7  safety rules, and I would imagine the consistency of
8  that orientation program is still the same.
9      Q.  Well, let's just focus on what you recall
10 from 2002.
11     A.  Okay.
12     Q.  In 2002 was there an orientation session?
13     A.  Yes, sir, there always is.
14     Q.  And who was present at that orientation
15 session?
16     A.  Well, all the people that are going to work,
17 and Mr. Martinez, and whoever else from the plant is
18 there.  They go over stuff, that's where they hand out
19 the glasses and whatever other things they need to
20 work.
21     Q.  Now, when you say people from the plant, are
22 you saying people from Mycogen are present?
23     A.  Yes.  Like there Mr. Sheriff would probably
24 be there with Mr. Martinez, and they go over the
25 program, put the film -- there's a safety film they

Page 43

1  show them.
2      Q.  Were you present at the orientation in 2002?
3      A.  Yes, sir.
4      Q.  Was the conditions -- let me take that back.
5          Was there any discussion at all about what
6  work the people were going to be doing?
7      A.  Well, just the detasseling, that's what they
8  do, you know.
9      Q.  Was there a discussion about how much work
10 was available?
11     A.  I don't remember.
12     Q.  Was there any discussion at all at the
13 orientation session in 2002 about how much people were
14 going to be paid?
15     A.  Well, I think they discussed the $70 an acre
16 as the agreement.  But you see, you're there, and
17 because you've already been there, I'm not like
18 focusing on what's going on, people who are talking
19 about --
20     Q.  Let me put it to you this way, what was your
21 role at the orientation?
22     A.  Well, just to be there, you know.
23     Q.  Were you there as a spectator?
24     A.  No, no.  I was there picking up the
25 credentials of the people so we can make copies, that's

Page 44

1  we would do all the copying of the credentials.  I'm
2  saying, I was doing something while this was going on.
3      Q.  All this was done at the Mycogen plant?
4      A.  Yes, sir.
5      Q.  All the documents are filled out at the
6  Mycogen plant?
7      A.  Yes.  And I take all those forms, like I
8  said, their IDs, and we make copies of all that, that's
9  how we know who is there.
10     Q.  Do you recall if there was any discussion at
11 the orientation in 2002 about the difference in how the
12 payroll was going to be handled?
13     A.  No, sir.  I don't remember.
14     (Exhibit No. 23 was marked for identification.)
15 BY MR. SANCHEZ:
16     Q.  Mr. Martell, you've been handed a document
17 marked as Exhibit 23.  Can you identify this document
18 for me?
19     A.  Well, it says Mycogen Seeds Field Worker
20 Safety Guidelines.
21     Q.  Have you seen this document before?
22     A.  I think I saw it one time when they gave us
23 all one the first time I worked in the field.
24     Q.  So you're saying back in '96 or '97?
25     A.  Yes.  Because I don't know if it varies from

11 (Pages 41 to 44)

**Page 45**

1  year to year, different things they might change on it.
2  But they hand it out, and I think the people go over it
3  to kind of let everybody fill in on what is to be
4  careful with and what is required of them, because I
5  know they're very strict. They don't want people
6  barefooted, and those glasses, you have to wear them.
7      Q.  Back in '96 or '97, had you heard of the
8  company Mycogen Seeds?
9      A.  No.  Because back then it was Cargill, the
10  different company.
11      Q.  So when we're referring to Exhibit 23, it
12  says Mycogen Seeds, have you seen this document marked
13  as Exhibit Number 23 before today?
14      A.  Where it says Mycogen Seeds?  No.
15      Q.  So you don't recall having seen this
16  document?
17      A.  No.  I know they got this document.  Seeing
18  it here in my hand holding it, no.
19      Q.  And you mentioned earlier that at the
20  orientation session in 2002 there was a discussion
21  about field worker safety and that sort of stuff,
22  right?
23      A.  Yes.  They discuss all that at orientation.
24      Q.  But you don't know if this document was
25  reviewed for the workers in 2002?

**Page 46**

1      A.  No, sir.  For a fact, I don't know.
2      Q.  Do you know where that orientation session
3  was held in 2002, which Mycogen plants?
4      A.  Well, there was already — we were over here,
5  like I told you, what do they call it there, that
6  address, 101 Elm Street.  It used to be like an old gym
7  of some sort, and the company that was renting or
8  whatever, they had the facilities there, so they had,
9  like, benches, and everyone was sitting there,
10  something like a gym, they brought the benches down so
11  everybody could listen.
12      Q.  That was in Gladstone, right?
13      A.  Yes, sir, that's Gladstone.
14      Q.  And I believe earlier you testified that
15  Gladstone was about a two-hour drive from the hotel in
16  Heidelburg?
17      A.  Yes.  Because you have to cross to Illinois.
18  It's a good — at least, yes, two hours at least.
19      Q.  It's your understanding that the workers were
20  required to attend that orientation session, correct?
21      A.  Yes.  They have to, yes, they want everybody
22  there.
23      Q.  Were the workers paid for sitting in that?
24      A.  I think so, yes.  I think there is a
25  compensation.  I don't know how much they're allowed,

**Page 47**

1  but they are reimbursed.
2      Q.  Were the workers paid for the trip to and
3  from Gladstone?
4      A.  I don't know.  I don't know what encompasses
5  what's paid there.  Mr. Martinez handles that, so I
6  wouldn't know.
7      (Exhibit No. 24 was marked for identification.)
8  BY MR. SANCHEZ:
9      Q.  Mr. Martell, I'm handing you a document
10  marked Exhibit 24, and I believe, and you can correct
11  me if I'm wrong, Exhibit 24 is a letter addressed to
12  Mr. Norton, but it was actually sent to the court in
13  this case; is that correct?
14      A.  I don't know.  Are you saying it went to the
15  wrong place?
16      Q.  Well, I understood this to be the answer you
17  filed in this lawsuit.
18      A.  Okay.
19      Q.  But maybe that's not correct.
20      A.  Well, I'm trying to — because here I
21  remember that — if I'm allowed to discuss this — it
22  came as a surprise to me, because I was never aware of
23  anything was going on until Jose Torres approached me
24  at my home and said they wanted to speak to me, and I
25  said sure.  I had no idea what they wanted to speak to

**Page 48**

1  me about.  Because being in the past, I had some
2  association with the people that I used to know.  And I
3  had no idea until I talked to Mr. Norton, and I'm going
4  to find out what's going on.
5      So I think, and again, I'm sorry if I did
6  this wrong, but it was just like my way of
7  explaining — I thought this is what I was doing, but
8  if I was doing it wrong, I'm sorry I didn't do it the
9  right way.
10      Q.  I'm just trying to — because I've seen
11  different things, different documents that you've
12  signed, for example the interrogatories, which you
13  don't recall.  I believe you said it was your
14  signature, but you didn't recall having those read.
15      A.  The way it was worded, yeah.  Because we've
16  done so many papers, you know.  And forgive me, you
17  know, because I couldn't tell you if sometimes — if
18  you see the signature you say I know it's my signature,
19  I know I wrote it, but sometimes you don't remember, so
20  many things.  Like this one, I know I did it because
21  there is my signature, and when I'm reading this, I
22  remember now, as we go back I remember.
23      Q.  Do you recall you wrote this statement and
24  signed it?
25      A.  Yes, sir, I did.  Like at first, I was saying

12 (Pages 45 to 48)

Page 49

1  this case number and it didn't ring any bells, until I
2  started reading the rest, and when I see this part
3  Jose Torres, yes, I did write this.
4      Q.  And towards the very bottom of Exhibit number
5  24, the second to last paragraph, the first sentence
6  reads: "I myself am employed mostly to help
7  Mr. Martinez." Correct?
8      A.  Yes, sir.
9      Q.  That statement looks a little different from
10  some of the other statements that we've seen, it's
11  very -- it doesn't really have any explanation; would
12  you agree with that?
13      A.  Well, because sometimes, and I'll be honest
14  with you, I write for the newspaper and I have a
15  column, and sometimes I go back in some instances I
16  read something that I wrote, and I cannot tell you it
17  was me, because it looks different. And I don't know
18  what it is. And I can have no explanation, Rudy.
19          But I've gone through some of the stuff I
20  write, and I don't know if this has any bearing on
21  this, but it's like the handwriting, we sometimes don't
22  sign our name the same way. So I'm reading things that
23  I don't remember writing, and I did write them, because
24  there's my signature.
25          But what I'm trying to say is I'm making no

Page 50

1  excuses, I'm just saying we write differently at
2  different times. I don't know.
3      Q.  Exhibit Number 24, you wrote that on the
4  typewriter?
5      A.  Yes.
6      Q.  You have a typewriter?
7      A.  I borrowed one.
8      Q.  You know how to type?
9      A.  Well, I don't know how to use a computer, but
10  I can type, you know. And you can tell I do mistakes,
11  there's no hidden fact here.
12      MR. SANCHEZ:  Okay.
13      (Exhibit No. 25 was marked for identification.)
14  BY MR. SANCHEZ:
15      Q.  This document marked as Exhibit Number 25, I
16  understand this is another letter that you sent to the
17  court; is that correct?
18      A.  Yes, sir, that's correct.
19      Q.  And this one is dated March 11th, 2004; is
20  that right?
21      A.  That is correct, sir. March 12th, mine says.
22  Okay. Yeah. On the date they received it. Okay.
23      Q.  If you look at the second paragraph of
24  Exhibit Number 25, towards the middle of the paragraph,
25  can you read that sentence to me that says "I am a

Page 51

1  helper"?
2      A.  I am answering, is that the one?
3      Q.  The second paragraph, second sentence.
4      A.  Okay.  "I am a helper for Mr. Pablo Martinez,
5  and an employee, just like the people who are making
6  the complaint."
7      Q.  Okay.  Now, the people in this lawsuit that
8  we represent are the people who were detasseling corn,
9  right?
10      A.  Right.
11      Q.  And you in 2002 didn't detassel any corn; is
12  that correct?
13      A.  Right.
14      Q.  And the people in this lawsuit who are making
15  the complaint were paid either by the acre or by the
16  hour to do that work, correct?
17      A.  Right, uh-huh.
18      Q.  And you were just paid a flat fee for all the
19  services you provided?
20      A.  Right.
21      Q.  So really, would you agree that there is a
22  difference in sort of the role that you had in this
23  detasseling operation than the workers who are making
24  the complaint?
25      A.  Yes.  In two respects.  One is that they do

Page 52

1  one job and I perform another.  But what I'm trying to
2  get at here, somewhere in there there is some
3  misunderstanding.  What I'm trying to say in this line,
4  if I remember correctly, is that I am not a labor
5  contractor, I am an employee, I am only employed by
6  him.
7          Because there was some place in there where I
8  read that they were saying I was unlicensed, but I'm
9  not a labor contractor.  In other words, I just do that
10  for him out of the whole year, that's it.
11          What I'm trying to make reference to, and
12  forgive me if I didn't explain myself correctly, that I
13  am an employee like these people, too.  They are
14  employees, even though they perform a different
15  capacity, a different job.
16          It's like this building, one lady might be
17  the secretary, the other the janitor, but they're both
18  employed here in different capacities.
19          So I'm an employee in one area, and the
20  people who detassel in another area.  Like the bus
21  driver, he drives the bus, the surquero enumerates, but
22  we're all employees of his.  That's what I was trying
23  to make reference to, not comparison to who did the
24  same job.
25      Q.  Right.  But you weren't paid -- for example,

13 (Pages 49 to 52)

Page 53

1  you weren't paid for -- you had mentioned earlier you
2  were paid just $2,000, period.
3      A.  Right.  Regardless if it's four weeks or
4  three weeks, I'm going to get the same.
5      Q.  And it didn't matter how many hours you put
6  in doing the paperwork?
7      A.  No.  It didn't matter.  And that includes
8  complaints, if somebody is over there and the owner of
9  the hotel comes and says hey, they're making noise, I
10 have to go talk to the guys and say look, take it easy,
11 settle down.  It encompasses different things, not just
12 one, so it's just a variation of different things.
13     Q.  And in fact, you mentioned earlier also that
14 you had this barter system with Mr. Martinez.  I
15 believe that's the word you used.
16     A.  Okay, okay.
17     Q.  Where he gave you money?
18     A.  Uh-huh.
19     Q.  And you would do different sorts of favors
20 for him throughout the year, correct?
21     A.  Right.  But that is completely opposite or
22 aside, this has nothing to do with the contract in
23 Iowa, it's detached, this is completely different.
24     Q.  Those monies that are given to you by
25 Mr. Martinez under this barter system, do you report

Page 54

1  that on your income tax?
2      A.  Well, if you want to look at it from that
3  point of view, then we have to examine the whole world
4  of how I report this thing.  Because if the man gave me
5  the money, he gave it to me.  If I exchange it as a
6  favor, I exchanged it.
7      Q.  I mean, you use different words for the
8  reasons he gave you the money.  I believe you said that
9  some money was loaned to you with the expectation you
10 were going to pay it back?
11     A.  I pay it back, yes.
12     Q.  And some of it was given to you in exchange
13 for you doing some favors for him?
14     A.  Okay.  If the man gives me the money and I do
15 something for that service, then I've paid him back
16 with the service.
17     Q.  Just like wages, right?
18     A.  But they weren't actual wages, if you want to
19 split a hair.
20     Q.  Okay.  I'm just trying to understand.  When
21 you're using those words, what you're saying, and
22 correct me if I am wrong, is that he gives you money
23 for performing a service, but it's not wages?
24     A.  No, no, no.  This was again -- let's go back.
25     If I tell the man look, can you borrow me

Page 55

1  $500 or 300 or a thousand or whatever, he says okay.
2  Then if I can pay it back to him in money, I'll pay it
3  back to him in money.  I'm paying it back, but it's not
4  a -- you wouldn't say I was working for him, because
5  I'm paying him back the way I know.
6      I mean, who finds $5 and reports it on their
7  income tax?  I've never heard of that, unless somebody
8  is doing it and I'm not aware of it.
9      Q.  We're not --
10     A.  What I'm saying is this is an agreement we
11 have, me and him.  And I could say tomorrow I go to the
12 bank and I'll borrow it and I'll pay it back, you see.
13 So really it's not an income if you look at it from
14 that point of view.  I mean, I don't consider it an
15 income.
16     Q.  Well, I'm just trying to understand the way
17 it works, because you had mentioned earlier
18 Mr. Martinez spends the bulk of his time in Florida and
19 you're in Texas, and all these workers, the best we can
20 tell, except for the seventeen people from Florida,
21 were from Texas, right?
22     A.  Right.
23     Q.  And so did you do any favors for Mr. Martinez
24 in terms of helping him locate those workers or talk to
25 those workers in Texas?

Page 56

1      A.  Oh, no.  Because, see, most of those people,
2  they are already people that he knows.  So whoever I
3  met through his friendship are people who were already
4  friends of his or former employees of his.  None of
5  these people have I known before I came to help him.
6      Q.  I believe that in 2002 you mentioned that the
7  workers got two checks?
8      A.  Uh-huh.  Yes, sir.
9      Q.  It's my understanding that one of those
10 checks was handed out to workers in Mercedes; is that
11 true?
12     A.  Yes.  The checks were delayed, because
13 again -- and I want to make this clear -- ADP, when it
14 was over, and I specifically told them that they had to
15 be sent to us by a certain date, and when they got
16 there, it was too late, so we had left.
17     So the checks, when they arrived at the
18 motel, Mr. Pang sent the package back to Florida to
19 where ADP originates from.  And then ADP had to send
20 them to Mr. Martinez so he could sign the checks,
21 otherwise they couldn't cash them, and then
22 Mr. Martinez sent them to us.
23     That's when I got the people and I told them
24 to meet at the bank there so they could get the checks,
25 I had made arrangements with that bank so they could

14 (Pages 53 to 56)

Page 57

1 cash checks. There that was the confusion that
2 happened there so he could sign those checks.
3    Q. Now, when you did that, when you did that,
4 were you doing that as part of your employment with
5 Mr. Martinez, or as a favor to him?
6    A. Well, you have to understand, if he's over
7 there and I'm in Texas, the season was over, I wasn't
8 working any more, but it was helping along. Just
9 like the gentleman from the motel, he helped us by
10 sending the checks back and notifying us. And
11 Mr. Martinez had to sign those checks again before they
12 could get them again.
13      It was like the bank, he called the bank and
14 he had to arrange with them to have money there so they
15 could cash those checks. It was a big confusion, Rudy,
16 because ADP, somehow in there -- it was the first time
17 we worked with them, we had lot of problems.
18    Q. Right.
19    A. And I'm sorry that, you know, it ended like
20 that. Because we -- I mean, when Cargill used to pay,
21 my understanding was at the last week you worked, even
22 then, your last check is mailed to you, you don't get
23 your last check there.
24      Somehow in there -- and it's because somebody
25 started a rumor somewhere that they weren't going to

Page 58

1 get paid, people started to get mad. And I tried to
2 explain to them, look, we are working with a different
3 company, and we're all in the same boat together. I
4 don't know either. When the money gets here, we'll all
5 get it together.
6      And somebody somewhere started the rumor that
7 they weren't going to get paid, so people started
8 feeling uneasy about it, who wouldn't, not getting
9 paid. But I assured them, look, I'm in the same boat
10 you all are. As soon as the checks are here, we'll all
11 get together. And that's what happened. When we paid
12 everybody, everybody came to the bank and you get the
13 checks there and go cash them, and it was done.
14    Q. Did Mr. Martinez send you the checks?
15    A. He sent them to us, yeah.
16    Q. And you contacted everybody?
17    A. Yes. I told them just hold on, I'll try to
18 get hold of everybody as best as I can, you know.
19      (Exhibit No. 26 was marked for identification.)
20 BY MR. SANCHEZ:
21    Q. Mr. Martell, you've been handed a document
22 marked Exhibit 26. Can you tell me what Exhibit 26 is?
23    A. It's a check from somebody.
24    Q. Is it your understanding that Exhibit 26 is
25 an ADP check stub?

Page 59

1    A. Yes, sir.
2    Q. For a particular worker?
3    A. Uh-huh.
4    Q. Is it also your understanding that this is
5 the type of check stub that was given to all the other
6 workers when they received their pay?
7    A. Yes, sir, that's what it looked like.
8    Q. If you look on Exhibit Number 26 where it has
9 the description, it says salary.
10    A. Yes, sir.
11    Q. Then it has hours and it's blank?
12    A. Yes.
13    Q. Then it has this period and it has 300?
14    A. Right.
15    Q. This document doesn't have how many hours or
16 acres that a worker produced, correct?
17    A. Right.
18    Q. Was there some other document that was given
19 to workers that showed how many hours or acres they had
20 been credited with?
21    A. No. The way -- and this is the way I'm going
22 to try to work it the best way I know, how I was told
23 to do it. Everybody understands that they're working
24 on contract labor, and they know that the total of what
25 they make will equal whatever acreage they did, which

Page 60

1 should be within the guidelines of the satisfaction of
2 the hourly wage.
3      And the first time we did it, everybody would
4 come to the room there and we would get together.
5 Let's say Rudy Sanchez comes over. Okay, Rudy, we're
6 going to go over it, and we would go over every single
7 block and block number -- and they write their own
8 notes. They would say in this block I did so many
9 acres, and I said okay. This block number, one by one,
10 all the workers. Then we would come to a total. Okay.
11 So you make this much. And we would sit down, this is
12 the figure I got, this is the figure you got, that's
13 the figure. Okay. Now we go to the deductions, like
14 this 300, whatever monies were owed, and this would be
15 your final pay. And everybody walked out of those
16 rooms, and everybody was comfortable.
17    Q. Was this done, that meeting that you
18 described, is that done once at the end of the season?
19    A. Yes. Because at the end of the season,
20 that's when we actually know what they did. Because
21 you have to add up all the block numbers. And like I
22 said, one by one they come in, because you don't want
23 the other guy knowing -- that's your business, so it's
24 one by one. It's a long process, but it's effective.
25      And then the person, I said are you in

15 (Pages 57 to 60)

Page 61

1  agreement, and if someone is not in agreement, then we
2  will go okay, let's put it aside and we'll discuss it
3  later. But as far as I was concerned, everybody was in
4  agreement as far as is that the number of acres you
5  did? Yes, sir. This is what you made? Yes, sir. So
6  before I even said okay, is this all right with you.
7  And then we have to allow to show the deductions or
8  whatever. So everybody that left that room, from what
9  I understood, everybody was satisfied, there was no
10  discrepancies.
11  Q.  This is --
12  A.  2002.
13  Q.  -- at the end of the season in 2002?
14  A.  Yes. That's before they got their last
15  check, yes.
16  Q.  When workers are at the orientation, or
17  sometime before they start working, are they told to
18  keep track of all the work they do?
19  A.  Yes, sir. Everybody, you've got to take care
20  of your own business. I have my paperwork, but see, I
21  confer with them at the end. In other words, everybody
22  is supposed to do it, because I can't be giving
23  everybody a paper with their amount. This is the
24  amount, you want to see it, and people would ask, how
25  much did I do, in that block number I've got you for

Page 62

1  this much.
2  But most of the people, they keep their own,
3  see. And then I ask them compare with me, because I'm
4  going by what they're giving me. So if it does not
5  match, then we want to know why, see.
6  If Mr. Hill says to me, well, Rudy made five
7  acres in block 110, and he says wait a minute, I made
8  six, well, then we have to find out where the problem
9  is, because, you know, we want to make sure everybody
10  is getting credit for what they are doing.
11  That is the purpose of having people out
12  there enumerating and making sure everybody has
13  whatever production they did. And I tell them, and I
14  stress it the first time I was out there with them, do
15  not get into any row until you know your number is at
16  that tag. There is a tag at the beginning, and it's a
17  number that corresponds to that frame.
18  You say Rudy, what's your number, he says I'm
19  number ten. Okay, Rudy, make sure they put your number
20  on there. Because see, you go to her end there, but
21  what's the idea of working so much production when your
22  number is not going to give you credit, so make sure
23  that your number is there. That way you say okay, I
24  did so much on this block, and you keep record of that.
25  I verify with them.

Page 63

1  Q.  So you kept records of all the acres done by
2  each worker?
3  A.  Yes.
4  Q.  And did you keep that information in your
5  notebook also?
6  A.  Yeah. It's there. It shows, see, everybody
7  knows what they made, see.
8  Q.  Was that in any of the records that we
9  reviewed, one through 25?
10  A.  They should be in there somewhere, because I
11  know --
12  Q.  Whoa, whoa. Let's stop. We can look at the
13  exhibits, 1 through 25. Now, my question is, the
14  records you're talking about, are they in any of those
15  exhibits, 1 through 25?
16  A.  Okay. If they're not here, I don't know
17  where they went, but I know they were submitted,
18  because I personally saw all that stuff there. And that
19  shows the person and it shows the acreage. And that
20  person is told okay, in block number 110, the acre is
21  paid at $45 or 50, it all depends on the variation,
22  see. So all of that's in there, because how we
23  tabulate. Because otherwise how would I get the
24  figures of what they made? I have to have the basis
25  for what is given to me from the field, or I have a

Page 64

1  problem. Like I tell them --
2  Q.  Let's just speed it up. Just look through 1
3  through 25, those exhibits, and you tell me if the
4  document you're referring to is one of those documents
5  for 2002.
6  A.  Okay. Because I know across the board when
7  you see it, it shows it. It would be on a page -- it's
8  a page from the tablet that shows person for person
9  what they made.
10  Q.  Then it's a page from the tablet that you
11  have at your house?
12  A.  Probably in that book. But like I said, we
13  made copies of everything for you guys, so...
14  Q.  I'm just trying to -- as long as it's not in
15  that stack, I have more stuff I can look through, but I
16  want to make sure it's not something we've already
17  discussed.
18  A.  No, no. That's why I'm saying, I know it's
19  kind of hard since this is not a regular office job or
20  job period, the way the figures come to be at the end,
21  you know, how we determine where we get, see.
22  And like I said, and I want to make this very
23  implicit, before we leave the camp there, before we
24  leave the hotel, everybody sits down and we go over
25  what they made. And I ask them, is this -- do you see

16 (Pages 61 to 64)

Page 65

1  any problem, or do you think -- no, no, it's okay,
2  everything looks okay.
3      Because every block number, everybody has
4  different acreages, some people make more than others,
5  some people make less. But I can't push that, that's
6  their own ability to do the work, because some people
7  are faster than others. So we want to give everybody
8  credit for what they earned, you know.
9      (Exhibit No. 27 was marked for identification.)
10 BY MR. SANCHEZ:
11     Q. Mr. Martell, you've been handed a document
12 marked as Exhibit number 27.
13     A. Okay, sir.
14     Q. This is a W-2 for Rogellio Sanchez, correct?
15     A. Yes. I see it.
16     Q. And it lists the employer, do you see that
17 information?
18     A. Yes.
19     Q. And it has Pablo Martinez, 101 Elm Street,
20 Gladstone, Illinois.
21     A. Okay.
22     Q. Now, that address again, that's the Mycogen
23 plant right?
24     A. That's correct.
25

Page 66

1      (Exhibit No. 28 was marked for identification.)
2  BY MR. SANCHEZ:
3      Q. Mr. Martell, I've handed you a document
4  marked Exhibit Number 28.
5      A. That's correct.
6      Q. Can you identify this document?
7      A. Yes. Those are the cards I made for
8  Mr. Martinez.
9      Q. Okay. Look to the bottom of that business
10 card.
11     A. Yes, sir.
12     Q. It has E.D. Martell?
13     A. Right, sir.
14     Q. That's you, right?
15     A. That is correct, sir.
16     Q. And it has a phone number under that?
17     A. That is correct, sir.
18     Q. That's your phone number?
19     A. That is my home phone number, yes, sir.
20     Q. And it has Pablo Martinez, Labor Contractors?
21     A. Right, sir.
22     Q. And a phone number?
23     A. Yes, sir.
24     Q. What is that other phone number?
25     A. That 992-7801?

Page 67

1      Q. Right.
2      A. That's his phone number.
3      Q. Is that Mr. Martinez's home phone or cell
4  phone, or some other phone?
5      A. That's the phone he has here at the store.
6      Q. Now, earlier we had talked about some
7  business cards you had made?
8      A. That is correct.
9      Q. You said M & M stood for some business cards
10 you made for Mr. Martinez and his wife?
11     A. Well, let me -- I think we have a
12 misunderstanding somewhere, okay. When I put business
13 cards, I could have done company business cards,
14 Pablo's business cards; it was just a notation what
15 cards they were.
16     In other words, if you say get me some
17 coffee, and I go bring coffee, I don't have to write
18 cappuccino or Dunkin Donut coffee, I just -- I might
19 put down McDonalds coffee, even if I didn't go to
20 McDonalds.
21     What I'm saying, the M & M discrepancy is
22 just like Martinez and Martinez, but it was not
23 necessarily. At one time he had told me he might put
24 M & M, and I told him no, you have to concentrate on
25 your name, because you are the one that people know.

Page 68

1  And I suggested to him -- he wanted to put M & M, and I
2  suggested Pablo Martinez, because you are the person
3  that they know.
4      Q. So M & M, he wanted that to be --
5      A. -- a family thing, you know, Martinez and
6  Martinez.
7      Q. Berta Martinez and Pablo Martinez, Labor
8  Contractors?
9      A. You know. Or maybe his son. I don't know.
10 But he said M & M, he was referring to his family, his
11 wife and him together. He liked the term M & M. Not
12 to actually say it is. I'm saying he wanted a name,
13 and that was on his mind. So I was the one who said
14 no, you want to use your name, Pablo. Because he
15 wanted some business cards, and we were brainstorming
16 what would be a good name.
17     So for my notation to know what those
18 business cards were, see to him if I say M & M business
19 cards, he knows it's company business cards.
20     Q. So he didn't say put Martell and Martell
21 (sic)?
22     A. No, no, sir.
23     Q. Even though he has business cards with his
24 name and your name on it?
25     A. It would be coincidence, yes, sir. But no,

17 (Pages 65 to 68)

**Page 69**

1  it wouldn't be like that, because he is the main man, I
2  am an employee of his.
3       As a matter of fact, I didn't want to put my
4  number on there, but he said put your number on there,
5  because, you know, people call me, where can I get hold
6  of Pablo.
7       Q.  But it has his number on there also, right?
8       A.  Yes.  But you have to understand, that's a
9  Florida number.  How many people will pick up the phone
10  and call Florida?  It's easier for them to call me,
11  then I have to pay for the call and call him, and say
12  Pablo, this guy is looking for you, see.  But some
13  people would not call Florida.  But I guarantee, out of
14  the people who have this card, 90 percent of them have
15  never called that number, they have called me.
16       Q.  So one purpose of these cards is so people
17  can call you to get hold of Pablo or to find out --
18       A.  Yes.  Like people that know us around here
19  say hey, where is Pablo.  Well, if I can help it, I
20  don't call him, I said there is his number, call.
21       Q.  So if you can answer whatever question they
22  have when they call you, would you answer it, or you
23  call him?
24       A.  No, no.  Just basically, see, because I have
25  his cell phone number also, and some people he says

**Page 70**

1  give them my cell phone number.  Not to everybody, you
2  know.
3       Q.  What is Mr. Martinez's cell phone number?
4       A.  It's not on there somewhere?
5       Q.  I only see two numbers on there, one is
6  992-7801, and one is 968-2756.
7       A.  That's what I'm saying, if he wanted
8  everybody to know his cell number, he would ask me to
9  put it on there.
10       Q.  I'm asking you what it is, his cell phone
11  number.
12       A.  Oh, you want it now?
13       Q.  Yes.
14       A.  (561) 261-1344.  But it's like I'm saying, if
15  he had wanted that number on there, he would have said
16  put it on there.  But he wanted the number at the
17  store, that's where they can get hold of him.
18       Q.  How many of these cards did you have made up?
19       A.  Well, I think the package was either 500 or a
20  thousand for $60, somewhere in there.
21       Q.  And these are the cards that you had made in
22  Weslaco?
23       A.  Yes, sir, those were the cards.
24       Q.  Who did you give these cards out to?
25       A.  Well, he hands them to people.

**Page 71**

1       Q.  Did you also have some of these cards to hand
2  out?
3       A.  I had some with me for for my phone number,
4  for friends or whatever.  But if you they want to get
5  hold of Pablo, that's his number, but the cards were
6  basically for him.
7       Q.  Did you keep some of the cards and hand them
8  out?
9       A.  Yes.  I've got a couple, not that much.
10       Q.  Who did you hand the cards out to?
11       A.  Friends of mine.
12       Q.  Any workers?
13       A.  I don't remember.  I could have, like when we
14  were in Iowa.  But basically the ones I gave to were
15  for Pablo's number because it's got Pablo's number.
16       Q.  It also has your number?
17       A.  Yes.  But that's for my friends, you know.
18  Like you know, how many people say you want to call me,
19  and people -- and I've seen it -- take a piece of paper
20  and scribble it and say call me here.  Well, I think
21  it's a little bit more professional to give a card with
22  a number.
23       Q.  Before the workers travel from Texas to
24  Illinois, did Mr. Martinez, or actually did you give
25  out any money to any of the workers?

**Page 72**

1       A.  Me myself?
2       Q.  Yes.
3       A.  No.  Because Pablo handles that.  That's why
4  you notice there, on the part that says Texas, that's
5  the amount he told me those people he had loaned money
6  to.  I didn't actually give any money until we were in
7  Iowa.
8       Q.  Did you have any conversations with any of
9  the workers in Texas about where they should go when
10  they got up to Illinois or Iowa?
11       A.  No.  Because everybody was under Pablo's
12  direction, see.  So they conferred with him.  Because
13  there was a year I went with him when they had been
14  going already up there, I was just going to do my part,
15  helping do the payroll for the people.  That was my --
16  that was where I came in.  Everything was already
17  pre-arranged, whatever deals had been made.
18       Q.  When you first met Mr. Pang, did you give him
19  one of these business cards we marked as Exhibit 28?
20       A.  I don't remember.  But I know before we left
21  I gave him one in case he wanted to call me on mail we
22  had pending, things like that.  I do remember that.
23  But the first time, I don't remember.
24       Because I know before we left, we became -- I
25  didn't know the man until I got there, but before we

18 (Pages 69 to 72)

**Page 73**

1  left, I remember him telling me, call me because if we
2  get some mail or whatever, and I gave him the card with
3  the numbers, call me if you got any mail.
4      Q.  Before any of the workers left Texas to
5  travel to Iowa, did you have any discussions with them
6  about car pooling or who they could ride with?
7      A.  No.  Because like I said, Rudy, the first
8  time I worked with Pablo, my instructions were to go
9  with Chino up there, that's all I knew.  Chino, I was
10  going to ride with him in his pickup.
11      Q.  You said earlier a group of you got together
12  and traveled like caravan style, right?
13      A.  No, no.  They made plans, whatever plans they
14  made to go up there, and Rudy picked me up -- I mean
15  Chino picked me up at my house so I could ride with
16  him.  They had made plans, whatever they were going to
17  do.  I didn't even know where we were going, I didn't
18  know we were going to Mount Pleasant, that was my first
19  time going to Mount Pleasant.
20      Q.  How soon after everybody arrived at the
21  Heidelburg Motel did people go to the orientation
22  session at Gladstone?
23      A.  Okay.  I'm trying to remember.  I know that
24  people arrived the next day, so I don't know if it
25  was -- everybody arrived almost the same day, and I

**Page 74**

1  think some people arrived the next day, but I'm
2  thinking it was the next day in the afternoon, but I'm
3  not sure.
4      Q.  How did people get from the hotel in
5  Heidelburg to the orientation session in Gladstone,
6  their own vehicles, or were they provided group
7  transportation?
8      A.  I'm thinking, because I remember, I think
9  they had gone in the morning to get the bus that was
10  going to be used for the season, and that might have
11  been the way they went to the orientation, you know.
12  Because I was already over there when they got there.
13      Q.  You don't know.  You think, but you're not
14  sure?
15      A.  Not sure.
16      Q.  How many buses or how many vehicles were used
17  to transport workers from the housing to the fields?
18      A.  Well, one, because the capacity on the bus is
19  72 or 78, so we just used one bus.
20      Q.  Was there a van also used?
21      A.  No, not for us, not that year.  Wait a
22  minute, wait a minute.  I think -- yes.  I think they
23  were using a van because of the other group.  Yes.
24  Because I think they had people at the other hotel, so
25  I think they rented another van, because of the

**Page 75**

1  inconvenience of moving the bus all the way across town
2  and back, so I think the van they also took.
3      Q.  So it's your understanding that there was a
4  bus and a van used to transport workers?
5      A.  Yes.  There was a van.  Because like I said,
6  because the bus was parked at the Heidelburg, but the
7  other families, the other people working were at the
8  other hotel, and instead of moving the bus all across
9  town and back -- we're talking about two different
10  hotels on both edges of town -- the van would bring the
11  other group and then they would all go to the field.
12      Q.  During the 2002 detasseling season, did you
13  have any discussions at all with anybody at the Mycogen
14  plants about workers who were being housed at the
15  Heidelberg Motel?
16      A.  Discussions in what form?
17      Q.  Any discussions at all.
18      A.  No, not that I know of.
19      Q.  Did you have any discussions with Mr. Sheriff
20  in 2002?
21      A.  Discussion about everything or overall or
22  discussion about what?
23      Q.  Right.  You know Mr. Sheriff, right?
24      A.  Yes, sir.
25      Q.  And you met him in -- did you meet him in

**Page 76**

1  2002?
2      A.  2002.
3      Q.  Was that the first time you had met him?
4      A.  First time I met him.  I think the first
5  conversation we had was in trying to set up this thing,
6  the pay thing with ADP.
7      Q.  So you met Mr. Sheriff before the work
8  actually started, correct?
9      A.  Yes.
10      Q.  And I believe you said that workers arrived
11  at the hotel on one day, and the next day they went to
12  the orientation session?
13      A.  Sometimes they will skip a day, but I'm
14  pretty sure, depending on the work schedule, but I
15  think it was the next day when they had the
16  orientation.
17      Q.  So about when do you recall having this
18  conversation with Mr. Sheriff, was it after the
19  orientation session or before the orientation session?
20      A.  I think we talked before, if not during.
21  Because like I say, I was picking up all the cards to
22  go over there and make copies of all the documentation.
23      Q.  Did you have any conversations with
24  Mr. Sheriff about the fact that you were staying at the
25  Heidelburg Motel in Mount Pleasant, Iowa?

**Page 77**

1    A.  Well, he knew we were staying at the hotel,
2  because that's -- that's where we were scheduled to be,
3  so that's where we were.
4    Q.  So how did Mr. Sheriff know that?
5    A.  How did he know that?
6    Q.  Uh-huh.
7    A.  I guess Pablo told him where they were
8  staying. And I don't know if the previous year
9  Mr. Sheriff was already in that capacity, so he and
10  Pablo already knew that's where he stays.
11    Q.  And the previous year Pablo's crew stayed at
12  the Heidelburg?
13    A.  Yes. They were there the previous year. So
14  that's what I'm saying, they probably have an
15  understanding of where they stay already. Except for
16  this year, like I say, we didn't stay there.
17    Q.  But it's your understanding that Mr. Sheriff
18  knows that Pablo is bringing up a crew of migrant
19  workers and they're all staying in hotels?
20    A.  They know. They know we have to stay
21  somewhere, you know, and it's got to be a hotel. You
22  cannot rent a house, because if the previous year,
23  because it costs too much to rent a house or two.
24  Plus, the people, you couldn't fit them in one house.
25  So they know everyone stays in a motel or whatever.

**Page 78**

1    Q.  As far as you know, Mr. Martinez has never
2  been in the hotel business, right?
3    A.  Oh, no. No.
4    Q.  And you're not in the hotel business?
5    A.  No, sir.
6    Q.  And never have been?
7    A.  Never have been.
8    Q.  And you don't know, or do you known the terms
9  of rental for those rooms that were occupied by the
10  workers in 2002, do you?
11    A.  No. Because it was paid as a whole, so Pablo
12  was the one that made the actual arrangements with
13  Mr. Pang to how what price was going to be quoted and
14  what was going to be paid for the whole thing.
15    Q.  So he negotiated like a block rate for the
16  rooms?
17    A.  Yes. Because any time you stay at a hotel,
18  wherever you stay, you get a better rate by the week as
19  opposed to by the day.
20    Q.  Do you know if he got a better rate for
21  renting a block of rooms as opposed to renting a single
22  room?
23    A.  I don't know, Rudy, if it's because of the
24  number of rooms or the number of days. See, that they
25  negotiate, I don't know how they came to an agreement

**Page 79**

1  on the price. Because see, like I said, he had stayed
2  there the previous year, so whatever they already had,
3  it was just a continuance, let's do it again, we're
4  going to stay with you. And I don't know either if he
5  got another rate because he stayed again. So all that
6  was done by him and Mr. Pang.
7    Q.  Do you know what rooms rent for normally at
8  the Heidelburg Motel?
9    A.  Rudy, I don't know, because I've never rented
10  a room there on a single basis, so the actual price per
11  room, I couldn't tell you. I would imagine he has
12  different rates for different rooms and different days.
13  Because a Saturday would be completely different to a
14  Monday, anywhere.
15    (Thereupon, a short recess was taken.)
16    (Exhibit No. 29 was marked for identification.)
17  BY MR. SANCHEZ:
18    Q.  Mr. Martell, you've got this document marked
19  as Exhibit 29.
20    A.  Okay.
21    Q.  And can you identify this document for me?
22    A.  Yes. This is an agreement, personnel
23  agreement. This is read to everybody, and the name on
24  the top is of the person that has it, and when they
25  explain this, they sign it, Social Security, and they

**Page 80**

1  date it.
2    Q.  Exhibit Number 29 is a document that you
3  signed, correct?
4    A.  Everybody signs one.
5    Q.  Right. But I'm just trying to --
6  Exhibit Number 29 is the one you signed, true or false?
7    A.  I signed this document, this document, yes.
8    Q.  So the second page of Exhibit 29, that's your
9  signature?
10    A.  Yes, sir, that's my signature.
11    Q.  If you look at the first numbered paragraph
12  there on the first page.
13    A.  Right. Number one?
14    Q.  Right. Can you read -- "I understand and
15  acknowledge that I shall not, by any reason of my
16  services provided for Mycogen Seeds, become an employee
17  of Mycogen seeds."
18    Do you see that?
19    A.  Yes, sir.
20    Q.  "Except to the extent that Mycogen Seeds is
21  considered to be my special employer for purposes of
22  the Occupational Safety and Health Act and
23  substantially equivalent provisions, and workers'
24  compensation laws."
25    Do you see that?

Page 81

1    A.  Uh-huh, yes.
2    Q.  What did that mean to you when you signed
3    this document?
4    A.  Well, you know, I think what we translated is
5    everybody who works here is not a direct employee of
6    Mycogen, because it's just a temporary job, it's just
7    seasonal.
8    Q.  You didn't write that paragraph, right?
9    A.  No.
10    Q.  You just signed this document?
11    A.  Right.
12    Q.  And did someone explain to you what that
13    paragraph meant before you signed it?
14    A.  Yeah.
15    Q.  Who?
16    A.  Mr. Martinez.
17    Q.  Mr. Martinez?
18    A.  Mr. Martinez and me, we went over this form,
19    because, see, this is what the people have to sign, and
20    we have to tell them what this says here.  And most of
21    them read it, they can read and then sign it.  And
22    those that can't read it, then we talk to them and say
23    this is what it says, does everybody understand it.
24    Okay?
25    Q.  This document, Exhibit 27 (sic) is in

Page 82

1    English, correct?
2    A.  Right.
3    Q.  Does Mr. Martinez speak English?
4    A.  Some.
5    Q.  Does he read English?
6    A.  Some.
7    Q.  Well enough to understand this document, do
8    you think?
9    A.  Well, I think because his acquaintance with
10    the company was such long-term, it's like me saying
11    this is a cup of coffee, tomorrow I'll say it's a cup
12    of coffee, all my life I'll say it's a cup of coffee.
13    So this here, he already understands what it
14    says, he already knows what it is, how he got it to be.
15    Because he told it to me before I even read it, and
16    when I read it, it was what he told me.
17    Q.  Even though in 2002 this was the first time
18    he had worked with Mycogen, correct?
19    A.  Right.  But I think -- Rudy, I'm sorry for
20    interrupting.  But I think it's just a matter of
21    different names.  Because now it's Mycogen Seeds, and
22    one time it was Cargill Seeds, but the forms are
23    basically the same, they have to say to the people, you
24    know, explain to them what the conditions are.
25    Q.  Even though in the previous years, I thought

Page 83

1    you had said that the payroll was handled by the seed
2    corn company and not the contractor, correct?
3    A.  Uh-huh.
4    Q.  But still they signed this same document in
5    previous years?
6    A.  Not in the exact terminology, but something
7    to that effect, saying that you're working just like
8    temporary, you're not a full employee.  It's like to
9    say you come for the company and you work for a month,
10    it's not same as a guy that works with the company,
11    like let's say Jim Sheriff, who works there the whole
12    year, he's a full-time employee.  These people that
13    come to work there are just temporary seasonal, I think
14    that's all what it's trying to say the whole thing, the
15    seasonal employees.
16    Q.  But your role in 2002, part of your role was
17    to explain documents like this to workers; is that
18    true?
19    A.  Help them out, yes.
20    Q.  The first paragraph there says:  I,
21    Eugene D. Martell, in consideration of the opportunity
22    through blank contractor, to perform certain services
23    for Agrigenetics, Inc., d/b/a Mycogen seeds, agree as
24    follows, correct?
25    A.  Right.

Page 84

1    Q.  What services were you performing for
2    Agrigenetics, Inc., d/b/a Mycogen Seeds?
3    A.  Well, no, I was working for Pablo Martinez,
4    but I signed one of these, too, but I was working for
5    Pablo.
6    Q.  Did you tell that to Mr. Martinez --
7    A.  Yeah.
8    Q.  -- when you signed this document?  Why are
9    you signing a document talking about performing
10    services to Mycogen Seeds when you're working for him?
11    A.  Well, we all signed them.
12    Q.  I'm asking if you discussed that with
13    Mr. Martinez before you signed this form.
14    A.  No.  I just signed it, everybody signed it.
15    Q.  If you look at the fourth paragraph.
16    A.  Uh-huh.
17    Q.  It says:  "Upon completion of my services for
18    Mycogen Seeds or my employment with contractor, I will
19    surrender to Mycogen Seeds all property of Mycogen
20    Seeds, such as documents, computer programs, files, or
21    data, equipment, samples, cultures and models."
22    A.  Yes.
23    Q.  Were you provided any documents other than --
24    A.  No.  This did not apply to us.  Because this
25    is -- I guess this is like a standard form they

21 (Pages 81 to 84)

Page 85

1  probably had, because we didn't have anything with
2  computers or anything like that, or files or equipment
3  or samples.
4      Q.  The second page of Exhibit Number 29 has your
5  signature and the date of 7/14/02, correct?
6      A.  Right.
7      Q.  Was this when the -- did you sign this at the
8  orientation session at the Mycogen plant?
9      A.  No.  I signed this somewhere, but I signed
10  somewhere just because I signed it.  In other words, if
11  everybody signed it on the 10th or the 12th, and I
12  signed it later, I just signed it later.  But I didn't
13  sign it the first day.  I don't remember when I signed
14  it.
15      Q.  You recall having signed this document, you
16  just don't know when or where?
17      A.  Right, yeah.  But I did sign it.
18      (Exhibit No. 30 was marked for identification.)
19  BY MR. SANCHEZ:
20      Q.  Mr. Martell, I'm going to hand you a document
21  marked Exhibit Number 30.
22      A.  Exhibit Number 30.  Okay.
23      Q.  And at the very bottom of Exhibit Number 30
24  is DEF 0038.
25      A.  Yes, sir.

Page 86

1      Q.  Can you identify Exhibit Number 30 for me?
2      A.  No, sir.
3      Q.  Is this your handwriting on
4  Exhibit Number 30?
5      A.  No, sir.
6      Q.  Do you recognize this as Mr. Martinez's
7  handwriting?
8      A.  It could be, but I couldn't really tell you
9  for sure whether it is or not.
10      Q.  It might be his, it might be somebody else's?
11      A.  Right, yes.
12      Q.  Have you ever seen this document marked as
13  Exhibit Number 30?
14      A.  No.
15      Q.  Based on your personal knowledge from the way
16  the detasseling operation worked in 2002, do you know
17  what expenses Mr. Martinez had?
18      A.  Okay.  When you say expenses, are you talking
19  everything, or what?
20      Q.  Sure.  In other words, Mr. Martinez was
21  paid -- I believe we looked at one of the exhibits --
22  $175 per acre, correct?
23      A.  Right, sir.
24      Q.  He was going to do somewhere in the
25  neighborhood of 800 acres?

Page 87

1      A.  Right.
2      Q.  So he would have had that amount of -- you
3  know, 175 times 800 plus as money coming in, right?
4      A.  Right.
5      Q.  And then there was money going out --
6      A.  That's correct.
7      Q.  -- for expenses?
8      A.  Yes.
9      Q.  We know one of the expenses he had was rent
10  at the hotel.
11      A.  Yes, sir.
12      Q.  Do you know much he spent at the hotel?
13      A.  No.  But I do remember that the last check
14  was around 6,000-something, and that money had already
15  been paid before.  That was just at the Heidelburg.
16  There was the other hotel also, the Iris.  He would
17  know probably the full amounts, because they were done
18  through check, you know.
19      Q.  Do you know how much was spent to pay the
20  workers?
21      A.  No, sir.  Because everybody was paid
22  different amounts.  But if you add the total, it would
23  be on the ADP what they paid out.  That would show --
24  the last papers that ADP sent, what they paid out
25  completely, and that would give us the figure.

Page 88

1      Q.  To rent the bus and the van?
2      A.  Yes.  They have to pay rent for that.
3      Q.  That money was deducted from Mr. Martinez's
4  pay?
5      A.  From that, from his part, he has to pay all
6  of that.
7      Q.  I heard you say Mr. Renderos drove the bus?
8      A.  Yes.
9      Q.  Who drove the van?
10      A.  I don't know.
11      Q.  I believe there were field toilets where the
12  workers were at?
13      A.  Yes, that is correct.
14      Q.  Was that paid by Mr. Martinez, or was that
15  paid for by Mycogen?
16      A.  I don't know whether it was the company.  I
17  know there is a company takes them out there, but I
18  don't know who pays for them.
19      Q.  Have you ever been licensed by any state or
20  federal agency to be a farm contractor?
21      A.  No, sir.
22      Q.  And you've never been authorized by any state
23  or federal agency to engage in any farm labor
24  contracting activity, right?
25      A.  No, sir.  And I've never been a farm labor

22 (Pages 85 to 88)

Page 89

1  contractor, either.
2       MR. SANCHEZ: I'll pass the witness.
3       CROSS (EUGENE MARTELL)
4  BY MR. HILL:
5       Q.  Mr. Martell, my name is Frank Hill, I
6  represent Mycogen Seeds in this matter. We've met on
7  numerous occasions before, have we not?
8       A.  That is correct, sir.
9       Q.  Okay. Let's talk about Exhibit 29 for a
10  second. That's where you signed Exhibit C, a
11  contractor personnel agreement.
12      A.  Yes, sir.
13      Q.  Did you understand from reading this document
14  that you were not an employee of Mycogen?
15      A.  Yes, sir.
16      Q.  Did you ever think that you might be an
17  employee of Mycogen?
18      A.  No, sir.
19      Q.  Now, did other people who had come from Texas
20  in order to detassel corn sign similar documents?
21      A.  Yes, sir.
22      (Exhibit No. 31 was marked for identification.)
23  BY MR. HILL:
24      Q.  Let me hand you Exhibit Number 31, which is
25  essentially the same form you signed as Exhibit 29.

Page 90

1  Can you flip through there? Are those contractor
2  personnel agreements that other people from Texas
3  signed?
4       A.  Yes, sir.
5       Q.  Basically they are the plaintiffs in this
6  case, are they not?
7       A.  Yes, sir.
8       Q.  Now, is it your understanding that every
9  plaintiff signed that form?
10      A.  Yes, sir.
11      Q.  Were you a part of that process?
12      A.  Yes, sir.
13      Q.  Okay. How so?
14      A.  Well, everybody was explained what's going to
15  happen at the fields and throughout the season, so
16  everybody signs the forms in agreement, we're all
17  employees of Mr. Martinez, who contracts with Mycogen
18  Seeds.
19      Q.  Were you aware of any confusion on the part
20  of the plaintiffs about that issue?
21      A.  No, sir. Because when we were explaining,
22  that's the very first thing he asked, is there any
23  questions, and nobody had any questions, so we were
24  understanding everybody understood.
25      Q.  Just from general conversation, could you

Page 91

1  tell whether or not they understood that Pablo Martinez
2  was their employer?
3       A.  Oh, yes, sir, because they'd been with him
4  several years working already.
5       Q.  Did they understand he would pay them?
6       A.  Yes, sir.
7       Q.  Were they expecting a check from Mycogen?
8       A.  No, sir.
9       Q.  Now, Exhibit 7, could you peek at that,
10  please?
11      A.  Okay.
12      Q.  Now, you testified previously about having a
13  notebook with 2002 materials in it; is that correct?
14      A.  That is correct, sir.
15      Q.  This is Defense Exhibit Number 1. Do you
16  recall this exhibit coming out of your 2002 notebook?
17      A.  Yes, sir.
18      Q.  Was it maintained by you just as an ordinary
19  business record?
20      A.  Yes, sir.
21      Q.  And is this for the 2002 detasseling season?
22      A.  Yes, sir. It's right there in number two,
23  July 5th, 2002, August 2002.
24      Q.  Is this the type of information that was
25  communicated to plaintiffs in Spanish?

Page 92

1       A.  Yes, sir.
2       Q.  And on the front page it contains information
3  such as wages, 6.50 an hour, it contains information
4  about workers' compensation insurance, and on the
5  second page it indicates how workers would be paid if
6  they earned more than minimum wage?
7       A.  Right.
8       Q.  Was it your -- did you believe that the
9  workers had a clear understanding of how they would be
10  paid?
11      A.  Yes, sir. Because most of them want to work
12  contract, they don't want to work by the hour, because
13  they make more on the contract.
14      Q.  Well, if a worker works hard, for instance --
15  they're guaranteed minimum wage?
16      A.  Yes, sir.
17      Q.  But if they work really hard they might beat
18  minimum wage by quite a bit; is that correct?
19      A.  Most all these people do not work by the
20  hour, they want to work contract because they know they
21  work hard and they make more money.
22      Q.  Page two of Exhibit 7 says transportation to
23  and from the field will be provided. Was that
24  communicated to the workers?
25      A.  Yes, sir.

Page 93

1    Q.  That transit to the field they would be paid
2  going but not coming.  Was this your understanding?
3    A.  Right.  That is explained to them.  I think
4  they tell them one way, because they don't get the full
5  thing, it's one or the other.
6    Q.  Are you aware of any confusion among the
7  plaintiffs regarding the information contained in
8  Exhibit Number 7?
9    A.  No, sir, not to my knowledge.
10   Q.  Did any of them ever say that they didn't
11 understand how they would be paid or how long they
12 would work or something of that nature?
13   A.  No, sir, not to us.
14   (Exhibit No. 32 was marked for identification.)
15 BY MR. HILL:
16   Q.  Let me hand you an exhibit which has to do
17 with detasseling -- excuse me -- sorting in 2002.  This
18 is not a detasseling document.  Did you work with
19 Mr. Martinez in the 2002 sorting season?
20   A.  Yes, sir.
21   Q.  This document is from the same year from the
22 same state, but it is a different category of work,
23 correct?
24   A.  Yes, sir.
25   Q.  Sorting of corn.

Page 94

1    A.  Right.
2    Q.  Now, understanding this particular case,
3  Exhibit Number 32, does it reflect someone's -- the
4  type of document that plaintiffs would sign when they
5  showed up to sort corn?
6    A.  Yes, sir.
7    Q.  Now, did they sign a document containing
8  similar information when they showed up to detassel?
9    A.  Yes, sir.
10   Q.  Is it your testimony you didn't save those?
11   A.  We know that they were somewhere, but we
12 don't know where they are, but they were signed.
13   Q.  Is there any doubt in your mind but that they
14 were actually signed by each of the plaintiffs?
15   A.  No, sir.  Everybody signed them.
16   Q.  But it's your testimony you can't find them
17 anywhere?
18   A.  I cannot find them, sir, but I know they were
19 signed.
20   Q.  But the information that is communicated on
21 Exhibit 7, was it communicated to the plaintiffs in the
22 type of form reflected in Exhibit 32, and did they sign
23 it?
24   A.  Yes, sir.  They understood exactly what was
25 going on.  And again, I repeat myself that these

Page 95

1  people, most of them had gone in previous years, so
2  they were already familiar with the process.  If there
3  were any changes, they were told, but other than that,
4  this is continuous, same kind of people, they keep
5  going with him.
6    Q.  Now, have you ever claimed to be a farm
7  worker contractor?
8    A.  No, sir.
9    Q.  Have you ever told anyone that you are a farm
10 worker contractor?
11   A.  Noose.
12   Q.  Prior to this lawsuit, had anyone ever
13 accused you of being a farm labor contractor?
14   A.  No, sir.
15   Q.  Now, did you help Mr. Martinez?
16   A.  Yes, sir.
17   Q.  And he paid you?
18   A.  Yes, sir.
19   Q.  Mycogen never paid you?
20   A.  Mycogen?  No, sir.
21   Q.  Did you try in the 2000 detasseling season to
22 take care of the people as an employee of Mr. Martinez?
23   A.  Yes, sir.  As a matter of fact, before we
24 even go up there, some people that we know have some --
25 we have a program called Proteus, and we made contact

Page 96

1  with them to let them know, because they want to be
2  aware when we get there so they can provide, like,
3  health checkups for the people.  And they make
4  arrangements with us, and they can be at the motel to
5  give them, you know, quality medical attention.
6    Q.  Let's take it one at a time.  Okay.
7         My question is, did you try and take care of
8  the people, and let's start listing your efforts to
9  adequately care for the plaintiffs who went up to
10 Illinois to detassel corn.  Did they have suitable
11 living conditions?
12   A.  Yes, sir.
13   Q.  Describe the hotel.
14   A.  The hotel where we stayed there at the
15 Heidelburg Motel is a quality motel, it's got maid
16 service, it has linen service, soap, it's vacuumed
17 every afternoon, they have television, they have air
18 conditioning.
19   Q.  Where did you stay?
20   A.  I stayed at the hotel myself.
21   Q.  The same hotel as the plaintiffs?
22   A.  Yes, sir.
23   Q.  Did you have any complaints?
24   A.  No, sir.
25   Q.  Did you feel comfortable there?

24 (Pages 93 to 96)

**Page 97**

1   A.  Yes, sir.

2   Q.  Where did Pablo Martinez stay?

3   A.  At the same hotel, sir.

4   Q.  Did you ever hear him complaining about the

5 hotel?

6   A.  No, sir.

7   Q.  Were the rooms of -- I don't know if there is

8 a normal size of hotel room, so why don't you give us a

9 description of the rooms.

10   A.  Well, I know all the rooms are not the same

11 size, some rooms are bigger than others.  And I don't

12 know about how the hotels are built, but the particular

13 hotel, some of the rooms are very big.  And it's like

14 one of those hotels when you add on to it or whatever,

15 but it's really nice, it's very nicely kept, it's

16 clean, there is police security at night for the

17 people, we have a place to park the bus.  And I mean, I

18 have no complaints, because the man bent over backwards

19 to take care of us.

20   Q.  Is that Lewis, the Oriental man?

21   A.  Yes.

22   Q.  Okay.  Did any worker or any plaintiff in

23 particular ever complain about housing while you were

24 at the 2002 detasseling season?

25   A.  No, sir.  Nobody ever complained to me about

**Page 98**

1 any problems.

2   Q.  Did any worker ever complain to you about any

3 working condition that you did not try to correct?

4   A.  No, sir.  Nobody ever came to me.  As a

5 matter of fact, Mr. Martinez told them, if you have any

6 problems, talk to Mr. Martell, and he'll try to

7 whatever the problem is, and nobody ever gave me

8 complaints.

9   Q.  Was that part of your job, to try and resolve

10 people's problems?

11   A.  Try to like at night if there were problems

12 quiet them down, whatever.

13   Q.  Well, are you aware of any overcrowding in

14 the rooms?

15   A.  Not to my knowledge, sir.

16   Q.  Now, if someone -- if a group of -- if there

17 were say five to a family and they wanted to stay in

18 the same room just to be together, would you have

19 objected to that?

20   A.  Well, like I said, some of them, because I

21 know sometimes they come as a group and they don't want

22 to be separated, so then it's up to them, you know.

23   Q.  Well, did you force more than four people to

24 a room?

25   A.  No, sir.

**Page 99**

1   Q.  If someone happened to stay five to a room,

2 was it their choice or your choice?

3   A.  No.  It would be their choice, completely up

4 to them.

5   Q.  Pardon?

6   A.  It could be completely up to them.

7   Q.  Now, you mentioned something about health

8 care.  Did you try and make sure that workers that came

9 from Texas, the plaintiffs in particular, had adequate

10 health care?

11   A.  Yes, sir.

12   Q.  How did you do that?

13   A.  There is a program called Proteus, and they

14 provided dental, free checkups, and if they need any

15 type of a medication, they work with us and they

16 provide vouchers for the people to get medical

17 attention where they pay a nominal fee of $5 where it

18 would normally cost 70, 80, whatever.  And if don't

19 have the $5, they will waive that also.  But they

20 provide that service for us.  And we call them ahead,

21 let them know when we anticipate being there so they

22 can provide that type of attention, and they come to

23 satisfy the needs of the people.

24   Q.  Did that happen in the 2002 detasseling

25 season?

**Page 100**

1   A.  Yes, sir.  They have been doing that for

2 several years now.

3   Q.  Well, do you recall specifically when they

4 came, or for what purposes in 2002 detasseling?

5   A.  Well, no, sir.  Because we called, and then

6 since there are other groups there from other parts of

7 the country, they try to schedule according to when you

8 arrive.  But they do come to the hotel.  And as a

9 matter of fact, I talked to Mr. Pang to let him know

10 what kind of facility we can have as far as they bring

11 several different vehicles, and they provide medicine,

12 and like I said, checkups and everything.  So they will

13 use one of the rooms if it's women or whatever they're

14 checking, whatever problems they might have.

15   Q.  Did that happen in the 2002 detasseling

16 season?

17   A.  Yes, sir.

18   Q.  Do you recall in particular any health care

19 problems that you addressed or that Mr. Martinez

20 addressed?

21   A.  No, not in 2002.  But I know in 2003 we did

22 have some problems, medical problems we addressed.

23   Q.  Okay.  So that sticks out more in your mind?

24   A.  Yes, sir.

25   Q.  Now, do you know of any worker in 2002

25 (Pages 97 to 100)

Page 101

1  detasseling season that was cheated?
2      A.  When you say "cheated," sir, how do you mean?
3      Q.  Well, not paid what they were told that they
4  would be paid.
5      A.  No, sir.  To the best of my ability, I
6  personally myself concluded with each employee what
7  their earnings were, and we looked at the figures, and
8  I said if there is a discrepancy, tell me now, because
9  I have to correct them, and nobody said nothing,
10  everybody was satisfied.
11      Q.  Were you the main person to calculate what
12  the plaintiffs would do; in other words --
13      A.  Yes, sir.  Because I compiled from the
14  information that was given, and I verified.  And the
15  way I did it, block by block, showing them what they
16  had, and they were in agreement, and I would come to
17  the totals, and we'd figure it out together.  And all
18  the answers I got were positive, nobody said I'm short
19  money.
20      Q.  Well, if any of the workers were cheated,
21  would you have been the one who did the calculation?
22      A.  Well, if anybody had been cheated, it would
23  have been a mistake, and an honest mistake at that,
24  because I tried to go over the numbers, and there is
25  lots of numbers.

Page 102

1      Q.  But you're the man who did the calculation?
2      A.  Yes, sir.
3      Q.  And are you aware of cheating any plaintiff?
4      A.  No, sir.
5      Q.  Are you aware of any worker who was abused in
6  any way?
7      A.  No, sir.
8      Q.  Are you aware of any worker who was not
9  treated with respect?
10      A.  No, sir.  On the contrary, I bent over
11  backwards to help everybody the best way I can.
12      Q.  Now, are you aware of -- can you find the
13  document which indicates how much the plaintiffs were
14  supposed to be paid by EasyPay?  It's in that stack
15  somewhere.
16      A.  Okay.
17      Q.  There it is.
18      A.  Okay.
19      Q.  Isn't that the money that Mr. Martinez's
20  payroll company paid to the plaintiffs?
21      A.  Yes, sir.
22      Q.  Okay.  The amounts reflected on Exhibit
23  Number -- what is that -- one, the amounts reflected on
24  there, did they come about by the calculations that you
25  did?

Page 103

1      A.  Yes, sir.  The information I provided to ADP,
2  the payroll services, was based on the figures we
3  compiled from the work that was one in the fields, and
4  I faxed that to ADP and they made the checks.
5      Q.  And did ADP, on behalf of Mr. Martinez,
6  withhold federal income tax?
7      A.  Yes, sir.
8      Q.  Did they withhold Social Security tax?
9      A.  All the necessary requirements by the
10  government were done, sir.
11      Q.  Now, are you aware of a circumstance where
12  say plaintiff did not receive the checks that are
13  reflected on Exhibit 1?
14      A.  Not to my knowledge, everybody got paid.
15      Q.  Now, was the last check delayed somewhat?
16      A.  There was confusion at the end because of the
17  way we had never worked with ADP.  And when the checks
18  came, they had to be signed, and Mr. Martinez never
19  signed them, so they had to go back to Florida so they
20  could be signed so they could be sent to Texas.
21      Q.  Let's slow down there.  You were on a
22  galloping horse when you said that.
23      A.  I'm sorry.  It's just that the checks would
24  come made out to the individual, but Mr. Martinez had
25  to sign them to be valid.

Page 104

1      Q.  Okay.  So what happened this last occasion
2  that might have slowed that down?
3      A.  The checks came, but they weren't signed, and
4  Mr. Martinez had already left to Florida.  So we had to
5  send the checks to Florida, and everybody -- I
6  explained just we'll meet in Texas and we'll get the
7  checked signed.  And so Mr. Martinez got them in
8  Florida, he signed them, he sent them to me in Texas to
9  distribute to the people, and he notified the bank so
10  they could cash those checks.
11      Q.  Well, was the goal to try and pay the workers
12  on the last day of their service?
13      A.  Yes, sir.  We tried that.
14      Q.  That was the goal, but it didn't work?
15      A.  No, sir.
16      Q.  But in fact, does your contract say that they
17  can be paid by the following Friday?
18      A.  Yes, sir.
19      Q.  Pardon?
20      A.  Yes, sir.
21      Q.  Okay.  Well, do you know whether or not they
22  were paid by the following Friday?
23      A.  I don't want to guess on the date, but I know
24  that as soon as the checks were signed we got them to
25  Texas as soon as possible, and they were distributed.

26 (Pages 101 to 104)

Page 105

1  I don't know the actual number of days transpired in
2  there.
3      Q.  Okay. I hear you that you don't know the
4  actual number of days, but would it have been weeks or
5  would it have been days?
6      A.  Days.
7      Q.  Do you think that any plaintiff waited longer
8  than seven days after the last day of work in Illinois
9  to have their check available in Texas?
10     A.  I don't think we went past seven days, no,
11  sir.
12     Q.  Okay. On Exhibit 7 it says bonuses will be
13  paid at the end of the season based on the above
14  criteria, which explains how the bonus is calculated.
15  Do you believe that the plaintiffs received their check
16  payable one week from the end of the season?
17     A.  Yes, sir.
18     Q.  Now, let me hand you Mycogen 53, which is
19  a -- let me mark it, actually.
20     (Exhibit No. 33 was marked for identification.)
21  BY MR. HILL:
22     Q.  It's a very poor quality photograph that
23  Mycogen has produced in this case. Can you take a look
24  at that? Does that look familiar?
25     A.  Yes. I know it's kind of bad, but it's out

Page 106

1  in the field, you can see one of the toilets there.
2  There is the signs there that are posted out in the
3  field.
4      Q.  Is that the type of portable toilet that was
5  used in the field?
6      A.  Yes, sir.
7      Q.  And were there numerous toilets out there?
8      A.  Yes, sir.
9      Q.  Okay. Did you provide the drinking water?
10     A.  Yes, sir, Mr. Martinez does.
11     Q.  Did you ever hear plaintiffs or any of your
12  workers complaining about inadequate toilets or
13  inadequate drinking water?
14     A.  No. Because I know they carried plenty of
15  those tanks for the water.
16     Q.  And you did that yourself?
17     A.  Yes, sir. Every morning we got the tanks
18  from the trucks, and the trucks would take off then and
19  get ice and everything for them.
20     Q.  Do you see the bulletin board there?
21     A.  Yes, I see it.
22     Q.  Now, you can't really read what's on the
23  bulletin board, because it's such a -- I don't know if
24  the picture can be blown up big enough to show what's
25  on there, but can you tell from your memory what's on

Page 107

1  that bulletin board?
2      A.  It's little signs that they put up what the
3  minimum wage is and things like that.
4      (Exhibit No. 34 was marked for identification.)
5  BY MR. HILL:
6      Q.  Let me hand you Exhibit 34, which are some
7  documents that have been produced in discovery.
8  Mr. Martell, could you take a look at those.
9      A.  Yes, sir.
10     Q.  I'm not claiming that those are photographs
11  of the exact bulletin board that's out in the field,
12  but are those the types of documents on Exhibit 34?
13     A.  Yes, sir. Those are the ones that show the
14  wages and stuff like that, and posted, like the sign
15  shows right there.
16     Q.  Were those signs posted anywhere else?
17     A.  Yes. We had them -- I myself, when they gave
18  them to me, I placed them on the bus, we had to have
19  them on the bus.
20     Q.  So the workers, the plaintiffs in the 2002
21  detasseling season, could see them in the field on a
22  bulletin board and in the bus?
23     A.  Yes.
24     Q.  And you personally placed them on the bus?
25     A.  On the bus. Because I remember I told the

Page 108

1  people, the signs that are required, we have to have
2  them posted.
3      Q.  Now, with respect to housing the plaintiffs,
4  according to the form that we looked at, Mycogen
5  anyway, did not provide housing; is that correct?
6      A.  No, sir. Because Mr. Martinez paid for the
7  rooms.
8      Q.  So did Mycogen have anything to do with the
9  housing?
10     A.  No, sir.
11     MR. HILL: No further questions. Thank you.
12        REDIRECT (EUGENE MARTELL)
13  BY MR. SANCHEZ:
14     Q.  I have a few follow-ups based on what
15  Mr. Hill asked you, Mr. Martell.
16     A.  Okay.
17     Q.  Exhibit Number 31, which I believe are the
18  contractor personnel agreements, and I believe you said
19  those are the ones that were signed by the plaintiffs,
20  correct?
21     A.  Right.
22     Q.  Is that in English or in Spanish?
23     A.  English.
24     Q.  Do you know if any of the plaintiffs speak
25  English?

27 (Pages 105 to 108)

**Page 109**

1   A. But everybody is told --
2   Q. My question is, do you know if any of the
3   plaintiffs speak English?
4   A. I don't know if they all do. I know some do,
5   I don't know if they all do.
6   Q. Which ones of the plaintiffs speak English?
7   A. Out of these ones here? First of all, I see
8   some of the names, but I can't place the person with
9   the name. Only one of the whole bunch, only one guy
10  stands out as to who I remember who he was, but the
11  rest of the guys, I don't know who they are. I know
12  they were with us, because they are signed here, but...
13  Q. Can you tell me whether any of those
14  plaintiffs speak English?
15  A. I don't know. I don't know. If I said I
16  did, I'd be lying. I'd have to see the person, then I
17  could tell.
18  Q. Fair enough.
19      If you look back at Exhibit Number 7, I
20  think, it's in there, it looks just like this. Can you
21  pull it out of the stack for me?
22  A. Here it is.
23  Q. There. Can you look at where it says pay
24  rate on the first page?
25  A. Okay.

**Page 110**

1   Q. What it does say for pay rate?
2   A. 6.50.
3   Q. Per hour?
4   A. Uh-huh.
5   Q. Correct. Were any of the plaintiffs paid
6   6.50 per hour?
7   A. I think they were probably paid more than
8   6.50.
9   Q. Based on the Exhibit Number 1 you saw, the
10  ADP payroll sheets, does that show any plaintiff was
11  paid 6.50 per hour?
12  A. I'd have to refer to each one individually
13  one by one, but I don't know.
14  Q. Does that show how they were paid at all,
15  other than having a lump sum for each plaintiff? Can
16  you look at Exhibit Number 1 for me?
17  A. Okay. Total earnings, that's all it says.
18  Q. Exhibit number 1 doesn't show how many hours
19  a person worked or how many acres a person is credited
20  for, right?
21  A. No.
22  Q. Is that correct?
23  A. Right.
24  Q. How many field toilets were there out in the
25  fields?

**Page 111**

1   A. The exact amount, I don't know, because like
2   I said, I don't go to the fields that often. But I
3   would -- if I can remember correctly, when I did go to
4   some of the fields, you can see them. So I don't know
5   what is the amount that is required per field or per
6   square area, but I do know that they provide them, as
7   well as cleaning them and everything.
8   Q. How do you know that?
9   A. Because I was out there when they were
10  cleaning them. They have to be serviced, you know. I
11  don't know how often, but I know they are serviced,
12  it's a service that's taken care of.
13  Q. You don't go to the fields very often, you
14  said, right?
15  A. Right. I might go today, I might go
16  tomorrow, see. But what are the chances of me being
17  out there and seeing the truck servicing them? That
18  means they've got to come. I don't know what the
19  schedule they have for it, I don't know.
20  Q. And you don't know how many toilets there
21  are?
22  A. No, sir, I do not know.
23  Q. I believe you stated on reviewing
24  Exhibit Number 34 that you were responsible for posting
25  posters like that on the bus; is that correct?

**Page 112**

1   A. Yes, sir, I did.
2   Q. Earlier we talked pretty much at length about
3   what your job duties were, and I don't believe that you
4   said that of one your responsibilities was to post
5   posters.
6   A. Well, it's not like I do it every day, it's
7   done just once, you do it once and it stays there.
8   Q. Were there any job duties that you had like
9   posting posters or anything else that you didn't tell
10  us about earlier?
11  A. Well, it's like I said, because that
12  particular thing, you do it once, so it's not like an
13  activity on a daily basis. Once you put it up, that's
14  it, unless it comes down, then it's just a one-shot
15  thing.
16  Q. Are there any other activities or duties you
17  had that you performed on a one or two time basis that
18  you didn't tell us about earlier?
19  A. Off the top of my head, I can't think of it
20  right now.
21  Q. I believe also, talking about the housing at
22  the Heidelburg Motel, you said that there were
23  situations where there might be five workers to a room,
24  correct?
25  A. If they don't want to get separated, you

Esquire Deposition Services (561) 659-4155

Page 113

1   can't force them to get separated. Some of these
2   people, you have to understand the way they work, they
3   work in groups, so what we can do is try to best
4   accommodate them, probably with a cot for another
5   person. But as far as us forcing them, no, we don't do
6   that.
7       Q.   But there were occasions when there were five
8   workers in a room?
9       A.   I think there was one particular case.
10      Q.   Can you recall whose room that was?
11      A.   No, I can't. Because I know that I remember
12  Pablo telling me go see Lewis and get a cot for that
13  room.
14      Q.   And did you take care of that, you got a cot?
15      A.   Yes. He provided us one.
16      Q.   If there were other housing problems like
17  that, were you sort of the go-between between Lewis and
18  the workers?
19      A.   If there was a problem, yes. But we didn't
20  have any as far as complaints of any sort, you know.
21  The only complaint we had was at the end where it was
22  sad that somebody, you know, burned the man's mattress,
23  you know, and Mr. Martinez paid Mr. Lewis for that
24  damage.
25      Q.   But my question to you was, was it sort of

Page 114

1   understood that you were the person who was --
2       A.   If there was a complaint, they would come to
3   me, yes, Rudy.
4       Q.   Then you would go and try to resolve the
5   problem?
6       A.   Yes, you know. For example, a disturbance
7   among themselves, or sometimes too loud music, and the
8   other guests in the hotel might complain. Lewis would
9   call me, and I would go and talk to our people, look,
10  take it easy, because there are other people in the
11  hotel, you know, we have to kind of keep down the
12  noise.
13      Q.   Was it also understood that if a worker had a
14  problem, needed a cot or something, they could also go
15  to you?
16      A.   Yeah. That's what I'm there for, to try to
17  help any way I can.
18      Q.   I believe you also said earlier that there
19  was no problem with payments to workers?
20      A.   Not that we knew of.
21      Q.   I thought earlier you had testified about
22  having to go meet people at the bank in Mercedes and
23  people were grumbling?
24      A.   That's what we talked about at the end, yes.
25  The last check, Mr. Martinez made arrangements at the

Page 115

1   bank to cash those checks, that was the last check. So
2   we had to make a plan to get together when the checks
3   came in to cash them there, that was the last check.
4       Q.   The workers thought they were going to get
5   paid and they didn't get paid, they got paid later in
6   Texas, correct?
7       A.   What happened was ADP, see, checks were not
8   signed in Iowa, so they got paid in Texas. But the
9   difference being only that the last check when Cargill
10  would pay them, they would mail the checks to the
11  house, same thing.
12      Q.   But --
13      A.   We try to pay them, yes, but...
14      Q.   My question to you is a group of workers all
15  came and complained to you about not getting paid,
16  right?
17      A.   No, no. They were asking when. And when
18  they came to see me, I said we are waiting for the
19  checks, I mean the check are on their way, we just have
20  to wait for them to get here, and as soon as we get
21  them, you got them, you know.
22      Q.   So when they came and asked you when they
23  were going to get paid, you didn't take that as a
24  complaint; is that what you're saying?
25      A.   No.  What they were trying to find out is why

Page 116

1   the checks were delaying. And I explained to them what
2   had happened, and trying to reason. Look, the checks
3   had to go to Florida, they had to be signed over there,
4   they are going to come here to Texas, then we are going
5   to cash them, you know. I understood where they were
6   coming from, they wanted their money, I understood.
7       Q.   Were the workers upset?
8       A.   Oh, yeah.
9       Q.   So they were complaining about not getting
10  paid?
11      A.   Well, they were complaining because the way
12  it was done, you know. And I had to explain to them
13  this was the first time ADP had done this, we didn't
14  know we were going to have this problem with ADP.
15      Q.   My question to you is there was a complaint
16  from workers about not getting paid when they expected
17  to get paid, correct?
18      A.   Sure, yeah. But not up there.
19      Q.   If you can look at -- I believe you mentioned
20  that Exhibit Number 32 that you had workers sign a
21  document similar to this for the detasseling season,
22  right?
23      A.   Yes.
24      Q.   This document says there is no housing
25  provided?

Page 117

1    A. Uh-huh.
2    Q. Is that accurate?
3    A. Yeah. But what they're saying is Mycogen
4  doesn't provide housing.
5    Q. But in 2002 the workers were provided
6  housing, correct?
7    A. Yes. Because Pablo Martinez paid for
8  housing.
9    Q. But the question is the workers were provided
10  housing in 2002, correct?
11   A. Yes.
12   Q. Did you explain to them that they were being
13  provided housing, even though it said no housing, that
14  they were going to be provided housing, but it was
15  Pablo doing it?
16   A. Again, let me go back to where -- I went to
17  do the job over there. Anybody as far as what was
18  discussed, Mr. Martinez already explained to everybody,
19  and most of those people are repeat people that come
20  back every year, so they know somebody takes care of
21  their housing, they know they don't have to pay for it.
22   Q. They know that this housing is being provided
23  to them as long as they work detasseling seed corn,
24  right?
25   A. Yeah.

Page 118

1    Q. Once the detasseling is over, the free
2  housing --
3    A. Everybody leaves, everybody goes their own
4  direction. Some people go to Mexico, some people go
5  other places.
6    Q. Can you tell me how many posters you posted
7  in the bus?
8    A. What they gave us for each set of whatever it
9  is that you have to post, there were three or four
10  different posters posted in the bus.
11   Q. Who gave you these posters?
12   A. Mycogen Seed Company.
13   Q. And you from your personal knowledge can't
14  tell me what those posters said, right?
15   A. Well, if you can open one of those pages and
16  tell me what it says word for word, I can tell what you
17  it says on that sign word for word. There is so many
18  words on those signs. I do know it's a minimum wage
19  sign poster.
20   Q. Other than the minimum wage poster, do you
21  recall any other posters that you posted?
22   A. No. Because they was different. The things
23  that have to be posted for the benefit of the people,
24  whatever it is, regulations, they gave that to me to
25  put on the bus, and I put it on the bus.

Page 119

1    Q. How big were those posters?
2    A. They were pretty big.
3    Q. Where on the bus did you post them?
4    A. We couldn't cover the windows, so we had to
5  put them where they was visible. So we put one next to
6  where the seat of the bus driver is so people could see
7  it; there was another one at an angle where you could
8  see it also.
9    Q. Do you recall where any of the others were
10  placed?
11   A. No. They were out in the fields, like big
12  posters.
13   Q. I'm talking about the ones you posted on the
14  bus.
15   A. Those were the ones.
16   Q. Just two posters?
17   A. Two, maybe one. Because I don't remember
18  what the other sign said, you know, "avis" or something
19  like that. But the ones with the minimum wage was on
20  the bus. And everybody in the morning -- Pablo said
21  tell the people what the poster says. Every morning
22  this sign has to be up here, because we were figuring
23  somebody might take it down out of just, you know,
24  pranks or whatever. This has to stay on the bus, we
25  can't take it down. This is what it says basically.

Page 120

1    Q. That was one for the minimum wage?
2    A. And whatever the big one that requires
3  knowledge of -- like the one they show there on that
4  picture.
5    Q. Was it in English or in Spanish?
6    A. I don't remember if it was both languages. I
7  don't remember.
8    Q. Did you post similar posters like that in the
9  van?
10   A. In the van, I never got inside the van, so I
11  don't know if the van already had one. Because the van
12  was brought from the company, so I never got inside
13  that van, I never drove it, I never rode in it, so I
14  don't know if it had it or not. I don't know.
15      MR. SANCHEZ: I'll pass the witness.
16      RECROSS (EUGENE MARTELL)
17  BY MR. HILL:
18   Q. Let me hand you Exhibit 26, which is an
19  example of a paycheck received by Jaime Pacheco. Do
20  you recall him?
21   A. The name Jaime, yes.
22   Q. Okay. You were testifying earlier about
23  EasyPay records. Now, doesn't that EasyPay record that
24  went to this particular individual state clearly that
25  his rate of pay is 6.50 an hour?

30 (Pages 117 to 120)

Page 121

1    A. On the top it does.
2    Q. Okay. So the earnings statements that went
3  to plaintiffs did in fact tell them what their hourly
4  wage was, correct?
5    A. Yes.
6    Q. So when you were talking about the hourly
7  wage was not provided, you were talking about
8  Exhibit 1, which was kind of for your internal use?
9    A. Yes.
10    MR. HILL: Thank you. No further questions.
11    FURTHER REDIRECT (EUGENE MARTELL)
12  BY MR. SANCHEZ:
13    Q. If you look at Exhibit Number 26,
14  Mr. Martell, it has hourly rate of 6.50 per hour.
15    A. Yes, sir.
16    Q. It doesn't say how many hours were worked by
17  Mr. Pacheco?
18    A. No, sir.
19    Q. I also thought you said earlier workers were
20  paid $70 an acre?
21    A. Yes.
22    Q. Is that reflected on this pay stub?
23    A. Not on this one.
24    Q. Was it reflected on any pay stub you saw
25  similar to that?

Page 122

1    A. No, not that I know of.
2    Q. Was that 6.50 per hour rate that's reflected
3  on that check stub, was that used in any way to
4  calculate the amount of monies paid to any plaintiff?
5    A. I'm trying to explain this that would be
6  understood, because again, I'm going to say that these
7  people are working on a contract basis. And if you
8  tell them that you're going to pay them by the hour,
9  nobody wants to work by the hour, they want to work by
10  the contract. So on the acreage, when they get paid
11  $70 an acre, and you figure out the hours it takes to
12  do it, they come out ahead, nobody comes under. And I
13  don't have the exact tabulation on that.
14    Q. So your answer is no, that 6.50 was not used
15  to determine the rate of pay?
16    A. I don't know.
17    Q. I thought you did all the payroll so you were
18  telling people -- you were telling EasyPay what amount
19  to put on those checks.
20    A. Yes. Because see, we do it by -- I'm
21  going -- somehow we're missing a line here somewhere.
22  This work is done on a contract basis at $70 an acre,
23  and the form explains it there. See, when you figure
24  out at the end whatever acreage you make times $70,
25  that will give you your total. And if you divide it by

Page 123

1  the hours, see, it will come to that or more.
2    Q. Okay. But how come that document marked as
3  Exhibit Number 7 doesn't say rate of pay $70 per acre?
4    A. There is one where it says $70 an acre.
5    Q. On the first page of Exhibit Number 7 it says
6  rate of pay, 6.50 per hour.
7    A. Well, I don't know who makes those forms,
8  because when I came to the picture, it was already
9  made. But if I had done this thing, I wouldn't have
10  shown 6.50, I would have just shown the flat 70, not to
11  confuse anybody.
12    Q. So you think that's confusing by putting
13  6.50?
14    A. You're saying one thing and another thing. I
15  don't know who made it. But they all understand that
16  they made more, if they figure their hours -- and
17  they'll tell you, they will figure their hours and they
18  will say I made so much. And I don't know how much
19  they make, because some work harder than other ones.
20    MR. SANCHEZ: Pass the witness.
21    FURTHER RECROSS (EUGENE MARTELL)
22  BY MR. HILL:
23    Q. Okay. According to the agreement in Spanish,
24  can you find that, was it Number 7, where the workers
25  were promised a minimum of 6.50 an hour?

Page 124

1    On that document, were the workers promised
2  6.50 an hour?
3    A. Yes, sir.
4    Q. Was that a base rate that they could not go
5  beneath?
6    A. Right. It's a base rate.
7    Q. Now, on the next page does it not indicate
8  that later on, not on the first paycheck, but on a
9  later paycheck, that they would get the bonus if in
10  fact their production exceed 6.50?
11    A. Yes, sir.
12    Q. Is that exactly what happened to these
13  workers?
14    A. Uh-huh. Everybody knows that the harder they
15  work, the more they make.
16    Q. What's confusing about this, if their first
17  paycheck is based on 6.50 an hour?
18    A. I think we tried to clear it to show the
19  hours indicated that at that rate they got that amount.
20  Mr. Martinez is the one that puts it together from the
21  hours, he said this is the amount we've got to pay on
22  this rate to cover that amount.
23    Q. It's easy to calculate the bonus rate based
24  on -- well, it's easy to calculate 6.50 an hour times
25  the number of hours, right?

31 (Pages 121 to 124)

**Page 125**

1  A. Uh-huh.
2  Q. But are additional calculations needed in
3  order to calculate the bonus? You've got to figure out
4  the rows, you've got figure out who worked which rows,
5  et cetera, et cetera; is that a more difficult
6  calculation?
7  A. Yes, sir.
8  Q. Is that why the workers are paid on the first
9  paycheck just flat out 6.50 an hour, and it takes until
10  the next paycheck to catch up on the bonus?
11  A. Because actually, we won't see the total
12  amount until the whole job is finished, see.
13  Q. Exactly.
14  A. At that point in time we don't know what the
15  total will be, so how do we know what the main number
16  will be. So that's why we have to try to find a way
17  that's fair to everybody to where it will justify at
18  the end, it comes out right, you know.
19  Q. You used the word "confusing." What's
20  confusing about this? The first paycheck is 6.50 an
21  hour times the number of hours they worked; the next
22  paycheck is the bonus, if they get it.
23  A. In the sense, and I'm sorry if I misled
24  anybody, I'm saying sometimes it's like they're asking
25  one thing and it leads to another. But this figure,

**Page 126**

1  that's what they do to show them that they're going to
2  make so much money but they won't go under that, that's
3  why that amount is paid. But if you just disregard
4  this and go to the acreage, it comes out with no
5  problems.
6  Q. They're guaranteed 6.50 an hour?
7  A. Yes.
8  Q. Do you think the typical worker would rather
9  be guaranteed minimum wage? Maybe they want to make
10  more, but --
11  A. Well, I think 90 percent of these people
12  would rather go by the acreage than by the hour.
13  Q. I understand. But don't you think it's a
14  benefit to them to guarantee them 6.60 an hour?
15  A. Yes.
16  Q. It's federal law, isn't it, to guarantee them
17  at least minimum wage?
18  A. Yes, sir. And they are guaranteed more than
19  that. And Pablo, by his experience in the field, he
20  says these people will exceed that, I know they will.
21  Q. So what's confusing about that?
22  A. Well, not to me, sir. I'm just trying to say
23  that maybe we're getting confused the way they're
24  saying it. When Mr. Martinez explains it, he explains
25  it to where it's understandable, because his knowledge

**Page 127**

1  of the field and the way it works, he'll tell you're
2  going to make more money on contract as opposed to the
3  other one.
4  Q. Now, is it true on Exhibit 31 the words on
5  that page are in English, and Exhibit 31 happens to be
6  the contractor personnel agreement signed by each of
7  the plaintiffs. But when that was discussed with them
8  at the site, was it discussed in English or Spanish?
9  A. In Spanish, Mr. Martinez goes over all of
10  that.
11  Q. In fact, do you recall him ever addressing
12  the workers in English?
13  A. No, sir. He talks to them in Spanish all the
14  time.
15  MR. HILL: No further questions. Thank you.
16  FURTHER REDIRECT (EUGENE MARTELL)
17  BY MR. SANCHEZ:
18  Q. When Mr. Martinez reviewed that document with
19  the workers in Spanish, do you recall where that was
20  at?
21  A. No. I'm sorry. I don't recall exactly
22  where, but I know it is discussed.
23  Q. Well, was that discussed at the orientation?
24  A. It's done at the orientation, and it's done,
25  to my knowledge, when he talks to them. And that, like

**Page 128**

1  I said, I don't know where he talks to them. When I
2  arrived, everybody was going to be there, was already
3  going to be there, so I don't know. It had already
4  been gone through.
5  Q. The orientation that took place at the
6  Mycogen plant, was that conducted in Spanish?
7  A. No. In English. I'm sorry. Both. Both.
8  Q. Both fully in Spanish and English, or a
9  mixture of Spanish and English?
10  A. See, they go through this, and they read it
11  and they translate it. See, whoever is reading this
12  has to translate it over, and then they go with a
13  question and answer session, and the questions,
14  whatever.
15  Q. And Mr. Martinez was -- I mean, he doesn't
16  speak English very well, correct?
17  A. Okay.
18  Q. So he was not translating this document word
19  for word, was he?
20  A. Believe it or not, Rudy, there are some
21  people that speak English there, you know. So if you
22  would be talking and I would be interpreting or
23  whatever, so whoever was working with it.
24  I was busy picking up the documents to get
25  sorted, but I know they were going over all the stuff.

Page 129

1 They try to cover all the bases to be assured that
2 everybody knows what's going on. We don't want to
3 leave no pages unturned, to try to prevent things like
4 this, and here it still happened. You try to satisfy
5 everybody as far as their questions.
6    Q.  I believe earlier when you testified about
7 all these different payroll records we looked at, I
8 believe the figures that you faxed to ADP, for example,
9 it was my understanding that you had used a figure of
10 5.15 per hour in coming up with the salaries for those
11 first checks?
12    A.  No.
13    MR. HILL:  Objection, form.
14 Mischaracterization. Not to butt in, but you're
15 referring to 2001, aren't you?
16    MR. SANCHEZ:  No.
17 BY MR. SANCHEZ:
18    Q.  I'm referring to the different records
19 that -- it's my understanding that you faxed to ADP the
20 amounts of money that they were supposed to put on the
21 checks, correct?
22    A.  On the first $300 that we did, Pablo figured
23 it, and I don't know, like I said, if he figured 5.15
24 or the 6.50 an hour. He figured one of those, to
25 whatever hours it was to give them that amount of

Page 130

1 money.
2    Q.  So you don't know if it was 6.50 or 5.15 or
3 some other figure?
4    A.  Right.
5    Q.  And you don't have any records of the hours
6 they worked to come up with that number?
7    A.  Right. But like I said, if you figure the
8 total, it comes out.
9    Q.  Right. But I'm talking about the first
10 check.
11    A.  No.
12    MR. SANCHEZ:  Pass the witness.
13    FURTHER RECROSS (EUGENE MARTELL)
14 BY MR. HILL:
15    Q.  Look at 26, if you don't mind. It's
16 Mr. Pacheco's pay stub. If you divide $300 by 6.50 an
17 hour, is that how many hours he worked?
18    MR. SANCHEZ:  Objection, form.
19    THE WITNESS:  It would probably be, because
20 Pablo was the one who give me the figures. So
21 whatever figure he used, and maybe it was the 6.50
22 he told me. He said this is the amount so it
23 would be in compliance. But then again, like I
24 said, I don't know if he used the 5.15 or the
25 6.50.

Page 131

1 BY MR. HILL:
2    Q.  That would be 42 hours, roughly at 6.50 an
3 hour; does that sound about right for the first week of
4 work?
5    A.  Yes. Probably less hours. The first week is
6 not as strong as the second week.
7    FURTHER REDIRECT (EUGENE MARTELL)
8 BY MR. SANCHEZ:
9    Q.  How difficult would it have been to send to
10 ADP the number of hours worked by Mr. Pacheco in that
11 week?
12    A.  No. Well, what it is, no disrespect to
13 anybody, but like I said, the figure we used, the
14 amount, if I'd have known it caused a problem, we would
15 have went ahead and put the hours to balance to show
16 that, see. So on my part, it was an oversight, no
17 wrong intentionally planned, it just -- if I said okay,
18 we're going to have problems, let's go ahead and put
19 the hours to justify that.
20    Because I remember him telling me so we can
21 be over the amount that they are supposed to make, I
22 remember that line, so we used the figure 300. But
23 then I say I don't know which figure he used, the 6.50
24 or 5.15. I'd be lying if I said he used either one, I
25 don't know which one. But it was to cover the hours so

Page 132

1 we have to be above, that's what he told me, to make
2 sure they get more than their amount.
3    FURTHER RECROSS (EUGENE MARTELL)
4 BY MR. HILL:
5    Q.  Just another couple. I've done the math more
6 fully, and I don't warrant this, but according to my
7 calculations, at 6.50 an hour, if a person makes $300,
8 they worked 45 hours point 1. Okay. Are you aware of
9 any workers that first week of the detasseling season
10 working more than 45 hours?
11    A.  I'm sorry, but I don't remember.
12    Q.  Well, I'm asking when you put the first week
13 at $300, was the goal to pay the workers too much or
14 too little?
15    A.  Oh, we wanted to make sure we paid them
16 enough to cover everything.
17    Q.  Okay. You didn't --
18    A.  We didn't want to pay less, we wanted to pay
19 more.
20    Q.  You didn't hear anybody complaining that you
21 were paying them too much, did you?
22    A.  No. Because we also could have given them
23 350, but that's less at the end, see.
24    Q.  Is there a doubt in your mind sitting here
25 today that you adequately paid the workers that $300,

33 (Pages 129 to 132)

**Page 133**

1  that you paid them at least the minimum wage?
2      A.  Oh, yes, sir.  We covered everything, yes,
3  sir.
4      Q.  And if you overpaid them, there is no law
5  against that, is there?
6      A.  Oh, no.  Because we wanted to make sure that
7  they have enough to cover what we are supposed to pay
8  them.
9          MR. HILL:  Okay.  Thank you.
10         FURTHER REDIRECT (EUGENE MARTELL)
11  BY MR. SANCHEZ:
12     Q.  Are there any records that we reviewed which
13  would reflect your last comments that they were
14  overpaid?
15     A.  I think what we're trying to say is that the
16  amount in that particular check was enough that they
17  got paid for whatever Mr. Martinez figured, 6.50 or
18  5.15, I don't know, to the point where they weren't
19  over worked, see.  We could have just as easily made a
20  check for 500.  The check was just to cover the base
21  and more, because the balance really comes at the end,
22  that's when everything really balances out.
23         In other words, we're not going to give them
24  200 if they work 40 hours, no way; we'd rather give
25  them 400 as opposed to 200, we want to make sure they

**Page 134**

1  get enough.  And that's where he comes in, says this is
2  the figure.
3          But like I said, if I'd have known it was
4  going to create a problem -- for the next time we'll
5  know -- put down the hours and make sure.  See, because
6  if they worked twenty, figure it at 70, make it 140.
7  Why make it six or five, or make it at eight.
8          But they know the more they get at the
9  beginning, the less they get from their final, it's
10  like an advance, it's how they're paid.
11     Q.  In 2002 was that your decision to figure out
12  how much to put in that first paycheck, or did
13  Mr. Martinez --
14     A.  No.  Mr. Martinez is the one.  Because he
15  wants to make sure everybody gets more than what they
16  worked.  That's why he tells me this is the amount,
17  because they want to make sure they get more than what
18  they worked.
19         MR. HILL:  No questions.
20         MR. SANCHEZ:  No questions.
21         MR. HILL:  Thank you, Mr. Martell.
22         THE COURT REPORTER:  And are you going to be
23  ordering this?  Do you like the mini and the ASCII
24  and all that?
25         MR. SANCHEZ:  Yes.

**Page 135**

1          (Thereupon, the videotaped deposition was
2  concluded at 5:56 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 136**

1      THE STATE OF FLORIDA
       COUNTY OF PALM BEACH.
2
3
4          I, the undersigned authority, certify that
5  the aforementioned witness personally appeared before
6  me and was duly sworn.
7
8          Dated this 31st day of December, 2004.
9
10
11         _____
           TERESA E. WHALEN, RPR
12         Notary Public-State of Florida
           My Commission Expires: 04/25/07
13         My Commission No.: DD 193453
14
15
16
17
18
19
20
21
22
23
24
25

34 (Pages 133 to 136)

Page 137

1
2          CERTIFICATE
3     THE STATE OF FLORIDA
      COUNTY OF PALM BEACH.
4
5
          I, TERESA E. WHALEN, Registered
6     Professional Reporter, State of Florida at Large, do
      hereby certify that the aforementioned witness was by
7     me first duly sworn to testify the whole truth; that
      I was authorized to and did report said deposition in
8     stenotype; and that the foregoing pages are a true
      and correct transcription of my shorthand notes of
9     said deposition.
10        I further certify that said deposition was
      taken at the time and place hereinabove set forth and
11    that the taking of said deposition was commenced and
      completed as hereinabove set out.
12
          I further certify that I am not attorney or
13    counsel of any of the parties, nor am I a relative or
      employee of any attorney or counsel of party
14    connected with the action, nor am I financially
      interested in the action.
15
          The foregoing certification of this
16    transcript does not apply to any reproduction of the
      same by any means unless under the direct control
17    and/or direction of the certifying reporter.
18        Dated this 31st day of December, 2004.
19
20
21
          TERESA E. WHALEN, RPR
22        Notary Public - State of Florida
          My Commission: DD 193453
23        My Commission Expires:  4/25/07
24
25

                                        35 (Page 137)

**A**

ability 65:6 101:5
abused 102:5
accommodate 113:4
accommodation 12:14
accurate 117:2
accused 95:13
acknowledge 80:15
acquaintance 82:9
acre 34:20 35:1,12 43:15
   51:15 63:20 86:22 121:20
   122:11,22 123:3,4
acreage 34:16,17 40:10
   59:25 63:19 122:10,24
   126:4,12
acreages 65:4
acres 23:17 34:17 40:4 41:8
   59:16,19 60:9 61:4 62:7
   63:1 86:25 110:19
Act 80:22
action 1:4 137:14,14
activities 112:16
activity 88:24 112:13
actual 6:5,22 7:4 12:14
   20:11,12 40:8 54:18 78:12
   79:10 105:1,4
add 60:21 87:22 97:14
additional 125:2
address 36:7,9 46:6 65:22
addressed 47:11 100:19,20
   100:22
addressing 127:11
adequate 99:9
adequately 96:9 132:25
ADP 3:6,11,22 6:18 7:4
   20:13,16,18 56:13,19,19
   57:16 58:25 76:6 87:23,24
   103:1,4,5,17 110:10 115:7
   116:13,14 129:8,19
   131:10
advance 134:10
advanced 3:9,10,16,17,21
   6:23
advances 7:2
Affidavit 3:8
aforementioned 136:5 137:6
afraid 22:19
afternoon 22:9 74:2 96:17
agency 88:20,23
ago 5:25
agree 49:12 51:21 83:23
agreement 4:10,17,19 23:3
   34:14 36:5,13,15,17 38:1
   43:16 55:10 61:1,1,4
   78:25 79:22,23 89:11
   90:16 101:16 123:23
   127:6
agreements 90:2 108:18
Agrigenetics 1:9 36:6 83:23
   84:2
ahead 28:13 99:20 122:12
   131:15,18
AID 2:4
air 96:17
al 1:6,9
alike 24:17
allow 61:7

**A (continued)**

allowed 46:25 47:21
Alonso 1:6
aloud 37:11,23
amount 6:24 16:17 20:19
   34:20 35:12,12,15 40:23
   61:23,24 72:5 87:2 111:1
   111:5 122:4,18 124:19,21
   124:22 125:12 126:3
   129:25 130:22 131:14,21
   132:2 133:16 134:16
amounts 15:13 87:17,22
   102:22,23 129:20
and/or 137:17
angle 119:7
answer 39:24 47:16 69:21
   69:22 122:14 128:13
answering 51:2
answers 101:18
anticipate 99:21
anybody 10:23 23:20 75:13
   101:22 117:17 123:11
   125:24 131:13 132:20
anyway 108:5
appear 21:10
APPEARANCES 2:1
appeared 136:5
apply 25:25 84:24 137:16
approached 47:23
approximately 40:4
area 28:1 52:19,20 111:6
Armando 1:6
arrange 57:14
arrangement 16:15
arrangements 11:2,20 56:25
   78:12 96:4 114:25
arrive 100:8
arrived 6:3 56:17 73:20,24
   73:25 74:1 76:10 128:2
arrow 14:18,25
ASCII 134:23
aside 6:22 10:17 28:8 53:22
   61:2
asked 36:14 90:22 108:15
   115:22
asking 14:12 70:10 84:12
   115:17 125:24 132:12
assign 25:1
assigned 13:7,17 14:2 17:17
   19:6
assignment 12:2
assigns 11:23
associate 7:10,13,16
association 48:2
assured 58:9 129:1
attached 37:25
attend 46:20
attention 96:5 99:17,22
attorney 137:12,13
August 40:15,19 91:23
Austin 2:9
authority 136:4
authorized 88:22 137:7
available 43:10 105:9
avis 119:18
aware 24:4 38:6 47:22 55:8
   90:19 93:6 96:2 98:13
   102:3,5,8,12 103:11 132:8

**B**

B 3:2 4:2 38:1,10
back 5:11 28:11 30:14 34:16
   42:5 43:4 44:24 45:7,9
   48:22 49:15 54:10,11,15
   54:24 55:2,3,3,5,12 56:18
   57:10 75:2,9 103:19
   109:19 117:16,20
background 41:15
backwards 97:18 102:11
bad 105:25
balance 29:25 131:15
   133:21
balances 133:22
bank 55:12 56:24,25 57:13
   57:13 58:12 104:9 114:22
   115:1
bar 7:15
barefooted 45:6
barter 53:14,25
base 35:1 124:4,6 133:20
based 10:19 40:24 41:7
   86:15 103:2 105:13
   108:14 110:9 124:17,23
bases 129:1
basically 25:3 28:4 69:24
   71:6,14 82:23 90:5 119:25
beds 63:24 79:10 112:13,17
   122:7,22
Beach 1:17,23 136:1 137:3
bearing 49:20
beat 92:17
bed 11:4,14,16 12:8
beds 11:5,8,10 12:5
beginning 39:21 62:16
   134:9
behalf 2:2,7 103:5
believe 5:23 21:3,6 29:25
   30:10,23 34:23 41:3 46:14
   47:10 48:13 53:15 54:8
   56:6 76:10 86:21 88:11
   92:8 105:15 108:17,18
   111:23 112:3,21 114:18
   116:19 128:20 129:6,8
bells 49:1
benches 46:9,10
beneath 16:4 124:5
benefit 118:23 126:14
bent 97:18 102:10
Berta 68:7
best 23:1 55:19 58:18 59:22
   101:5 102:11 113:3
better 11:24 78:18,20
big 10:25 11:1,5 20:23 23:16
   26:13,19,25 27:11,24
   57:15 97:13 106:24 119:1
   119:2,11 120:2
bigger 97:11
bit 71:21 92:18
blank 38:13 59:11 83:22
block 13:2,6 25:19 60:7,7,8
   60:9,21 61:25 62:7,24
   63:20 65:3 78:15,21
   101:15,15
blocks 13:2 24:20,23,24
   25:20,21,22
blown 106:24

**B (continued)**

board 64:6 106:20,23 107:1
   107:11,22
boat 58:3,9
bond 9:15
bonus 105:14 124:9,23
   125:3,10,22
bonuses 105:12
book 19:18 64:12
borrow 54:25 55:12
borrowed 30:3 50:7
boss 26:18
bottom 28:17,21 29:15,16
   30:9 33:7 39:12 49:4 66:9
   85:23
bought 30:10
Boulevard 2:9
box 32:14
brainstorming 68:15
bring 25:2 67:17 75:10
   100:10
bringing 77:18
brother 11:18,18
brothers 11:11 15:18
brought 46:10 120:12
Brownsville 1:3 26:9,14,16
   26:20 27:4 28:10
browse 37:2
building 52:16
built 97:12
bulk 55:18
bulletin 106:20,23 107:1,11
   107:22
bunch 109:9
Burlington 28:19
burned 113:22
bus 26:19 29:6,12 30:18,19
   31:1,7,7,15,15,23,25
   32:12 33:4 52:20,21 74:9
   74:18,19 75:1,4,6,8 88:1,7
   97:17 107:18,19,22,24,25
   111:25 118:7,10,25,25
   119:3,6,14,20,24
buses 74:16
business 4:16 7:9,13 60:23
   61:20 66:9 67:7,9,12,13
   67:14 68:15,18,18,19,23
   72:19 78:2,4 91:19
busy 128:24
butt 129:14
buy 30:3,3
B-04-005 1:4

**C**

C 2:3 5:1 89:10 137:1,1
calculate 101:11 122:4
   124:23,24 125:3
calculated 105:14
calculation 101:21 102:1
   125:6
calculations 4:18 102:24
   125:2 132:7
call 11:3 31:8 46:5 69:5,10
   69:10,11,11,13,17,20,20
   69:22,23 71:18,20 72:21
   73:1,3 99:20 114:9
called 31:11,24 57:13 69:15
   69:15 95:25 99:13 100:5

Page 139

camp 64:23
capacities 52:18
capacity 52:15 74:18 77:9
cappuccino 67:18
car 73:6
caravan 73:12
card 4:16 29:16 30:3,11
66:10 69:14 71:21 73:2
cards 66:7 67:7,9,13,13,14
67:15 68:15,18,19,19,23
69:16 70:18,21,23,24 71:1
71:5,7,10 72:19 76:21
care 61:19 95:22 96:7,9
97:19 99:8,10 100:18
111:12 113:14 117:20
careful 45:4
Cargill 42:5 45:9 57:20
82:22 115:9
carried 106:14
case 31:8 32:19 33:4 47:13
49:1 72:21 90:6 94:2
105:23 113:9
cases 11:11
cash 30:12 56:21 57:1,15
58:13 104:10 115:1,3
116:5
catch 125:10
category 93:22
caught 29:25
cause 5:6
caused 131:14
cell 67:3 69:25 70:1,3,8,10
certain 25:21,21 56:15
83:22
certification 137:15
certify 136:4 137:6,10,12
certifying 137:17
cetera 125:5,5
chances 111:16
change 14:22 45:1
changed 14:23 18:15 35:15
35:21
changes 34:8,15 35:6 95:3
charge 8:15
cheated 101:1,2,20,22
cheating 102:3
check 6:21 15:24 57:22,23
58:23,25 59:5 61:15 87:13
87:18 91:7 103:15 105:9
105:15 114:25 115:1,3,9
115:19 122:3 130:10
133:16,20,20
checked 11:21 104:7
checking 100:14
checks 6:16,22 7:1,4,7 20:13
20:16 56:7,10,12,17,20,24
57:1,2,10,11,15 58:10,13
58:14 103:4,12,17,23
104:3,5,10,24 115:1,2,7
115:10,19 116:1,2 122:19
129:11,21
checkups 96:3 99:14 100:12
Chino 18:17 31:5 73:9,9,15
choice 99:2,2,3
chop 40:10
circumstance 103:11
Civil 1:4

claimed 95:6
claiming 107:10
clean 97:16
cleaning 111:7,10
clear 14:9 56:13 92:9 124:18
clearly 120:24
clears 20:6
close 9:7 19:13
closer 41:21
coffee 67:17,17,18,19 82:11
82:12,12
coincidence 68:25
column 13:9,24 14:6 49:15
combined 15:22
come 9:4 10:24 31:9,12,25
60:4,10,22 64:20 83:9,13
89:19 98:21 99:22 100:8
101:16 102:24 103:24
111:18 114:2 116:4
117:19 122:12 123:1,2
130:6
comes 53:9 60:5 112:14
122:12 125:18 126:4
130:8 133:21 134:1
comfortable 11:7 60:16
96:25
coming 8:9 11:25 19:7 87:3
91:16 93:2 116:6 129:10
commenced 137:11
comments 133:13
Commission 136:12,13
137:22,23
communicated 91:25 92:24
94:20,21
company 27:25 38:15,22
42:6 45:8,10 46:7 58:3
67:13 68:19 82:10 83:2,9
83:10 88:16,17 102:20
118:12 120:12
company's 37:10,19
compare 62:3
comparison 52:23
compensation 46:25 80:24
92:4
compilation 21:2
compiled 101:13 103:3
complain 97:23 98:2 114:8
complained 97:25 115:15
complaining 97:4 106:12
116:9,11 132:20
complaint 51:6,15,24
113:21 114:2 115:24
116:15
complaints 53:8 96:23 97:18
98:8 113:20
complete 14:24 15:4
completed 137:11
completely 53:21,23 79:13
87:25 99:3,6
completion 84:17
compliance 130:23
composite 4:7
computer 50:9 84:20
computers 85:2
concentrate 67:24
concerned 61:3
conclude 12:7

concluded 101:6 135:2
condition 98:3
conditioning 96:18
conditions 37:24 40:25 43:4
82:24 96:11
conducted 128:6
confer 61:21
conferred 72:12
confess 41:10
confuse 123:11
confused 126:23
confusing 23:3 123:12
124:16 125:19,20 126:21
confusion 57:1,15 90:19
93:6 103:16
connected 137:14
consider 55:14
consideration 24:7 83:21
considered 80:21
consistency 42:7
consists 12:18
construction 27:23,25
contact 95:25
contacted 58:16
contained 25:11 36:21 93:7
containing 94:7
contains 92:2,3
Cont'd 2:15
continuance 79:3
Continued 3:23 5:8
continuous 95:4
contract 53:22 59:24 92:12
92:13,20 104:16 122:7,10
122:22 127:2
contracting 88:24
contractor 4:10,17,19 26:15
26:17 37:10,10,18,22 52:5
52:9 83:2,22 84:18 88:20
89:1,11 90:1 95:7,10,13
108:18 127:6
contractors 24:21 25:23
26:4,6 66:20 68:8
contracts 90:17
contrary 102:10
control 137:15
conversation 27:2,11 76:5
76:18 90:25
conversations 27:5 72:8
76:23
copied 14:19 15:4
copies 43:25 44:8 64:13
76:22
Copy 4:16
copying 44:1
corn 22:14 27:13 40:5 41:9
51:8,11 83:2 89:20 93:25
94:5 96:10 117:23
correct 5:16 8:17 10:10 13:5
13:13,21 14:6 16:13,20,22
19:18,25 21:10 22:18
28:19,20,24,25 30:24 33:9
34:3,14 35:13 36:7,10
40:16 42:2 46:20 47:10,13
47:19 49:7 50:17,18,21
51:12,16 53:20 54:22
59:16 65:14,24 66:5,15,17
67:8 76:8 80:3 82:1,18

83:2,24 85:5 86:22 87:6
88:13 89:8 91:13,14 92:18
93:23 98:3 101:9 108:5,20
110:5,22 111:25 112:24
115:6 116:17 117:6,10
121:4 128:16 129:21
137:8
correctly 15:17 22:24 52:4
52:12 111:3
correspond 14:4 19:17
corresponds 62:17
cost 77:23
costs 77:23
cot 11:13 113:4,12,14
114:14
cots 12:12,13
counsel 137:13,13
country 100:7
COUNTY 136:1 137:3
couple 11:2 71:9 132:5
court 1:1 47:12 50:17
134:22
cover 119:4 124:22 129:1
131:25 132:16 133:7,20
covered 133:2
covering 19:14
create 134:4
credentials 43:25 44:1
credit 29:16 62:10,22 65:8
credited 59:20 110:19
crew 21:19 22:22 77:11,18
crews 25:22 27:20 28:7
criteria 105:14
crop 8:11
cross 2:16 46:17 89:3
crossed 18:22
crowded 11:7
cultures 84:21
cup 82:11,11,12

**D**

D 2:3,12 5:1 83:21
daily 112:13
damage 113:24
data 84:21
date 28:22 34:2,8 40:14,18
50:22 56:15 80:1 85:5
104:23
dated 4:12,13 50:19 136:8
137:18
dates 5:25 34:16
dates/hours 3:15
day 6:3,3 22:8 34:2 73:24,25
74:1,2 76:11,11,13,15
78:19 85:13 104:12 105:8
112:6 136:8 137:18
days 5:18,19,23 6:5 78:24
79:12 105:1,4,5,6,8,10
DD 136:13 137:22
deal 16:16
dealing 26:2
deals 72:17
December 1:15 136:8
137:18
decide 23:4 24:20 25:1
decision 134:11
deducted 88:3